1 | Rinat Klier-Erlich (State Bar No. 188933)
rerlich@zelmserlich.com
2 | Brian T. Smith (State Bar No. 234651)
bsmith@zelmserlich.com
3 | **ZELMS ERLICH & MACK**
20920 Warner Center Lane, Suite B
4 | Woodland Hills, California 91367
Telephone: (480) 608-2114
5 | Facsimile: (818) 999-9155

6 | Attorneys for Defendants CHARLES Z. STEIN, ESQ. a/k/a CHARLIE STEIN and
DAVIDOVICH STEIN LAW GROUP, LLP

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | RADICAL INVESTMENTS, LTD | Case No. 2:22-cv-02752-SVW-AFMx

12 | Plaintiff, | Hon. Stephen V. Wilson, Crtrm 10A

13 | v.

14 | GOOD VIBRATIONS | **COMPENDIUM OF EXHIBITS**
ENTERTAINMENT, LLC; ALEX LEE | **PART 1A TO REQUEST FOR**
15 | MOORE, JR. a/k/a ALEX MOORE | **JUDICIAL NOTICE IN SUPPORT**
a/k/a FLEX MOORE; PRESTIGE | **OF NOTICE OF MOTION AND**
16 | PEGASUS, LLC; MONILADAE | **MOTION FOR JUDGMENT ON**
COLEY a/k/a MONILADAID COLEY; | **THE PLEADINGS**
17 | CHARLES Z. STEIN, ESQ. a/k/a
CHARLIE STEIN; and DAVIDOVICH | **Filed Concurrently with**
18 | STEIN LAW GROUP, LLP, | **Notice of Motion and Motion for**
**Judgment on the Pleadings, Request**
19 | Defendants. | **for Judicial Notice, Compendium of**
**Exhibits Part 2 and [Proposed] Order**
20
| **DATE:      July 11, 2022**
21 | **TIME:      1:30 p.m.**
**CRTRM:  10A**
22
23 | *Pretrial Conference: July 25, 2022*
*Jury Trial:         August 9, 2022*
24

25

26 | / / /

27 | / / /

28

# EXHIBIT "A"

COMPENDIUM OF EXHIBITS PART 1A

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| Radical Investments Ltd., a St. Lucia Company | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | )   Civil Action No.  9:21cv81761 |
| Good Vibrations Entertainment LLC, a Florida Corporation, et. al. | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   DAVIDOVICH STEIN LAW GROUP
c/o CHARLES Z. STEIN
6442 Coldwater Canyon Avenue Suite 209
North Hollywood, California 91606

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Gerardo A. Vazquez, Esq.; Ralph R. Longo IV, Esq.
Vazquez & Associates
1111 Brickell Avenue, Suite 1550
Miami, FL 33131

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**SUMMONS**

Date: _____09/17/2021_____

s/ Patrick Edwards

Deputy Clerk
U.S. District Courts

Angela E. Noble
Clerk of Court

Case 9:21-cv-81761-AMC   Document 1-1   Entered on FLSD Docket 09/17/2021   Page 1 of 1

JS 44  (Rev. 10/20)  FLSD Revised 02/12/2021

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

Radical Investments Ltd, a St. Lucia Company

**DEFENDANTS** GOOD VIBRATIONS ENTERTAINMENT LLC, a Florida Corporation; MOORE, ALEX; PRESTIGE PEGASUS LLC, a Colorado Corporation; COLEY, MONILADAE; STEIN, CHARLES DAVIDOVICH STEIN LAW GROUP, LLLP; and; RDS CARGO GROUP DWC LLC, a UNITED ARAB EMIRATES CORPORATION

**(b)** County of Residence of First Listed Plaintiff

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Gerardo A. Vazquez, Esq, Ralph R. Longo IV, Esq.; Vazquez & Associates, 1111 Brickell Ave. Suite 1550, Miami, FL 33131

Attorneys *(If Known)*

**(d)** Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☒ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product   Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &   Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander   Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'   Product Liability | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability   ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| Student Loans | ☐ 340 Marine   Injury Product Liability | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit |
| (Excl. Veterans) | ☐ 345 Marine Product | **LABOR** | **SOCIAL SECURITY** | (15 USC 1681 or 1692) |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act (TCPA) |
| of Veteran's Benefits | ☐ 350 Motor Vehicle   **PERSONAL PROPERTY** | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 370 Other Fraud | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | Product Liability   ☐ 371 Truth in Lending | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal   ☒ 380 Other Personal | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | Injury   Property Damage | Leave Act | | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury -   ☐ 385 Property Damage | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| | Med. Malpractice   Product Liability | ☐ 791 Empl. Ret. Inc. | | Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/   Sentence | | | |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment   ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities -   ☐ 550 Civil Rights | ☐ 465 Other Immigration | | |
| | Other   ☐ 555 Prison Condition | Actions | | |
| | ☐ 448 Education   ☐ 560 Civil Detainee – | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed (See VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation – Direct File  ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

*(See instructions)*: a) Re-filed Case ☐ YES ☒ NO    b) Related Cases ☐ YES ☒ NO

JUDGE:                                      DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
Fla. Stat. § 501.201 -.213; Deceptive Unfair Trade Practices, Fraud, Conspiracy

LENGTH OF TRIAL via 5 days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 6,685    CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**

DATE  9/17/2021    SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY: RECEIPT #          AMOUNT          IFP          JUDGE          MAG JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**West Palm Beach Division**

**Case No.:21-81761-CIV-CANNON**

RADICAL INVESTMENTS LTD.,　　　)
a St. Lucia Company,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
GOOD VIBRATIONS ENTERTAINMENT )
LLC, et al.　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　)
_____/.

**INDEX OF EXHIBITS TO AMENDED COMPLAINT**

**Exhibit 1:** Authorization from Government of Barbados to RIL for vaccines.

**Exhibit 2:** Purchase and Sale Agreement

**Exhibit 3:** AstraZeneca Invoice

**Exhibit 4:** Correspondences from Def. Moore Attorneys

**Exhibit 5:** Escrow and Paymaster Agreement

**Exhibit 6:** Correspondence Detailing Wires and Amounts of $ Sent

**Exhibit 7:** WhatsApp Messages Between RIL's Counsel, Stein & Moore

**Exhibit 8:** Judgment against Defendant Coley

**Exhibit 9:** Notice of Intention to Terminate

**Exhibit 10:** Correspondence from Defendant Stein

**Exhibit 11:** Correspondence from RIL to Stein

**Exhibit 12:** Correspondence from Defendant Stein (2)

**Exhibit 13:** Correspondence from Serum Pharma

**Exhibit 14:** Correspondence from RIL on deal with Serum Pharma/Moore

**Exhibit 15:** Moore Acceptance (through Counsel) of Deal with Serum Pharma/RIL

**Exhibit 16:** Correspondence from Moore to PM of Barbados

**Exhibit 17:** Proposed PSA between Moore, Pegasus, Government of Barbados

**Exhibit 18:** Correspondence from Serum Pharma

**Exhibit 19:** Correspondence from British High Commission

**Exhibit 20:** Correspondence to Stein Seeking Return of Funds

**Exhibit 21:** Stein's Release

**Exhibit 22:** Defendant Coley Instagram Photos

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served via E-filing on September 29, 2021 on all counsel or parties of record on the Service List below.

*/s/ Ralph R. Longo IV*

Dated: September 29, 2021

Respectfully submitted,

VAZQUEZ & ASSOCIATES
*Attorney for Plaintiff*
1111 Brickell Avenue Suite 1550
Miami, Florida 33131
Telephone (305) 371-8064
Facsimile (305) 371-4967

By:      */s/ Ralph R. Longo IV*
RALPH R. LONGO IV, ESQ.
Florida Bar No.: 124169
RL@GVazquez.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division

### Case No.:21-81761-CIV-CANNON

| | |
|---|---|
| RADICAL INVESTMENTS LTD., <br> a St. Lucia Company, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) <br> ) |
| v. | ) <br> ) <br> ) |
| GOOD VIBRATIONS ENTERTAINMENT <br> LLC, a Florida limited liability company, | ) <br> ) <br> ) |
| ALEX LEE MOORE, JR., a/k/a ALEX <br> MOORE, a/k/a FLEX MOORE, | ) <br> ) <br> ) |
| PRESTIGE PEGASUS LLC, <br> a Colorado limited liability company, | ) <br> ) <br> ) |
| MONILADAE COLEY, a/k/a <br> MONILADAI D. COLEY, | ) <br> ) <br> ) |
| CHARLES Z. STEIN, ESQ., a/k/a <br> CHARLIE STEIN, | ) <br> ) <br> ) |
| DAVIDOVICH STEIN LAW GROUP, <br> LLP, a California limited liability <br> Partnership, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) <br> ) |
| _____ | / |

## PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO 28 U.S.C. DIVERSITY OF CITIZENSHIP WITH JURY DEMAND

Plaintiff, Radical Investments Ltd. ("RIL") sues Defendants, GOOD VIBRATIONS

ENTERTAINMENT, LLC, a Florida limited liability company ("Good Vibrations"), ALEX LEE

MOORE, JR., a/k/a ALEX MOORE, a/k/a FLEX MOORE ("Moore"), PRESTIGE PEGASUS

LLC, a Colorado limited liability company, ("Prestige)", MONILADAE COLEY a/k/a MONILADAI D. COLEY ("Coley"), CHARLES Z STEIN, ESQ. a/k/a CHARLIE STEIN ("Stein"), and DAVIDOVICH STEIN LAW GROUP, LLP, a California limited liability partnership ("DS Law Group"), and states as follows:

## THE PARTIES

1.      Plaintiff RIL is a company formed under the laws of St. Lucia, with its principal place of business in Barbados. It is deemed a citizen of Barbados for purposes of 28 U.S.C. § 1332(c).

2.      Defendant Good Vibrations is a Florida limited liability company organized under the laws of the State of Florida. As a limited liability company, Good Vibrations' citizenship is determined by that of its members. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). Good Vibrations has one member, Moore, who is a citizen of the State of Florida for diversity purposes. Accordingly, Good Vibrations is a citizen of the State of Florida for diversity purposes. Good Vibrations' principal address is located at 21218 St. Andrews Blvd., Suite 318, Boca Raton, FL 33433, within the Southern District of Florida. At all times material to this Complaint, Good Vibrations has, acting alone or in concert with others, transacted business in this district and throughout the United States.

3.      Defendant Moore is an individual and a citizen of the State of Florida. and/or operates a business in the state of Florida. Defendant Moore resided in Palm Beach County, Florida at all times material to this Complaint. At all times material to this Complaint, Moore has, acting alone or in concert with others, transacted business in this district and throughout the United States. Defendant Moore is Good Vibrations' sole member, and also lists himself as Good Vibration's CEO and COO.

4.      This Court has personal jurisdiction over Defendant Moore by virtue of, among other bases, transacting of business in the State of Florida, and his engagement of tortious acts within the State of Florida, and his overall contacts with the State of Florida; all commensurate with the United States and Florida Constitutions, so as to submit himself to the jurisdiction and process of this Court.

5.      Defendant Prestige is a Colorado limited liability company formed under the laws of the State of Colorado. As a limited liability company, Prestige's citizenship is determined by that of its members. See *Rolling Greens, supra.* Prestige has one member, Coley, who is a citizen of Colorado for diversity purposes. Accordingly, Prestige is a citizen of Colorado for diversity purposes. At all times material to this Complaint, Prestige has, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

6.      Defendant Coley is a citizen of the State of Colorado. At all times material to this Complaint, Coley has, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

7.      Defendant Stein is a citizen of the State of California. At all times material to this complaint, Stein, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

8.      Defendant DS Law Group is a limited liability partnership formed under the laws of the State of California, with its principal place of business located in California. As a limited liability partnership, DS Law Group's citizenship is determined by that of its members/partners. DS Law Group has two members/partners, namely Niv V. Davidovich and Charles Z. Stein. Niv V. Davidovich is a citizen of California for diversity purposes. Charles Z. Stein is a citizen of California for diversity purposes. Accordingly, DS Law Group is a citizen of California for

diversity purposes. At all times material to this Complaint, DS Law Group has, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship amongst the parties.

10.     The amount in controversy, without interest and costs, exceeds $75,000.00.

11.     Venue lies in the Southern District of Florida Pursuant to 28 U.S.C. §1391(b), specifically in the West Palm Beach division, because a substantial part of the events or omissions giving rise to the claims occurred in this district and this a judicial district in which Defendants are subject to personal jurisdiction.

12.     This Court has personal jurisdiction over the Defendants pursuant to and consistent with the Constitutional requirements of Due Process, in that Defendants, acting through their agents or apparent agents, committed one or more of the following in the State of Florida:

        a.      The transacting of any business with this state;

        b.      The making of any contract within this state; and

        c.      The commission of a tortious act within this state.

13.     In particular, Defendants are all members of a conspiracy, and as members of the conspiracy acted as each other's agents with respect to the acts in furtherance of the conspiracy, and hence committed a tortious act within the State of Florida, pursuant to within the meaning of Fla. Stat. § 48.193(1)(a)(2).

14.     Defendant Good Vibrations is subject to the jurisdiction of this Court by virtue of, among other bases, having operated, conducted, engaged in, or transacting of business in the State of Florida, and having committed tortious acts within the State of Florida.

15.     Defendant Moore is subject to the jurisdiction of this Court by virtue of, among other bases, having operated, conducted, engaged in, or transacting of business in the State of Florida, and having committed tortious acts within the State of Florida, and his overall contacts with the State of Florida; all commensurate with the United States and Florida Constitutions, so as to submit himself to the jurisdiction and process of this Court.

16.     Defendant Prestige is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of Florida.

17.     Defendant Coley is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of Florida.

18.     Defendant Stein is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of Florida.

19.     Defendant DS Law Group is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of Florida.

20.     Requiring Defendants to litigate these claims in Florida does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

21.     At all times relevant hereto, Defendants expected or should have expected that its acts would have consequences within the United States of America, and the State of Florida in particular.

22.     RIL has retained the law firm of Vazquez & Associates in connection with the filing of this action and has agreed to pay counsel a reasonable fee for their services.

23.     All conditions precedent for bringing this action have been fully performed, waived or excused.

## INTRODUCTION

24.     The coronavirus pandemic continues to have a devastating impact on individuals, businesses, and society as a whole. As a result, individuals are unable to work, businesses have been forced to close, and the death count continues to rise. This has created an immediate and drastic need for medical supplies and goods, especially personal protective equipment ("PPE") and vaccines. The Pan American Health Organization reported that more than one million people in Latin America and the Caribbean have died from Covid-19; yet only about 5% of the population has been vaccinated. In June and July 2021, Antigua and Barbuda, Saint Lucia, Saint Vincent and the Grenadines, Saint Kitts and Nevis, Virgin Islands-UK, Anguilla, Grenada, Dominica, and Montserrat have shown a steady increase and surge of Covid-19. Covid-19 infections are increasing in Barbados, with 86 new infections reported on average each day.

25.     INTERPOL has issued a global alert of organized groups attempting to defraud governments with fake offers to sell COVID-19 vaccines. The warning follows some 60 cases in 40 countries around the world where health ministries, governments, and hospitals have received offers for COVID-19 vaccines approved for distribution in their country.

26.     Needless to say, Plaintiff RIL was deceptively lured into an elaborate scam to advance the sum of 12.2 million U.S. dollars for one million nonexistent doses of AstraZeneca vaccine.

## FACTUAL ALLEGATIONS

27.     In or around late March or early April, 2021, Mr. Mark Maloney, ("Mark") the principal of Plaintiff RIL, was introduced to Moore via Cheryl Chamley, a who resides in the Coral Springs, Florida and works in the PPE Sector in South Florida. Because of her experience in the PPE Sector, Ms. Chamley assisted RIL to facilitate the transaction terms between RIL and Good Vibrations. During the course of providing RIL with her expertise and assistance, Ms. Chamley from her offices in Florida, on behalf of RIL participated in numerous telephone conversations and other communications with Moore and Good Vibrations concerning negotiations and terms related to the subject transaction.

28.     Moore, upon information and belief, resided at that time in or around the Boca Raton, Florida area, where he continued to reside at all times material to this Complaint, in a home owned or rented by Good Vibrations, of which Moore is the CEO/COO.

29.     Ms. Chamley represented to Mark that Moore had the ability to secure COVID-19 vaccines manufactured by AstraZeneca which Moore would be able to source and deliver to RIL for the purpose of vaccinating the nearly 300,000 citizens of the island of Barbados.

30.     RIL was authorized by the Barbadian Government's Ministry of Health and Wellness to procure vaccines on its behalf. *See* documents attached as Exhibit 1.

31.     At that point, Moore provided to Mark a sale and purchase agreement and escrow and paymaster agreement naming Stein as the paymaster.[1]  Thereafter Moore introduced Stein to Mark and Olivia Watson ("Watson"), counsel to RIL and advised Watson to direct any questions or requests for due diligence to Stein. Stein is an attorney at Davidovich Stein Law Group in North

---

[1] A Paymaster or Escrow Agent typically acts as a neutral third party, in any transaction between two individuals, entities or businesses, whereby the Paymaster receives funds from a buyer into an escrow account, maintains the account, then disburses those funds to the seller or a third party, as per the instructions spelled out in a sales and purchase agreement or services agreement.

Hollywood, California. The purchase and sale agreement was executed on April 16, 2021. *See* PSA attached as Exhibit 2.

32.    The terms of the purchase and sale agreement are outlined below.

33.    The purchase price for the vaccines was to be $10.2 million.[2]

34.    A commission of $2 million would be payable to Good Vibrations upon delivery of the vaccines to RIL in Barbados.

35.    Upon signing of the purchase and sale agreement, RIL was to deposit the $12.2 million into an escrow account/IOLTA account. Moore was to provide an invoice from AstraZeneca for the one million doses of AstraZeneca vaccines, together with the information for the AstraZeneca account into which the purchase price of $10.2 million was to be paid.

36.    Upon receipt of the details for AstraZeneca account, RIL would authorize the release of the $10.2 million to AstraZeneca (or to a qualified intermediary).

37.    Within 24 hours of the release of funds to AstraZeneca, RIL was to receive the dossier for the vaccines from AstraZeneca, and the vaccines were to be delivered within 7 days of the release of funds.

38.    As stated, only upon the actual, physical delivery of the vaccines was the commission of $2 million to be paid to Good Vibrations.

39.    Almost immediately after the execution of the purchase and sale agreement, RIL unsuccessfully sought to obtain the invoice from AstraZeneca from Moore.

40.    The invoice from AstraZeneca was a necessary condition to release the escrowed funds. Moore supplied documents purporting to be the invoice RIL was seeking. Despite RIL's

---

[2] All reference to "$" shall refer to United States dollars.

8

insistence, these documents did not contain account information for AstraZeneca. *See* attached as Exhibit 3.

41.     Moore justified the lack of account information by stating to RIL that he was working with various intermediaries and because of certain confidentiality provisions, he could not supply the account details for AstraZeneca. Moore ultimately produced two letters which purported to confirm that Moore and Good Vibrations had the capacity to enter into the transaction for the sale of AstraZeneca Vaccines. *See* attached as Exhibit 4. One of the letters was from DS Law Group and executed by Stein, stating that based on evidence presented to him, which included contracts for the right to sell AstraZeneca, irrevocable purchase orders, and letters of attestation, that Good Vibrations had been involved in the medical supply and distribution business and had negotiated contracts to sell AstraZeneca products. *Id.*

42.     On or about April 27, 2021, RIL, satisfied by the letters from Moore's counsel, signed a release for the purchase price in the amount of $10.2 million, in the form of Exhibit A of the Escrow and Paymaster Agreement. *See* attached as Exhibit 5. RIL release the funds on the basis of the assurances it received from Stein, in his capacity as an attorney member of the California Bar. *See* Correspondence from Stein previously referenced attached as Exhibit 4.

43.     Stein, as Paymaster, was only authorized to pay the sum of $10.2 million to Defendant Prestige Pegasus LLC, a "necessary" intermediary to facilitate the transaction at the account noted on the signed Exhibit A of the Escrow and Paymaster Agreement. Upon information and belief, Stein, solely and completely in his own discretion, ultimately made the following payments via wire transfer listed below out of the IOLTA account:

44.     April 27, 2021: $2 million to Prestige.

45.     April 27, 2021: $2.2 million to Good Vibrations.

46. May 3, 2021: $2 million to Good Vibrations.

47. May 3, 2021: $485,000 to RDS, a foreign freight company based out of the United Arab Emirates, charged with handling the delivery of the vaccines. *See* correspondence detailing wire confirmation attached as Exhibit 6.

48. In total, Stein paid out $2 million to Prestige, $4.2 million dollars to Good Vibrations and Moore, in direct contradiction to the paymaster agreement, and $485,000.00 to RDS for a total of $6,685,000.00.

49. On April 27, 2021, counsel for RIL corresponded with Stein via WhatsApp regarding the wire transfers listed above. Counsel for RIL requested via WhatsApp that Stein provide a copy of the wire transfer confirmation of $10.2 million to Prestige. At 6:11pm, Stein responded that there was no wire confirmation, because he had processed the transfer through an online portal and did not print the confirmation page. He also stated that he was automatically logged out of the account after the wire transfer was completed. *See* WhatsApp text messages attached as Exhibit 7.

50. At 6:45pm, counsel for RIL, befuddled that there could be no evidence of an eight-figure wire confirmation, pressed Stein, telling him RIL needed to see some sort of confirmation that the funds were in fact sent to Prestige to procure the vaccines, as was required by the Paymaster Agreement. *Id.*

51. At 6:57 pm, Stein responded and took a highly defensive posture, asking counsel for RIL where in the paymaster/escrow agreement it stated that he had an obligation to provide proof of the wire transfers. He also stated, quite curiously, that he just noticed that the escrow agreement had an exhibit with the account information (for Prestige) but that this had no bearing on his obligations in the Agreement. *Id.*

10

52.     At 7:00 pm, counsel for RIL pressed Stein for a third time, stating the obvious, that he as paymaster should absolutely expect that RIL could request confirmation of the wire to ensure Stein had properly performed his obligations, meaning that he sent the funds where they were supposed to be sent under the explicit terms of the paymaster agreement. *Id.*

53.     At 7:10 pm, Stein once again went on the defensive, stating that there were issues with the paymaster agreement and that it had been improperly changed. He also stated that Moore provided the information to him as to where the payment needed to be sent per Moore's contact at Prestige, and that Stein issued the necessary wires to obtain the vaccines. Further, Stein advised RIL that he was withholding certain funds for shipment. *Id.*

54.     At 8:18 pm, counsel for RIL, flatly stated the objective fact that no changes had been made to the paymaster agreement. RIL expressed that Stein was provided with the proper account information, and RIL had only agreed for Stein to send the funds to Prestige in order to procure the vaccines, and if a further wire was required for shipment of the vaccines, that RIL would have to provide authorization. Counsel for RIL concluded its text by stating, very plainly, "All we are asking for is confirmation that the funds were paid out as instructed by us", a seemingly reasonable request for a party to make regarding the end destination of wire transfers related to a $12.2 million deposit. *Id.*

55.     At 8:20 pm, Stein responded that RIL's request for wire confirmation exceeded the scope of his role as paymaster, and to address any other requests to Moore. *Id.*

56.     Moore, who was also a party to this WhatsApp chat, responded thereafter that the funds had been sent to Prestige and that they were on track and on schedule, and he was speaking to AstraZeneca. *Id.*

11

57.     The plain terms of the paymaster agreement charged Stein with distributing $10.2 million to Prestige, to procure vaccines for the health and betterment of the entire nation of Barbados. Moore and Stein failed to mention during that WhatsApp chat that less than 20% of the $10.2 million had been sent to Prestige, nor did they mention that ultimately $4.2 million would be sent to Good Vibrations, in express violation of the paymaster agreement.

58.     After these wire transfers took place, Moore introduced Mark to a Moniladai Coley of Prestige, who he represented as an intermediary with the capacity to procure and deliver the vaccines. Upon information and belief, Coley is the principal of Prestige, and was thought to act as the liaison with respect to obtaining the vaccines for RIL from AstraZeneca.

59.     Unbeknownst to RIL, Moniladai Coley was the subject of a lawsuit in the State of New York, in which a corporation DIAMOND HOOK MEDIA, LLC ("Diamond Hook") obtained a judgment against Coley and Prestige Brands, Inc. in November of 2020 for $335,083.75. The crux of that matter was that Coley and Prestige had held themselves out as a New York corporation doing business in the PPE sector. It was alleged that Coley falsely claimed she was licensed to do business in the state of New York, and that Prestige Brands, Inc. was in fact a Nevada corporation, falsely claiming to be authorized to transact business in the state of New York.

60.     The Complaint further alleged that Coley and Prestige held themselves out to be able to procure 1,000,000 FDA 3 ply face masks, for the price of $670,000.00, and that she could deliver them within 48 hours of payment of 50% of the purchase price, $335,000.00. Diamond Hook tendered the 50% payment to Coley and Prestige. Apparently, Coley disappeared, and Diamond Hook never received any of the masks, nor did they receive a refund for their 50% deposit. A judgment for the deposited amount was rendered by the Court in New York against Prestige and Coley therewith. *See* Judgment attached as Exhibit 8.

61.    In late May, no progress with respect to the procurement of the vaccines had been made. RIL became concerned as to the status of the transaction and the capacity of the parties to perform and deliver the vaccines. On May 28, 2021, RIL issued a notice of its intention to terminate the agreement by signing Exhibit C of the Paymaster Agreement. *See* Exhibit 9. RIL demanded via this correspondence directed to Stein that it would require veracity of the vaccines it sought to be delivered to be confirmed, or, in the alternative, a return of its $12.2 million dollars it had put into escrow, which, unbeknownst to RIL, had already been largely misappropriated.

62.    Stein responded to this letter by sending RIL a long, convoluted e-mail stating that he was required to release funds pursuant to the irrevocable pay order previously signed, and that at this point, the only amount of money he could return would be the $2 million which was to be paid as commission to Good Vibrations upon receipt of the vaccines. Stein also represented that he spoke to Defendant Coley who, according to Stein, rather incredulously stated that RIL was in fact the party responsible for causing a delay in the delivery of the vaccines, and that RIL itself could be subject to a 1% penalty. Stein also referred to the inability of AstraZeneca to sell directly to anyone other than governments, which would necessitate the involvement of Prestige, a licensed distributor. *See* Exhibit 10.

63.    It should be noted that Stein did not refer to making the transfers listed in paragraphs 44-47 of this Complaint. Stein merely noted that the $10.2 million had been distributed per the terms of the Purchase and Sale Agreement which stated that upon receipt of the AstraZeneca invoice (which again, had not actually been received and was fraudulent) the buyer shall execute an irrevocable pay order in accordance with the escrow agreement and upon receipt of same the paymaster shall release the sum of $10.2 million being the full purchase price for the products, to the AstraZeneca account, or to Prestige as an intermediary. *Id.*

64.     However, as previously stated, the $10.2 million was actually sent to the parties listed above in paragraphs 44-47.

65.     RIL responded to Stein's correspondence by making a simple, but critical statement that sums up Stein's culpability: RIL told Stein that under the purchase agreement, Stein, as the paymaster, was only authorized to do two things with RIL's deposit in order to procure the vaccines: pay AstraZeneca $10.2 million or pay Prestige $10.2 million dollars. Full stop. Stein did neither. *See* Exhibit 11.

66.     RIL reiterated in this correspondence that nothing had been done on the part of Defendants to verify these transactions related to procuring the vaccines were actually going to take place, that the obligations of the seller were not being fulfilled, and that RIL was seeking to either have the veracity of the delivery of the vaccines confirmed, or it wanted its deposit returned. *Id.*

67.     On May 30, 2021, Stein responded to RIL, writing a rambling, scattered letter in which he took a highly defensive posture and denied any breach of his fiduciary duties, despite the irrefutable fact that the payments had been allocated by Stein in a manner not in accordance with the provisions of the paymaster agreement. *See* Exhibit 12.

68.     Shortly thereafter, Moore represented to Mark that he had a contract through Prestige with a company called Serum Pharma Ltd. which would enable them to finally procure the vaccines. Serum Pharma provided the prime minister of Barbados confirmation via letter that AstraZeneca had been overwhelmed by orders, but that they would make the Barbados vaccines that RIL had long sought as their top priority. *See* Exhibit 13.

69.     However, despite voluminous and repeated calls with the Ministry of Health in Barbados, between Moore, Coley and Serum Pharma, it became clear that neither Moore, nor Good

14

Vibrations, Coley or Prestige had the legal capacity to enter into a contract to supply AstraZeneca vaccines, despite their insistence for months that they in fact would be able to deliver them. RIL ultimately spoke directly with Serum Pharma, who said that they would be happy to contract directly with RIL.

70.     On June 25, 2021, RIL proposed the following: It would terminate its relationship with Moore and Good Vibrations and would contract directly with Serum Pharma to deliver the vaccines and pay Moore a commission upon delivery of the vaccines. On June 25, 2021, RIL sent a notice of termination to Moore's attorney, Jonathan Sutton, in which it outlined its reasons for termination of the agreement and reiterated that Stein had distributed nearly $6.7 million dollars that had not been authorized by RIL, which constituted a breach of the purchaser and paymaster agreements. RIL offered a compromise where it would contract with Serum and pay Moore a commission. *See* Exhibit 14.

71.     This proposal was accepted by Moore via his attorney on June 27, 2021. *See* Exhibit 15.

72.     Moore's attorney forwarded to RIL a copy of a draft purchase and sale agreement to purchase vaccines through Serum Pharma, which, with Serum's commission, would be in the amount of $14.3 million.

73.     Despite termination of the initial agreement between RIL and Good Vibrations, and the subsequent agreement with Serum Pharma, Moore took it upon himself to write directly to the Prime Minister of Barbados on July 2, 2021. *See* Exhibit 16.

74.     Moore attached a purchase and sale agreement which was to be between Prestige and the government of Barbados in the amount of $23 million. *See* Exhibit 17. Moore requested that the Barbados Government sign and return the purchase agreement immediately, and further

stated in this correspondence that if the Government of Barbados signed this new agreement, it would be the fastest option for delivery of the vaccines. Moore understood that Barbados, with its weak position in the international community, was in dire need of vaccines and had significant difficult obtaining them, as Barbados is a small island nation. Moore's actions cannot be seen as anything more than greed and an attempt to take advantage of Barbados' position. In this agreement, reference was made to products purportedly to be supplied by Serum Pharma. As described below, Serum Pharma unequivocally denied and disavowed all knowledge of this agreement.

75.    RIL forwarded the correspondence between Moore and the Prime Minister to Serum Pharma, who responded on July 3, 2021, stating that they had zero affiliation with Moore, or the purchase and sale agreement Moore had sent to Barbados' Prime Minister. Further, Serum Pharma stated that they never received or filled out any sort of agreement or opened any escrow pertaining to this order, and that any order from Moore's group would not be acknowledged by Serum Pharma. Serum went to the lengths to say that the document Moore sent to the Prime Minister was copied and edited and was being used for nefarious purposes. *See* Exhibit 18.

76.    RIL, beginning to sense that Moore was involved in some sort of fraudulent activity, continued its discussions with Serum Pharma, but was unable to strike a deal for vaccines. Ultimately, RIL sent correspondence to the British High Commission, inquiring as to whether or not AstraZeneca had actually allocated 1,000,000 doses of vaccines to Barbados, and whether or not Serum Pharma was legitimate. The British High Commission responded, stating that they had reached out to Astra Zeneca and Astra Zeneca had confirmed that it had no relationship with Serum Pharma, and that RIL should assume that it was not a legitimate opportunity. *See* Exhibit 19.

77.     After this final setback, RIL made the decision to cease its quest to obtain vaccines and sought a return of the funds from Stein. RIL and Moore sent Stein a signed amendment to the paymaster agreement, which sought a return of $5.475 million still in the IOLTA account to RIL, along with a request for information relating to all of the payments made out of the IOLTA account, in exchange for a release for Stein. *See* Exhibit 20.

78.     Per the terms of the release, Stein is obligated to aid as will be required to diligently pursue all recipients of funds from the IOLTA account. *See* Exhibit 21.

79.     Further, there were a significant number of conditions precedent contained within the release that Stein did not or has not complied with. Per the terms of the release, the conditions precedent which Stein either has not conformed with or conformed in violation of the release's terms are:

    a.  Stein shall wire the balance of the funds in the IOLTA Account relating to the Transaction, being $5,474,830 to RIL within one business day of mutual execution of this Release;

    b.  Stein shall use his best endeavors to pursue the IOLTA recipients and all persons to whom funds were disbursed to out of the IOLTA Account in order to procure the return of all sums previously paid out in connection with the transaction;

    c.  Stein shall provide to RIL such assistance as may be requested by Radical to allow Radical to pursue the IOLTA recipients and all parties to whom sums were paid by Stein out of the IOLTA account in connection with the transaction;

    d.  Stein shall provide such correspondence, documentation or other communication related to requests for the disbursements out of the IOLTA

Account or otherwise related to the Transaction together with evidence of all payments made, as Radical may request; and,

e.  Stein shall forwith pay to RIL any sums which are returned to Stein/the IOLTA Account in respect of any repayment of sums previously disbursed by Stein out of the IOLTA Account to the IOLTA recipients or otherwise in respect of the Transaction. *Id.*

80.    Stein was supposed to transmit the remainder of the funds held in trust back to RIL within a day of full execution of the release, which occurred on July 12, 2021. Stein did not do so, returning the funds over two weeks later on July 28, 2021, in express violation of the "Settlement Terms" of the Release. Further, Stein has done absolutely nothing in his power to assist RIL with pursuing his co-Defendants, nor has he been forthcoming with providing correspondence and communications he had with his co-Defendants related to the disbursement of monies as described herein. Simply put, Stein has done nothing whatsoever to aid RIL in the recovery of the monies that Stein so grossly misappropriated.

81.    The aforementioned release in favor of Stein states that the release shall be interpreted and enforced under the laws of the State of California. California has very stringent laws designed to protect the public and businesses from unfair, deceptive, or fraudulent business practices. California Civil Code § 1668, reads: All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law. *See* Cal. Civ. Code. § 1668. Stein's release is exactly what this statute contemplates; *to wit,* a party attempting to contract his way out of his own fraud and violations of law. Stein's attempt to obtain a release for his actions is improper under California law. This is coupled with

the objective fact that Stein did not comply with the explicit terms of the release, violating its provisions and thereby rendering the release invalid.

82.     As of the date of the filing of this Complaint, RIL has been returned approximately $5.4 million of its initial deposit, leaving approximately $6.7 million in arrears. RIL has been unable to obtain the funds transferred out of the IOLTA account by Stein. To be more specific, RIL has not been returned funds distributed to Defendants Moore, Good Vibrations, and Prestige/Coley. In addition, RIL has not been returned funds in the amount of $485,000.00 which were disbursed to RDS, a foreign shipping company.

83.     With respect to RDS, Plaintiff was never advised of Defendants intended use of RDS to deliver the vaccines to Barbados via air freight. Curiously, Defendants appeared to have hired a corporation based out of Dubai organized under the laws of Poland, at a rate of nearly $500,000.00, far above the market rate to transport a relatively small cargo from Europe to Barbados. Plaintiff at no time approved, or even had knowledge, of RDS' involvement, until after Defendant Stein had disbursed to RDS nearly half a million dollars.

84.     Further, upon information and belief, Defendant Coley appears to have purchased, since the wire transfers took place, a Rolls Royce SUV, numerous diamond encrusted Rolex watches, various pieces of diamond encrusted jewelry, and various designer handbags and shoes, as evidenced by her Instagram account, which is available for public viewing. *See* screenshots of Coley's Instagram account attached as Exhibit 22. None of these expensive, luxury items appear on Coley's Instagram page prior to June of 2021. Even further still, Defendant Moore represented to counsel for RIL, Olivia Watson, that he had taken large portions of the funds he received from Stein and given them to his family.  As such, RIL was forced to file this lawsuit in order to seek redress and protect its rights.

## COUNT I – PIERCING THE CORPORATE VEIL OF DEFENDANT GOOD VIBRATIONS

85.     Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

86.     To pierce the corporate veil in Florida, "a Plaintiff is required to prove that both the Corporation is a mere instrumentality or alter ego of the Defendant, and that the Defendant engaged in improper conduct. *Priskie v. Missry,* 958 So.2d 613, 614-15 (Fla. 4th DCA 2007) (citation and internal quotation marks omitted). "It matters not that the improper conduct occurred after the formation of the corporation." *Bellairs v. Mohrmann,* 716 So.2d 323 (Fla. 2nd DCA 1998)

87.     In Florida, the corporate veil will be pierced only in exceptional circumstances, such as for fraud or where the corporation is formed for some illegal purpose. "Improper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1320 (11th Cir. 1998) (citation and internal quotation marks omitted); *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (Fla. 3d DCA 2000) (noting that "unless there is a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose - as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced.").

88.     Under *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So. 2d 1114, 1118 (Fla. 1984), the Court held that the corporate veil could be pierced if the corporation was used for an "unjust purpose." *Dania Jai-Alai* requires only that the corporation be used improperly or in an unjust manner, which clearly occurred here.

89.     Defendant Moore held himself out to be Good Vibrations' CEO and COO, and unilaterally controlled the formation, day-to-day operations, assets, liabilities and ability to enter into contractual obligations on behalf of Good Vibrations.

90.     Further to Moore's own admission, communicated to RIL shortly after RIL demanded the return of the $4.2 million – that he could not return the $4.2 million because upon receipt of the $4.2 million he withdrew all the money from Good Vibrations business account and gave it all to his immediate family and friends.

91.     Defendant Moore used Good Vibrations as a shell, instrumentality or conduit for the sole purpose of receiving the $4.2 million, and immediately thereafter transferring and diverting the monies to "family and friends" to defraud RIL.

92.     Defendant Moore used Good Vibrations as a subterfuge for the fraudulent vaccine transaction with RIL, as more fully set forth herein.

93.     Good Vibrations was used by Defendant Moore to unlawfully defraud RIL.

94.      In actuality, Defendant Good Vibrations is the instrumentality and/or alter ego of Moore.

95.     With respect to this matter, the existence of Good Vibrations is a mere façade for Moore to conduct his illicit and fraudulent dealings.

96.     Moore has used Good Vibrations, as discussed in the factual allegations above, to misrepresent, defraud, and ultimately swindle Plaintiff out of nearly $6.7 million. Moore used Good Vibrations for a wrongful and/or inequitable purpose, namely the aforementioned fraud and inducement of Plaintiff to deposit $12.2 million into an escrow account. The only purpose of Good Vibrations with respect to this transaction was to perpetuate an illegal scheme and defraud Plaintiff in its hope to obtain life-saving vaccines for the nation of Barbados.

97.     Moore himself, via Good Vibrations, has been unjustly enriched to the tune of $4.2 million via his illicit and tortious conduct.

98.     Moore will attempt to use Good Vibrations to shield himself from liability for his wrongdoing. However, Good Vibrations is the instrumentality of Moore. Moore is a wrongdoer and has engaged in fraudulent and illegal behavior, he is not an innocent stakeholder.

99.     Moore has used Good Vibrations as a subterfuge in these illegal, illicit, and fraudulent transactions.

100.    Moore and Good Vibrations have reaped enormous financial gains from their fraudulent activities.

101.    Plaintiff has suffered damages caused by Moore's use of Good Vibrations as a vehicle to swindle and defraud Plaintiff via Moore's fraudulent and wrongful conduct. Moore has diverted Plaintiff's assets which were intended to be used to procure vaccines for the nearly 300,000 citizens of Barbados to Good Vibrations, which serves as his instrumentality and/or alter ego.

102.    Good Vibrations is dominated by Moore in such a way that Good Vibrations is the instrumentality and/or alter ego of Moore, and Good Vibrations has been used for a fraudulent and/or illegal purpose. As such, Good Vibrations should be disregarded as a distinct entity, and its alter ego, Moore, should be held liable. Moore should not be able to use Good Vibrations to escape liability for his fraudulent activities.

WHEREFORE, Plaintiff demands judgment against Moore and Good Vibrations, piercing the corporate veil of Good Vibrations, as set forth above, holding Moore liable on the obligations and liabilities of Good Vibrations, and for such other and further relief as deemed necessary and proper by this Court.

## COUNT II – PIERCING THE CORPORATE VEIL OF DEFENDANT PRESTIGE

103.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

104.    To pierce the corporate veil in Florida, "a Plaintiff is required to prove that both the Corporation is a mere instrumentality or alter ego of the Defendant, and that the Defendant engaged in improper conduct. *Priskie v. Missry,* 958 So.2d 613, 614-15 (Fla. 4th DCA 2007) (citation and internal quotation marks omitted). "It matters not that the improper conduct occurred after the formation of the corporation." *Bellairs v. Mohrmann,* 716 So.2d 323 (Fla. 2nd DCA 1998)

105.    In Florida, the corporate veil will be pierced only in exceptional circumstances, such as for fraud or where the corporation is formed for some illegal purpose. "Improper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1320 (11th Cir. 1998) (citation and internal quotation marks omitted); *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (Fla. 3d DCA 2000) (noting that "unless there is a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose - as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced.").

106.    Upon information and belief, Defendant Coley controlled the operation and management of Defendant Prestige.

107.    At all times material, Coley was and is the principal of Prestige.

108.    Upon information and belief, Prestige is not managed by directors or managers, but by Coley herself, directly.

109.     In actuality, Defendant Prestige is the instrumentality and/or alter ego of Coley.

110.     Prestige is operated exclusively in the interest of Coley.

111.     Coley used Prestige merely as a vehicle through which she exercised her will.

112.     With respect to this matter, the existence of Prestige is a mere façade for Coley to conduct her illicit and fraudulent dealings.

113.     Coley has used Prestige, as discussed in the factual allegations above, to misrepresent, defraud, and ultimately swindle Plaintiff out of nearly $6.7 million. Coley used Prestige for a wrongful and/or inequitable purpose, namely the aforementioned fraud and inducement of Plaintiff to deposit $12.2 million into an escrow account. The only purpose of Prestige with respect to this transaction was to perpetuate an illegal scheme and defraud Plaintiff in its hope to obtain life-saving vaccines for the nation of Barbados.

114.     Coley herself, via Prestige, has been unjustly enriched to the tune of $2 million via her illicit behavior.

115.     Coley will attempt to use Prestige to shield herself from liability for his wrongdoing. However, Prestige is the instrumentality of Coley. Coley is a wrongdoer and has engaged in fraudulent and illegal behavior, she is not an innocent stakeholder.

116.     Coley has used Prestige as a subterfuge in these illegal, illicit, and fraudulent transactions.

117.     Coley and Prestige have reaped enormous financial gains from their fraudulent activities.

118.     Plaintiff has suffered damages caused by Coley's use of Prestige as a vehicle to swindle and defraud Plaintiff via Coley's fraudulent and wrongful conduct. Coley has diverted

Plaintiff's assets which were intended to be used to procure vaccines for the nearly 300,000 citizens of Barbados to Prestige, which serves as his instrumentality and/or alter ego.

119.    Prestige is dominated by Coley in such a way that Prestige is the instrumentality and/or alter ego of Coley, and Prestige has been used for a fraudulent and/or illegal purpose. As such, Prestige should be disregarded as a distinct entity, and its alter ego, Coley, should be held liable. Coley should not be able to use Prestige to escape liability for her fraudulent activities.

WHEREFORE, Plaintiff demands judgment against Coley and Prestige, piercing the corporate veil of Prestige, as set forth above, holding Coley liable on the obligations and liabilities of Prestige, and for such other and further relief as deemed necessary and proper by this Court.

## COUNT III – CIVIL CONSPIRACY
### (As to All Defendants)

120.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

121.    Defendants conspired with one another, as well as other individuals and entities to perpetrate an unlawful act upon Plaintiff, or to perpetrate a lawful act by unlawful means, *to wit:* Defendants conspired with one another in order through fraudulent means to induce Plaintiff to deposit a large sum of funds into an escrow account in order to obtain life-saving vaccines for the nearly 300,000 citizens of Barbados, despite Defendants having no intention or ability to procure or deliver those vaccines. Defendants, at all times material, acted in concert to continue along with the charade that they could in fact source and deliver vaccines to Barbados, in order to induce Plaintiff to not seek a return of its funds, which unbeknownst to Plaintiff, had been grossly misappropriated.

122.    Defendants put their own pecuniary interests ahead of the welfare and economic safety of the victims of the conspiracy, namely Plaintiff, as well as putting their own pecuniary interests ahead of the welfare and health of the nearly 300,000 citizens of Barbados. By acting in concert at all times material to defraud, misrepresent, and falsely induce Plaintiff to continue with the transaction, so Defendants could continue to possess and spend their ill-gotten gains at the literal expense of Plaintiff.

123.    Defendants had actual and/or constructive knowledge of the ongoing fraud being perpetuated, as well as of the misappropriation of funds deposited by Plaintiff to obtain the vaccines.

124.    Defendants were aware that themselves and their agents played a vital role in the success/maintenance of their fraud.

125.    As a direct and proximate result of Defendants' participation in, and furtherance of the conspiracy, Plaintiff has suffered substantial economic damages. Further, the people of Barbados have been deprived of life-saving vaccines.

WHEREFORE, Plaintiff demands entry of a judgment against Defendants, for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT IV- VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), CHAPTER 501, PART II, FLORIDA STATUTES
### (As to Defendant Good Vibrations)

126.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

127.    Fla. Stat § 501.204(1) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The provisions of the Act shall

be "construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in… deceptive[] or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat § 501.202 (2014).

128.    Good Vibrations was, at all times material to the allegations herein, engaged in "trade or commerce' as defined by Fla. Stat. § 501.203 (2014).

129.    As described above, RIL repeatedly attempted to obtain delivery of vaccines with the assistance of Good Vibrations which were needed to better the health and well-being of the citizens of Barbados. Good Vibrations represented, expressly or by implication, through a variety of means, including through the internet via e-mail, through text message, and over the telephone, that they had they had the business connections and ability to procure 1 million doses of AstraZeneca vaccines. Through these fraudulent and deceptive means, Good Vibrations induced Plaintiff to pay $12.2 million dollars under the guise that Good Vibrations would be able to source and deliver the vaccines.

130.    Upon information and belief, Good Vibrations, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

131.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., declares to be unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.24(1). The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

132.     An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. See *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). A deceptive act or practice under FDUTPA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment. *See PNR, Inc. v. Beacon Prop. Mmgt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

133.     Good Vibrations has been engaged in trade and commerce in the State of Florida.

134.     Plaintiff is a consumer under FDUPTA. See Fla. Stat. § 501.203(7).

135.     Plaintiff has been injured by Good Vibrations unfair or deceptive practices in the course of Plaintiff's attempts to procure vaccines via Good Vibrations.

136.     Good Vibrations specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

137.     Good Vibrations' business practices are unfair, deceptive, and unconscionable and constitute both per se and traditional violations of FDUPTA.

138.     "A defendant *per se* violates FDUTPA in one of two ways: (1) if the law, statute, rule, regulation, or ordinance 'expressly constitutes a violation of FDUTPA' or (2) if the law, statute, rule, regulation, or ordinance 'proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate.'" *Cox v. Porsche Financial Services, Inc.*, 16-23409-CIV, 2020 WL 837167 (S.D. Fla. 2020); *see* Fla. Stat. § 501.203(c), Florida Statutes., or regulation that proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices constitute per se violations of FDUTPA. Fla. Stat. § 501.203(3)(c).

139.   Good Vibrations specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

140.   Good Vibrations' deceptive and unfair practices, as alleged herein, also constitute traditional violations of FDUPTA.

141.   Good Vibrations has deceived and misled Plaintiff to its detriment. Specifically, Good Vibrations misled Plaintiff into depositing $12.2 million through false and incomplete representations regarding Good Vibrations' ability to procure and deliver vaccines to the island of Barbados.

142.   Good Vibrations has also deceived and misled Plaintiff to its detriment by making misrepresentations and omissions in connection with the allocation of the funds deposited by Plaintiff into escrow to facilitate the transaction.

143.   Good Vibrations' deceptive and unfair business practices offend public policy and have harmed Plaintiff and the nearly 300,000 citizens of Barbados, by (i) unjustly pocketing a significant portion of Plaintiff's escrowed deposit for Good Vibrations own pecuniary gain, and (ii) depriving the people of Barbados of life-saving vaccines.

144.   Because of Good Vibrations' unfair and deceptive trade practices, Good Vibrations has caused substantial damages to Plaintiff.

145.   In addition, Good Vibrations has been unjustly enriched because of their deceptive acts and/or practices.

146.   By virtue of the foregoing, and consistent with the provisions of Fla. Stat. § 501.211, Plaintiff seeks: (a) damages suffered by Plaintiff for Good Vibrations' fraudulent scheme to induce Plaintiff to deposit funds to procure vaccines that Good Vibrations could not supply, plus attorney's fees, costs, and interest, (b) a declaratory judgment declaring that Good Vibrations' acts

and practices are unfair and deceptive in violation of FDUTPA, (c) an order enjoining Good Vibrations from continuing to engage in such unfair and deceptive acts and practices, including enjoining Good Vibrations from misallocating any funds received from Stein, as further discussed in Plaintiff's *ex parte* motion filed contemporaneously with this complaint, (d) any other relief the Court deems just and proper.

## COUNT V - VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), CHAPTER 501, PART II, FLORIDA STATUTES (As to Defendant Alex Lee Jr, a/k/a Alex Moore a/k/a Flex Moore)

147.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

148.    Fla. Stat § 501.204(1) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The provisions of the Act shall be "construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in... deceptive[] or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat § 501.202 (2014).

149.    Moore was, at all times material to the allegations herein, engaged in "trade or commerce' as defined by Fla. Stat. § 501.203 (2014).

150.    As described above, RIL repeatedly attempted to obtain delivery of vaccines ordered by the Plaintiff with the assistance of Moore, which were needed to better the health and well-being of the citizens of Barbados. Moore represented, expressly or by implication, through a variety of means, including through the internet via e-mail, through text message, and over the telephone, that they had they had the business connections and ability to procure 1 million doses of AstraZeneca vaccines. Through these fraudulent and deceptive means, Moore induced Plaintiff

to deposit $12.2 million dollars under the guise that Moore would be able to source and deliver the vaccines.

151.    Upon information and belief, Moore, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

152.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., declares to be unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.24(1). The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

153.    An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. See *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). A deceptive act or practice under FDUTPA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment. *See PNR, Inc. v. Beacon Prop. Mmgt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

154.    Moore has been engaged in trade and commerce in the State of Florida.

155.    Plaintiff is a consumer under FDUPTA. See Fla. Stat. § 501.203(7).

156.    Plaintiff has been injured by Moore's unfair or deceptive practices in the course of Plaintiff's attempts to procure vaccines via Moore.

157.    Moore specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

158.   Moore's business practices are unfair, deceptive, and unconscionable and constitute both per se and traditional violations of FDUPTA.

159.   "A defendant *per se* violates FDUTPA in one of two ways: (1) if the law, statute, rule, regulation, or ordinance 'expressly constitutes a violation of FDUTPA' or (2) if the law, statute, rule, regulation, or ordinance 'proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate.'" *Cox v. Porsche Financial Services, Inc.*, 16-23409-CIV, 2020 WL 837167 (S.D. Fla. 2020); *see* Fla. Stat. § 501.203(c), Florida Statutes., or regulation that proscribes unfair methods of competition, or unfair, deceptive, or          unconscionable          acts          or          practices          constitute per se violations of FDUTPA. Fla. Stat. § 501.203(3)(c).

160.   Moore specifically sought to harm Plaintiff in the execution of his fraudulent scheme.

161.   Moore's deceptive and unfair practices, as alleged herein, also constitute traditional violations of FDUPTA.

162.   Moore has deceived and misled Plaintiff to its detriment. Specifically, Moore misled Plaintiff into depositing $12.2 million through false and incomplete representations regarding Moore's ability to procure and deliver vaccines to the island of Barbados.

163.   Moore has also deceived and misled Plaintiff to its detriment by making misrepresentations and omissions in connection with the allocation of the funds deposited by Plaintiff into escrow to facilitate the transaction.

164.   Moore's deceptive and unfair business practices offend public policy and have harmed Plaintiff and the nearly 300,000 citizens of Barbados, by (i) unjustly pocketing a

significant portion of Plaintiff's escrowed deposit for Moore's own pecuniary gain, and (ii) depriving the people of Barbados of life-saving vaccines.

165.    Because of Moore's unfair and deceptive trade practices, Moore has caused substantial damages to Plaintiff.

166.    In addition, Moore has been unjustly enriched because of his deceptive acts and/or practices.

167.    By virtue of the foregoing, and consistent with the provisions of Fla. Stat. § 501.211, Plaintiff seeks: (a) damages suffered by Plaintiff for Moore's fraudulent scheme to induce Plaintiff to deposit funds to procure vaccines that Moore could not supply, plus attorney's fees, costs, and interest, (b) a declaratory judgment declaring that Moore's acts and practices are unfair and deceptive in violation of FDUTPA, (c) an order enjoining Moore from continuing to engage in such unfair and deceptive acts and practices, including enjoining Moore from misallocating any funds received from Stein, as further discussed in Plaintiff's *ex parte* motion filed contemporaneously with this complaint, (d) any other relief the Court deems just and proper.

## COUNT VI – VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), CHAPTER 501, PART II, FLORIDA STATUTES
### (As to Defendant Prestige)

168.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

169.    Fla. Stat § 501.204(1) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The provisions of the Act shall be "construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in... deceptive[] or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat § 501.202 (2014).

170.     Prestige was, at all times material to the allegations herein, engaged in "trade or commerce' as defined by Fla. Stat. § 501.203 (2014).

171.     As described above, RIL repeatedly attempted to obtain delivery of vaccines with the assistance of Prestige, who was supposed to act as an intermediary supposedly needed to complete the transaction intended to better the health and well-being of the citizens of Barbados. Prestige represented, expressly or by implication, through a variety of means, including through the internet via e-mail, through text message, and over the telephone, that they had they had the business connections and ability to procure 1 million doses of AstraZeneca vaccines. Through these fraudulent and deceptive means, Prestige induced Plaintiff to continue on with the transaction after Plaintiff had deposited $12.2 million dollars into escrow under the guise that Prestige would be able to source and deliver the vaccines.

172.     Upon information and belief, Prestige, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

173.     Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., declares to be unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.24(1). The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

174.     An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. See *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). A deceptive act or practice under

FDUTPA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment. *See PNR, Inc. v. Beacon Prop. Mmgt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

175.    Prestige has been engaged in trade and commerce in the State of Florida.

176.    Plaintiff is a consumer under FDUPTA. See Fla. Stat. § 501.203(7).

177.    Plaintiff has been injured by Prestige's unfair or deceptive practices in the course of Plaintiff's attempts to procure vaccines via Prestige.

178.    Prestige specifically sought to harm Plaintiff in the execution of its fraudulent scheme.

179.    Prestige's business practices are unfair, deceptive, and unconscionable and constitute both per se and traditional violations of FDUPTA.

180.    "A defendant *per se* violates FDUTPA in one of two ways: (1) if the law, statute, rule, regulation, or ordinance 'expressly constitutes a violation of FDUTPA' or (2) if the law, statute, rule, regulation, or ordinance 'proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate.'" *Cox v. Porsche Financial Services, Inc.*, 16-23409-CIV, 2020 WL 837167 (S.D. Fla. 2020); *see* Fla. Stat. § 501.203(c), Florida Statutes., or regulation that proscribes unfair methods of competition, or unfair, deceptive, or         unconscionable         acts         or         practices         constitute per se violations of FDUTPA. Fla. Stat. § 501.203(3)(c).

181.    Prestige specifically sought to harm Plaintiff in the execution of its fraudulent scheme.

182.    Prestige's deceptive and unfair practices, as alleged herein, also constitute traditional violations of FDUPTA.

183.    Prestige has deceived and misled Plaintiff to its detriment. Specifically, Good Vibrations misled Plaintiff into continuing with the transaction after it had deposited $12.2 million through false and incomplete representations regarding Prestige's ability to procure and deliver vaccines to the island of Barbados. All the while, the principal of Prestige, Defendant Coley, continued to freely spend her ill-gotten gains.

184.    Prestige has also deceived and misled Plaintiff to its detriment by making misrepresentations and omissions in connection with the allocation of the funds deposited by Plaintiff into escrow to facilitate the transaction.

185.    Prestige's deceptive and unfair business practices offend public policy and have harmed Plaintiff and the nearly 300,000 citizens of Barbados, by (i) unjustly pocketing a significant portion of Plaintiff's escrowed deposit for Prestige's own pecuniary gain, and (ii) depriving the people of Barbados of life-saving vaccines.

186.    Because of Prestige's unfair and deceptive trade practices, Prestige has caused damages to Plaintiff.

187.    In addition, Prestige has been unjustly enriched because of its deceptive acts and/or practices.

188.    By virtue of the foregoing, and consistent with the provisions of Fla. Stat. § 501.211, Plaintiff seeks: (a) damages suffered by Plaintiff for Prestige's fraudulent scheme to induce Plaintiff to deposit funds to procure vaccines that Prestige could not supply, plus attorney's fees, costs, and interest, (b) a declaratory judgment declaring that Prestige's acts and practices are unfair and deceptive in violation of FDUTPA, (c) an order enjoining Prestige from continuing to engage in such unfair and deceptive acts and practices, including enjoining Prestige from

misallocating any funds received from Stein, as further discussed in Plaintiff's *ex parte* motion filed contemporaneously with this complaint, (d) any other relief the Court deems just and proper.

### COUNT VII – VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), CHAPTER 501, PART II, FLORIDA STATUTES (as to Defendant Coley)

189.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

190.    Fla. Stat § 501.204(1) provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The provisions of the Act shall be "construed liberally to promote the protection" of the "consuming public and legitimate business enterprises from those who engage in… deceptive[] or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat § 501.202 (2014).

191.    Coley was, at all times material to the allegations herein, engaged in "trade or commerce' as defined by Fla. Stat. § 501.203 (2014).

192.    As described above, RIL repeatedly attempted to obtain delivery of vaccines ordered by the Plaintiff with the assistance of Coley, which was needed to better the health and well-being of the citizens of Barbados. Coley represented, expressly or by implication, through a variety of means, including through the internet via e-mail, through text message, and over the telephone, that they had they had the business connections and ability to procure 1 million doses of AstraZeneca vaccines. Through these fraudulent and deceptive means, Coley induced Plaintiff to continue along with the transaction after Plaintiff had deposited $12.2 million dollars under the guise that Coley would be able to source and deliver the vaccines.

193.    Upon information and belief, Coley, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

194.     Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., declares to be unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.24(1). The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

195.     An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. See *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). A deceptive act or practice under FDUTPA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment. *See PNR, Inc. v. Beacon Prop. Mmgt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

196.     Coley has been engaged in trade and commerce in the State of Florida.

197.     Plaintiff is a consumer under FDUPTA. See Fla. Stat. § 501.203(7).

198.     Plaintiff has been injured by Coley's unfair or deceptive practices in the course of Plaintiff's attempts to procure vaccines via Coley.

199.     Coley specifically sought to harm Plaintiff in the execution of her fraudulent scheme.

200.     Coley's business practices are unfair, deceptive, and unconscionable and constitute both per se and traditional violations of FDUPTA.

201.     "A defendant *per se* violates FDUTPA in one of two ways: (1) if the law, statute, rule, regulation, or ordinance 'expressly constitutes a violation of FDUTPA' or (2) if the law,

statute, rule, regulation, or ordinance 'proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate.'" *Cox v. Porsche Financial Services, Inc.*, 16-23409-CIV, 2020 WL 837167 (S.D. Fla. 2020); *see* Fla. Stat. § 501.203(c), Florida Statutes., or regulation that proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices constitute per se violations of FDUTPA. Fla. Stat. § 501.203(3)(c).

202.    Coley specifically sought to harm Plaintiff in the execution of her fraudulent scheme.

203.    Coley's deceptive and unfair practices, as alleged herein, also constitute traditional violations of FDUPTA.

204.    Coley has deceived and misled Plaintiff to its detriment. Specifically, Coley misled Plaintiff into depositing $12.2 million through false and incomplete representations regarding Coley's ability to procure and deliver vaccines to the island of Barbados. All the while, Coley continued to freely spend her ill-gotten gains.

205.    Coley has also deceived and misled Plaintiff to its detriment by making misrepresentations and omissions in connection with the allocation of the funds deposited by Plaintiff into escrow to facilitate the transaction.

206.    Coley's deceptive and unfair business practices offend public policy and have harmed Plaintiff, and the nearly 300,000 citizens of Barbados, by (i) unjustly pocketing a significant portion of Plaintiff's escrowed deposit, for Coley's own pecuniary gain, and (ii) depriving the people of Barbados of life-saving vaccines.

207.    Because of Coley's unfair and deceptive trade practices, Coley has caused damages to Plaintiff.

208.    In addition, Coley has been unjustly enriched because of his deceptive acts and/or practices.

209.    By virtue of the foregoing, and consistent with the provisions of Fla. Stat. § 501.211, Plaintiff seeks: (a) damages suffered by Plaintiff for Coley's fraudulent scheme to induce Plaintiff to deposit funds to procure vaccines that Coley could not supply, plus attorney's fees, costs, and interest, (b) a declaratory judgment declaring that Coley's acts and practices are unfair and deceptive in violation of FDUTPA, (c) an order enjoining Coley from continuing to engage in such unfair and deceptive acts and practices, including enjoining Coley from misallocating any funds received from Stein, as further discussed in Plaintiff's *ex parte* motion filed contemporaneously with this complaint, (d) any other relief the Court deems just and proper.

### COUNT VIII –FRAUD
### (As to Defendant Good Vibrations)

210.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

211.    Good Vibrations knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Good Vibrations.

212.    As described above, Good Vibrations, at all times material, materially misrepresented their ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Good Vibrations offer proof that they could deliver, Good Vibrations continued to double and triple down on their ability to source and deliver the vaccines, despite no ability or intention to do so.

213.    Those representations, as Good Vibrations knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the

40

sham propagated by Good Vibrations, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

214.    Each time Plaintiff demanded reassurance from Good Vibrations, Good Vibrations represented that they would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

215.    Those representations, as Good Vibrations knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Good Vibrations, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

216.    Good Vibrations had a duty to disclose to Plaintiff that they would not be able to source and deliver the vaccines.

217.    Good Vibrations failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Good Vibrations at all times material.

218.    In failing to disclose the aforementioned material information to Plaintiff, Good Vibrations acted in bad faith.

219.    Good Vibrations intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that Good Vibrations could obtain pecuniary gain.

220.    Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late and Good Vibrations had already received funds which had been misallocated.

221.    As a direct and proximate result of Good Vibrations misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

222.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Good Vibrations from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT IX – FRAUD
### (As to Defendant Moore)

223.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

224.    Moore knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Moore.

225.    As described above, Moore, at all times material, materially misrepresented his ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Moore offer proof that he could deliver, Moore continued to double and triple down on his ability to source and deliver the vaccines, despite no ability or intention to do so.

226.    Those representations, as Moore knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the sham propagated by Moore, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

227.    Each time Plaintiff demanded reassurance from Moore, Moore represented that he would be able to source and deliver the vaccines, or that his trusted intermediaries would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

228.    Those representations, as Moore knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Moore, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

229.    Moore had a duty to disclose to Plaintiff that he would not be able to source and deliver the vaccines.

230.    Moore failed to disclose the aforementioned material information to Plaintiff, despite knowing his failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Moore at all times material.

231.    In failing to disclose the aforementioned material information to Plaintiff, Moore acted in bad faith.

232.    Moore intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that Moore could obtain pecuniary gain.

233.    Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late, and Moore had already received funds which had been misallocated.

234.    As a direct and proximate result of Moore misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

235.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Moore from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT X – FRAUD
### (As to Defendant Prestige)

236.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

237.    Prestige knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Prestige.

238.    As described above, Prestige, at all times material, materially misrepresented their ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Prestige offer proof that they could deliver, Prestige continued to double and triple down on their ability to source and deliver the vaccines, despite no ability or intention to do so.

239.    Those representations, as Prestige knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the sham propagated by Prestige, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

240.     Each time Plaintiff demanded reassurance from Prestige, Prestige represented that they would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

241.     Those representations, as Prestige knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Prestige, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

242.     Prestige had a duty to disclose to Plaintiff that they would not be able to source and deliver the vaccines. Further, Prestige had a duty to disclose that it was not a licensed or credentialed intermediary and did not have the status or ability to obtain vaccines from AstraZeneca.

243.     Prestige failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Prestige at all times material.

244.     In failing to disclose the aforementioned material information to Plaintiff, Prestige acted in bad faith.

245.     Prestige intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that Prestige could obtain pecuniary gain.

246.     Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late, and Prestige had already received funds which had been misallocated.

247.    As a direct and proximate result of Prestige's misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

248.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Prestige from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XI – FRAUD
### (As to Defendant Coley)

249.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

250.    Coley knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Coley.

251.    As described above, Coley, at all times material, materially misrepresented her ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Coley offer proof that she could deliver, Coley continued to double and triple down on their ability to source and deliver the vaccines, despite no ability or intention to do so.

252.    Those representations, as Coley knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the sham propagated by Coley, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

253.    Each time Plaintiff demanded reassurance from Coley, Coley represented that she would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

254.    Those representations, as Coley knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Coley, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

255.    Coley had a duty to disclose to Plaintiff that they would not be able to source and deliver the vaccines. Further, Coley had a duty to disclose that she was not a licensed or credentialed intermediary and did not have the status or ability to obtain vaccines from AstraZeneca. Even further still, Coley failed to disclose that she had been the principal of a different company that had been subject to a lawsuit and subsequent judgment in excess of $335,000.00 for a similar PPE-related fraud just months prior to the events detailed in this complaint.

256.    Coley failed to disclose the aforementioned material information to Plaintiff, despite knowing her failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Coley at all times material.

257.    In failing to disclose the aforementioned material information to Plaintiff, Coley acted in bad faith.

258.    Coley intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that Coley could obtain pecuniary gain.

259.    Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late, and Coley had already received funds which had been misallocated. As is clear from the attached photos of Ms. Coley flaunting her newfound wealth on social media, she has freely spent those ill-gotten funds.

260.    As a direct and proximate result of Coley misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

261.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Coley from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XII–FRAUD
### (As to Defendant Stein)

262.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

263.    Stein knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Stein.

264.    As described above, Stein, at all times material, materially misrepresented that he had properly performed his obligations as the paymaster/escrow agent. Upon Plaintiff's insistence that confirmation of the wire transfers be provided, Stein insisted that the funds had been transferred in accordance with the paymaster agreement.

265. Those representations, as Stein fully knew at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the transaction, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

266. Each time Plaintiff demanded reassurance from Stein, he stated that these reassurances were not a part of his responsibility as escrow agent and that the funds had in fact been transferred in accordance with the paymaster agreement.

267. Those representations, as Stein knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Stein, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

268. Stein had in actuality deviated entirely from the terms of the paymaster agreement, in express breach of his ethical and fiduciary duties, causing great harm to Plaintiff. Stein had a duty to disclose to Plaintiff that the funds had not been transferred in accordance with the paymaster agreement.

269. Stein failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how it would act were it provided the material information.

270. In failing to disclose the aforementioned material information to Plaintiff, Defendants acted in bad faith.

271. Stein intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its funds, so that Stein could obtain pecuniary gain for himself and the other Defendants.

272.     Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek the return of its funds until a time at which Stein had already misappropriated the funds. Upon information and belief, these funds have already been largely spent by the Defendants.

273.     As a direct and proximate result of Stein's misrepresentations and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

274.     By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Stein from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XIII –FRAUD
### (As to Defendant DS Law Group)

275.     Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

276.     DS Law Group knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of DS Law Group.

277.     As described above, DS Law Group, at all times material, materially misrepresented that he had properly performed his obligations as the paymaster/escrow agent. Upon Plaintiff's insistence that confirmation of the wire transfers be provided, Stein insisted that the funds had been transferred in accordance with the paymaster agreement.

278.    Those representations, as DS Law Group fully knew at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the transaction, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

279.    Each time Plaintiff demanded reassurance from DS Law Group via Stein, Plaintiff was told that those reassurances were not a part of his responsibility as escrow agent and that the funds had in fact been transferred in accordance with the paymaster agreement.

280.    Those representations, as DS Law Group knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by DS Law Group, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

281.    Stein had in actuality deviated entirely from the terms of the paymaster agreement, in express breach of his ethical and fiduciary duties, causing great harm to Plaintiff. Stein had a duty to disclose to Plaintiff that the funds had not been transferred in accordance with the paymaster agreement.

282.    Stein failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how it would act were it provided the material information.

283.    In failing to disclose the aforementioned material information to Plaintiff, Defendants acted in bad faith.

284.    Stein intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its funds, so that Stein could obtain pecuniary gain for himself and the other Defendants.

285.   Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek the return of its funds until a time at which Stein had already misappropriated the funds. Upon information and belief, these funds have already been largely spent by the Defendants.

286.   As a direct and proximate result of Stein's misrepresentations and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

287.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Stein from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XIV – NEGLIGENT MISRPRESENTATION
### (As to Defendant Good Vibrations)

288.   Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

289.   In accepting Plaintiff's $12.2 million deposit, Good Vibrations represented that they would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

290.   Good Vibrations had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to their ability to source and deliver the vaccines.

291.   From late March 2021 to late July 2021, as described above, Good Vibrations repeatedly misrepresented that they could source and deliver vaccines, to the detriment of Plaintiff.

Good Vibrations failed to disclose material information related to their ability to actually perform their obligations under the purchase and sale agreement.

292.   These misrepresentations and omissions made by Good Vibrations were materially misleading and false.

293.   Good Vibrations knew or should have known that their representations, including their representations conveyed as a result of omissions, were false, or made without knowledge of their truth or falsity.

294.   Plaintiff, acting in justifiable reliance on Good Vibrations misrepresentations and omissions, suffered significant damages.

295.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Good Vibrations from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XV – NEGLIGENT MISRPRESENTATION
### (As to Defendant Moore)

296.   Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

297.   In accepting Plaintiff's $12.2 million deposit, Moore represented that he would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

298.   Moore had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to their ability to source and deliver the vaccines.

299.     From late March 2021 to late July 2021, as described above, Moore repeatedly misrepresented that he could source and deliver vaccines, to the detriment of Plaintiff. Moore failed to disclose material information related to his ability to actually perform their obligations under the purchase and sale agreement.

300.     These misrepresentations and omissions made by Moore were materially misleading and false.

301.     Moore knew or should have known that his representations, including his representations conveyed as a result of his omissions, were false, or made without knowledge of their truth or falsity.

302.     Plaintiff, acting in justifiable reliance on Moore misrepresentations and omissions, suffered significant damages.

303.     By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Moore from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XVI – NEGLIGENT MISRPRESENTATION
### (As to Defendant Prestige)

304.     Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

305.     In entering into the transaction as an "intermediary" Prestige represented that they would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

306.    Prestige had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to their ability to source and deliver the vaccines.

307.    As described above, Prestige repeatedly misrepresented that they could source and deliver vaccines, to the detriment of Plaintiff. Prestige failed to disclose material information related to their ability to actually perform their obligations under the purchase and sale agreement.

308.    These misrepresentations and omissions made by Prestige were materially misleading and false.

309.    Prestige knew or should have known that their representations, including their representations conveyed as a result of omissions, were false, or made without knowledge of their truth or falsity.

310.    Plaintiff, acting in justifiable reliance on Prestige misrepresentations and omissions, suffered significant damages.

311.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Prestige from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XVII – NEGLIGENT MISRPRESENTATION
### (As to Defendant Coley)

312.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

313.    In entering into the transaction as an "intermediary", Coley represented that she would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

314.    Coley had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to her ability to source and deliver the vaccines.

315.    As described above, Coley repeatedly misrepresented that she could source and deliver vaccines, to the detriment of Plaintiff. Coley failed to disclose material information related to her ability to actually perform her obligations under the purchase and sale agreement.

316.    These misrepresentations and omissions made by Coley were materially misleading and false.

317.    Coley knew or should have known that her representations, including her representations conveyed as a result of omissions, were false, or made without knowledge of their truth or falsity.

318.    Plaintiff, acting in justifiable reliance on Coley misrepresentations and omissions, suffered significant damages.

319.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Coley from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XVIII – UNJUST ENRICHMENT
### (As to Defendant Good Vibrations)

320.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

321.    Plaintiff has conferred a benefit on Good Vibrations in the form of $4.2 million.

322.    Good Vibrations, undoubtedly, have knowledge of that benefit.

323.    Good Vibrations voluntarily accepted and retained the aforementioned funds from Plaintiff.

324.    Under the circumstances of this matter, it would be inequitable for Good Vibrations to retain those funds.

325.    The funds received by Good Vibrations belong in equity and good conscience to Plaintiff.

326.    By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Good Vibrations, together with interest and costs, and any other relief the Court deems just and proper.

### COUNT XIX – UNJUST ENRICHMENT
**(As to Defendant Moore)**

327.    Plaintiff incorporates by reference and realleges paragraphs 1 through 84 set forth above.

328.    Plaintiff has conferred a benefit on Moore via Good Vibrations as its principal in the form of $4.2 million.

329.    Moore undoubtedly, has knowledge of that benefit.

330.    Moore voluntarily accepted and retained the aforementioned funds from Plaintiff.

331.    Under the circumstances of this matter, it would be inequitable for Moore to retain those funds.

332.    The funds received by Moore belong in equity and good conscience to Plaintiff.

333.    By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Moore, together with interest and costs, and any other relief the Court deems just and proper.

### COUNT XX – UNJUST ENRICHMENT
**(As to Defendant Prestige)**

# **PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

      At the time of Service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California. My business address is 20920 Warner Center Lane, Suite B, Woodland Hills, California 91367.

      On June 2, 2022, I served True copies of the following document(s) described as **COMPENDIUM OF EXHIBITS – PART 1A - TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS** on the interested parties in this action.

# **SEE ATTACHED SERVICE LIST**

      BY CM/ECF NOTICE OF ELECTRONIC FILING:  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system .  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

      I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

      Executed on June 2, 2022 at Woodland Hills, California.


_____

Rosa E. Rojas

SERVICE LIST
Radical Investment Ltd v. Good Vibrations, et al.
Case No.:  2:22-cv-02752-SVW-AFM

| | |
|---|---|
| Gerardo A. Vazquez, Esq.<br>gv@gvazquez.com<br>RalphR. Longo, IV, Esq.<br>rl@gvazquez.com<br>Steven B.  Herzberg, Esq.<br>sh@gvazquez.com<br><br>Attorneys for Plaintiff Radical Investments, Ltd. | Maurice David Pessah, Esq.<br>Maurice@Pessahgrou.com<br>Jsunshine@pessahgroup.com<br>sbenson@pessahgroup.com<br>vusov@pessahgroup.com<br><br>Attorneys for Plaintiff Radical Investments, Ltd. |
| John D. Shwalb, Esq.<br>john@jdschwalb.com<br><br>Attorneys for Alex Moore and Good Vibrations Entertainment, LLC | Ronald Jay Cohen, Esq.<br>Ecf.rcohen@rprslaw.com<br><br>Attorneys for Alex Moore and Good Vibrations Entertainment, LLC |
| Michael Stoller, Esq.<br>michael.stoller@stollerlawgroup.com<br><br>Attorneys for Alex Moore and Good Vibrations Entertainment, LLC | |

**COMPENDIUM OF EXHIBITS PART 1A**

ZELMS ERLICH & MACK   CALIFORNIA | ARIZONA