GERARDO A. VAZQUEZ (admitted *Pro Hac Vice*)
*gv@gvazquez.com*
RALPH R. LONGO, IV (admitted *Pro Hac Vice*)
*rl@gvazquez.com*
STEVEN B. HERZBERG (admitted *Pro Hac Vice*)
*sh@gvazquez.com*
**VAZQUEZ & ASSOCIATES, P.A.**
1111 Brickell Ave., Suite 1550
Miami, Florida 33131
Tel. (305) 371-8064

MAURICE D. PESSAH (SBN: 275955)
*maurice@pessahgroup.com*
SUMMER E. BENSON (SBN: 326398)
*sbenson@pessahgroup.com*
**PESSAH LAW GROUP, PC**
9100 Wilshire Blvd., Suite 850E
Beverly Hills, CA 90212
Tel. (310) 772-2261

Attorneys for Plaintiff,
RADICAL INVESTMENTS LTD.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RADICAL INVESTMENTS LTD., a St. Lucia Company,<br><br>    Plaintiff,<br><br>    v.<br><br>GOOD VIBRATIONS ENTERTAINMENT LLC, a Florida Limited Liability Company, et al.,<br><br><br><br>    Defendants. | Case No. 2:22-cv-02752-SVW-AFM<br><br>*The Hon. Stephen V. Wilson*<br><br>**PLAINTIFF RADICAL INVESTMENTS LTD.'S  SECOND AMENDED COMPLAINT** |

SECOND AMENDED COMPLAINT

Plaintiff, Radical Investments Ltd. ("RIL") sues Defendants, GOOD VIBRATIONS ENTERTAINMENT, LLC, a Florida limited liability company ("GVE"), ALEX LEE MOORE, JR., a/k/a ALEX MOORE, a/k/a FLEX MOORE ("Moore"), PRESTIGE PEGASUS LLC, a Colorado limited liability company, ("Prestige)", MONILADAE COLEY a/k/a MONILADAI D. COLEY ("Coley"), CHARLES Z STEIN, ESQ. a/k/a CHARLIE STEIN ("Stein"),  and DAVIDOVICH STEIN LAW GROUP, LLP, a California limited liability partnership ("DS Law Group"),  JAMES L. SCOTT, ESQ. ("Scott"), and WARNER, NORCROSS, + JUDD LLP ("WNJ") , a Michigan Limited Liability Partnership, and states as follows:

## THE PARTIES

1.      Plaintiff RIL is a company formed under the laws of St. Lucia, with its principal place of business in Barbados. It is deemed a citizen of Barbados for purposes of 28 U.S.C. § 1332(c).

2.      Defendant GVE is a Florida limited liability company organized under the laws of the State of Florida. As a limited liability company, GVE's citizenship is determined by that of its members. *Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004). GVE has one member, Moore, who is a citizen of the State of Florida for diversity purposes. Accordingly, GVE is a citizen of the State of Florida for diversity purposes. GVE's principal address is located at 21218 St. Andrews Blvd., Suite 318, Boca Raton, FL 33433, within the Southern District of Florida. At all times material to this Complaint, GVE has, acting alone or in concert with others, transacted business in this district and throughout the United States.

3.      Defendant Moore is an individual and a citizen of the State of Florida. and/or operates a business in the state of Florida. Defendant Moore resided in Palm Beach County, Florida at all times material to this Complaint. At all times material to

SECOND AMENDED COMPLAINT

this Complaint, Moore has, acting alone or in concert with others, transacted business in this district and throughout the United States. Defendant Moore is GVE sole member, and also lists himself as Good Vibration's CEO and COO.

4.    This Court has personal jurisdiction over Defendant Moore by virtue of, among other bases, transacting of business in the State of Florida, and his engagement of tortious acts within the State of Florida, and his overall contacts with the State of Florida; all commensurate with the United States and Florida Constitutions, so as to submit himself to the jurisdiction and process of this Court.

5.    Defendant Prestige is a Colorado limited liability company formed under the laws of the State of Colorado. As a limited liability company, Prestige's citizenship is determined by that of its members. See *Rolling Greens, supra.* Prestige has one member, Coley, who is a citizen of Colorado for diversity purposes. Accordingly, Prestige is a citizen of Colorado for diversity purposes. At all times material to this Complaint, Prestige has, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

6.    Defendant Coley is a citizen of the State of Colorado. At all times material to this Complaint, Coley has, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

7.    Defendant Stein is a citizen of the State of California. At all times material to this complaint, Stein, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

8.    Defendant DS Law Group is a limited liability partnership formed under the laws of the State of California, with its principal place of business located in California. As a limited liability partnership, DS Law Group's citizenship is determined by that of its members/partners. DS Law Group has two members/partners, namely Niv V. Davidovich and Charles Z. Stein. Niv V.

3

Davidovich is a citizen of California for diversity purposes. Charles Z. Stein is a citizen of California for diversity purposes. Accordingly, DS Law Group is a citizen of California for diversity purposes. At all times material to this Complaint, DS Law Group has, acting alone or in concert with others, to commit a tortious act in this district and throughout the United States.

9. Defendant James L. Scott, Esq. is a citizen of the State of Michigan. Scott has, at all times material to this complaint, acted alone or in concert with others to commit a tortious act in this district and throughout the United States.

10. Defendant Warner, Norcross, + Judd LLP is a limited liability partnership formed under the laws of the State of Michigan. As a limited liability partnership, WNJ's citizenship is determined by that of its members/partners. All of WNJ's offices lie within the State of Michigan. Thus, upon information and belief, WNJ's members/partners are citizens of Michigan for diversity purposes. Thus, WNJ is a citizen of Michigan for diversity purposes. WNJ has, at all times material to this Complaint, acted alone or in concert with others to commit a tortious act in this district and throughout the United States.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) based on diversity of citizenship amongst the parties.

12. The amount in controversy, without interest and costs, exceeds $75,000.00.

13. Venue lies in the Central District of California Pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this district and this a judicial district in which Defendants are subject to personal jurisdiction.

14. This Court has personal jurisdiction over the Defendants pursuant to and

consistent with the Constitutional requirements of Due Process, in that Defendants, acting through their agents or apparent agents, committed one or more of the following in the State of California:

      a.     The transacting of any business with this state;

      b.     The making of any contract within this state; and

      c.     The commission of a tortious act within this state.

15.    In particular, Defendants are all members of a conspiracy, and as members of the conspiracy acted as each other's agents with respect to the acts in furtherance of the conspiracy, and hence committed a tortious act within the State of California pursuant to within the meaning of Cal. Code Civ. Proc § 410.10.

16.    Defendant GVE is subject to the jurisdiction of this Court by virtue of, among other bases, having operated, conducted, engaged in, or transacting of business in the State of California and having committed tortious acts within the State of California.

17.    Defendant Moore is subject to the jurisdiction of this Court by virtue of, among other bases, having operated, conducted, engaged in, or transacting of business in the State of California, and having committed tortious acts within the State of California, and his overall contacts with the State of California; all commensurate with the United States and California Constitutions, so as to submit himself to the jurisdiction and process of this Court.

18.    Defendant Prestige is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of California.

19.    Defendant Coley is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in

pursuance of the conspiracy and having committed tortious acts within the State of California.

20.    Defendant Stein is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of Florida.

21.    Defendant DS Law Group is subject to the jurisdiction of this Court by virtue of being a member of the conspiracy and undertaking overt and substantial acts in pursuance of the conspiracy and having committed tortious acts within the State of Florida.

22.    Requiring Defendants to litigate these claims in California does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

23.    At all times relevant hereto, Defendants expected or should have expected that its acts would have consequences within the United States of America, and the State of California in particular.

24.    RIL has retained the law firm of Vazquez & Associates in connection with the filing of this action and has agreed to pay counsel a reasonable fee for their services.

25.    All conditions precedent for bringing this action have been fully performed, waived or excused.

## **INTRODUCTION**

26.    The coronavirus pandemic continues to have a devastating impact on individuals, businesses, and society as a whole. As a result, individuals are unable to work, businesses have been forced to close, and the death count continues to rise. This has created an immediate and drastic need for medical supplies and goods,

especially personal protective equipment ("PPE") and vaccines. The Pan American Health Organization reported that more than one million people in Latin America and the Caribbean have died from Covid-19; yet only about 5% of the population has been vaccinated. In June and July 2021, Antigua and Barbuda, Saint Lucia, Saint Vincent and the Grenadines, Saint Kitts and Nevis, Virgin Islands-UK, Anguilla, Grenada, Dominica, and Montserrat have shown a steady increase and surge of Covid-19. Covid-19 infections are increasing in Barbados, with 86 new infections reported on average each day.

27.    INTERPOL has issued a global alert of organized groups attempting to defraud governments with fake offers to sell COVID-19 vaccines. The warning follows some 60 cases in 40 countries around the world where health ministries, governments, and hospitals have received offers for COVID-19 vaccines approved for distribution in their country.

28.    Needless to say, Plaintiff RIL was deceptively lured into an elaborate scam to advance the sum of 12.2 million U.S. dollars for one million nonexistent doses of AstraZeneca vaccine.

## **FACTUAL ALLEGATIONS**

29.    In or around late March or early April 2021, Mr. Mark Maloney ("Mark") the principal of Plaintiff RIL, was introduced to Moore via Cheryl Chamley, a who resides in Coral Springs, Florida and works in the PPE Sector in South Florida. Because of her experience in the PPE Sector, Ms. Chamley assisted RIL to facilitate the transaction terms between RIL and GVE. During the course of providing RIL with her expertise and assistance, Ms. Chamley, from her offices in Florida, on behalf of RIL participated in numerous telephone conversations and other communications with Moore and GVE concerning negotiations and terms related to the subject transaction.

30.     Moore, upon information and belief, resided at that time in or around the Boca Raton, Florida area, where he continued to reside at all times material to this Complaint, in a home owned or rented by GVE of which Moore is the CEO/COO.

31.     Ms. Chamley represented to Mark that Moore had the ability to secure and deliver COVID-19 vaccines manufactured by AstraZeneca to RIL to vaccinate the nearly 300,000 citizens of the island of Barbados.

32.     RIL was authorized by the Barbadian Government's Ministry of Health and Wellness to procure vaccines on its behalf. *See* documents attached as **Exhibit 1.**

33.     On or about April 16th, Moore provided Mark a sale and purchase agreement and escrow and paymaster agreement ("Escrow Agreement") naming Stein as the paymaster.[1]  Thereafter Moore introduced Stein to Mark and Olivia Watson ("Watson"), counsel to RIL and advised Watson to direct any questions or requests for due diligence to Stein. Stein is an attorney at Davidovich Stein Law Group in North Hollywood, California. The purchase and sale agreement was executed on April 16, 2021 ("The Purchase Agreement"). *See* The Purchase Agreement attached as (**Exhibit 2**).

34.     The terms of the Purchase agreement are as follows:

   a.  The purchase price for the vaccines was to be $10.2 million.[2]

   b.   A commission of $2 million would be payable to GVE upon delivery of the vaccines to RIL in Barbados.

   c.  Upon execution of the Purchase Agreement, RIL was to deposit the $12.2 million into an escrow/IOLTA account. Moore was to provide an invoice from AstraZeneca for the one million doses of

---

[1] A Paymaster or Escrow Agent typically acts as a neutral third party, in any transaction between two individuals, entities or businesses, whereby the Paymaster receives funds from a buyer into an escrow account, maintains the account, then disburses those funds to the seller or a third party, as per the instructions spelled out in a sales and purchase agreement or services agreement.
[2] All reference to "$" shall refer to United States dollars.

SECOND AMENDED COMPLAINT

AstraZeneca vaccines, together with the information for the AstraZeneca account into which the purchase price of $10.2 million was to be paid.

d.  Upon receipt of the AstraZeneca account information, RIL would authorize the release of the $10.2 million to AstraZeneca.

e.  Thereafter, within 24 hours of the release of funds to AstraZeneca, RIL was to receive the vaccines within 7 days.

35.  As stated, the $2 million commission to GVE was to be paid only upon the issuance of a bill of lading from AstraZeneca to RIL. GVE

36.  Immediately after the execution of the Purchase Agreement, RIL unsuccessfully sought to obtain the invoice from AstraZeneca from Moore.

37.  Moore supplied a heavily redacted AstraZeneca invoice which did not contain the information required pursuant to the terms of the Purchase Agreement. (*See Invoice* attached as **Exhibit 3).**

38.  On or about April 27, 2021, RIL sought further assurances to the transaction. Accordingly, Moore provided RIL an opinion letter from two reputable law firms, namely, Stein on behalf of DS Law Group and Scott on behalf of WNJ. Satisfied by Stein's and Scott's opinion letters, RIL signed a release for the purchase price in the amount of $10.2 million, in the form of Exhibit A of the Escrow Agreement. *See* attached as **Exhibit 4.** RIL released the funds on the basis of the assurances it received from Stein, in his capacity as a member of the California Bar. *See* Correspondence from Stein attached as **Exhibit 5.**

39.  On or about April 27, 2021, RIL provided amended instruction to pay Defendant, Prestige Pegasus LLC the $10.2 million.

40.  In complete violation of the Escrow agreement and amended instructions, Stein wrongfully dispersed following payments via wire transfer listed

9

below out of the IOLTA account:

        a. April 27, 2021: $2 million to Prestige.

        b. April 27, 2021: $2.2 million to GVE.

        c. April 27, 2021: $40,000 to Stein's personal bank account

        d. May 3, 2021: $2 million to GVE.

        e. May 3, 2021: $485,000 to RDS, a foreign freight company based out of the United Arab Emirates, charged with handling the delivery of the vaccines. *See* correspondence detailing wire confirmation attached as **Exhibit 6**.

41.    On April 27, 2021, counsel for RIL requested that Stein provide a copy of the wire transfer confirmation of $10.2 million to Prestige. At 6:11 pm, Stein responded that there was no wire confirmation because he had processed the transfer through an online portal and did not print the confirmation page. He also stated that he was automatically logged out of the account after the wire transfer was completed. *See* WhatsApp text messages attached as **Exhibit 7**.

42.    At 6:45 pm counsel for RIL, suspicious that there could be no evidence to support the wire confirmation, continued to press Stein, demanding that he was legally obligated under the terms of the Escrow Agreement to provide confirmation that the funds were, in fact, sent to Prestige. *Id.*

43.    At 6:57 pm, Stein continued to be unresponsive to RIL's request and became defensive asking counsel for RIL where in the paymaster/escrow agreement it stated that he had an obligation to provide proof of the wire transfers.

44.    At 7:00 pm, counsel for RIL pressed Stein for a third time, demanding confirmation for the wire transfer. *Id.*

45.    At 7:10 pm, Stein once again went on the defensive, raising unsupported issues with the Escrow Agreement. *Id.*

46.    At 8:18 pm, counsel for RIL flatly stated the objective fact that no

changes had been made to the Escrow Agreement. RIL expressed that Stein was provided with the proper account information, and RIL had only agreed for Stein to send the funds to Prestige in order to procure the vaccines, and if a further wire was required for shipment of the vaccines, that RIL would have to provide authorization. Counsel for RIL concluded its text by stating, very plainly, "All we are asking for is confirmation that the funds were paid out as instructed by us," a seemingly reasonable request for a party to make regarding the end destination of wire transfers related to a $12.2 million deposit. *Id.*

47. At 8:20 pm, Stein responded that RIL's request for wire confirmation exceeded the scope of his role as paymaster, and to address any other requests to Moore. *Id.*

48. Moore, who was also a party to this WhatsApp chat, responded thereafter that the funds had been sent to Prestige and that they were on track and on schedule, and he was speaking to AstraZeneca. *Id.*

49. Contrary to the terms of the Escrow Agreement and without RIL's consent, Stein continued to conceal that he had wrongfully wired $2 million to GVE and only $2 million to Prestige.

50. After these wire transfers took place, Moore introduced Mark to Moniladai Coley, the principal of Prestige, who was represented as the intermediary with the capacity to procure and deliver the vaccines from AstraZeneca.

51. Unbeknownst to RIL, Moniladai Coley was the subject of a lawsuit in the State of New York, in which a corporation DIAMOND HOOK MEDIA, LLC ("Diamond Hook") obtained a judgment against Coley and Prestige Brands, Inc. in November of 2020 for $335,083.75. The crux of that matter was that Coley and Prestige had held themselves out as a New York corporation doing business in the PPE sector. It was alleged that Coley falsely claimed she was licensed to do business

in the state of New York, and that Prestige Brands, Inc. was in fact a Nevada corporation, falsely claiming to be authorized to transact business in the state of New York.

52.     The Complaint further alleged that Coley and Prestige held themselves out to be able to procure 1,000,000 FDA 3-ply face masks for the price of $670,000.00, and that she could deliver them within 48 hours of payment of 50% of the purchase price, $335,000.00. Diamond Hook tendered the 50% payment to Coley and Prestige. Apparently, Coley disappeared and Diamond Hook never received any of the masks, nor did they receive a refund for their 50% deposit. A judgment for the deposited amount was rendered by the Court in New York against Prestige and Coley therewith. *See* Judgment attached as **Exhibit 8.**

53.     In late May of 2021, Moore had yet to procure the vaccines. As a result of Moore's breach of the Purchase Agreement, on May 28, 2021, RIL delivered its notice of intention to terminate the agreement and accordingly executed Exhibit C of the Escrow Agreement. *See* **Exhibit 9**.

54.     Stein responded to this letter by sending RIL a long, convoluted e-mail stating that he was required to release funds pursuant to the irrevocable pay order previously signed, and that at this point, the only amount of money he could return would be the $2 million which was to be paid as commission to GVE upon receipt of the vaccines. Stein also represented that he spoke to Defendant Coley who, according to Stein, rather incredulously stated that RIL was in fact the party responsible for causing a delay in the delivery of the vaccines, and that RIL itself could be subject to a 1% penalty. Stein also referred to the inability of AstraZeneca to sell directly to anyone other than governments, which would necessitate the involvement of Prestige, a licensed distributor. *See* **Exhibit 10**.

55.     However, as previously stated, the $10.2 million was actually sent to the

parties listed above in paragraphs 44-47.

56.   RIL responded to Stein's correspondence by making a simple but critical statement that sums up Stein's culpability. RIL told Stein that under the purchase agreement, Stein, as the paymaster, was only authorized to do two things with RIL's deposit in order to procure the vaccines: pay AstraZeneca $10.2 million or pay Prestige $10.2 million dollars. Full stop. Stein did neither. *See* **Exhibit 11**.

57.   RIL reiterated in this correspondence that nothing had been done on the part of Defendants to verify these transactions related to procuring the vaccines that were actually going to take place, that the obligations of the seller were not being fulfilled, and that RIL was seeking to either have the veracity of the delivery of the vaccines confirmed, or it wanted its deposit returned. *Id.*

58.   On May 30, 2021, Stein responded to RIL, writing a rambling, scattered letter in which he took a highly defensive posture and denied any breach of his fiduciary duties, despite the irrefutable fact that the payments had been allocated by Stein in a manner not in accordance with the provisions of the paymaster agreement. *See* **Exhibit 12**.

59.   On or about July 6, 2021, RIL and Moore sent Stein a signed amendment to the Escrow Agreement, which sought a return of $5.475 million still in the IOLTA account to RIL, in exchange for a release for Stein. *See Signed Amendment attached as* **Exhibit 13**.

60.   Stein refused to return RIL's funds unless RIL executed a release in favor of Stein and DS Law Group which was ultimately executed on or about July 9, 2021.

61.   Per the terms of the release, Stein is obligated to aid as will be required to diligently pursue all recipients of funds from the IOLTA account. *See* **Exhibit 14**.

62.   Further, there were a significant number of conditions precedent

13

SECOND AMENDED COMPLAINT

contained within the release that Stein did not or has not complied with. Per the terms of the release, the conditions precedent which Stein either has not conformed with or conformed in violation of the release's terms are:

    a. Stein shall wire the balance of the funds in the IOLTA Account relating to the Transaction, being $5,474,830 to RIL within one business day of mutual execution of this Release;

    b. Stein shall use his best endeavors to pursue the IOLTA recipients and all persons to whom funds were disbursed to out of the IOLTA Account in order to procure the return of all sums previously paid out in connection with the transaction;

    c. Stein shall provide to RIL such assistance as may be requested by Radical to allow Radical to pursue the IOLTA recipients and all parties to whom sums were paid by Stein out of the IOLTA account in connection with the transaction;

    d. Stein shall provide such correspondence, documentation or other communication related to requests for the disbursements out of the IOLTA Account or otherwise related to the Transaction together with evidence of all payments made, as Radical may request; and,

    e. Stein shall forthwith pay to RIL any sums which are returned to Stein/the IOLTA Account in respect of any repayment of sums previously disbursed by Stein out of the IOLTA Account to the IOLTA recipients or otherwise in respect of the Transaction. *Id.*

63.    Stein was supposed to transmit the remainder of the funds held in trust back to RIL within a day of full execution of the release, which occurred on July 12, 2021. Further, Stein has done absolutely nothing in his power to assist RIL with pursuing his co-Defendants, nor has he been forthcoming with providing

correspondence and communications he had with his co-Defendants related to the disbursement of monies as described herein. Simply put, Stein has done nothing whatsoever to aid RIL in the recovery of the monies that Stein so grossly misappropriated.

64.     On July 8, 2022, Stein provided RIL with supplemental document production which consisted, *inter alia,* of WhatsApp messages spanning from April 21, 2021 to July 22, 2021. These newly discovered WhatsApp messages were deliberately concealed from RIL and contain material information and facts which patently conflict with Stein's representations that he was acting as a neutral-third party escrow agent. For instance, the WhatsApp messages evidence the following facts and conduct unknown to RIL at the time of executing the Release with Stein on or about July 9, 2021:

A. Stein failed to disclose that co-Defendant Moore had promised him a monetary "bonus" to help Stein payoff his law school loans, which at the time were approximately $400,000.00. Stein's financial interest in the transaction is further supported by other communications with Moore, including one specific WhatsApp message from Stein to Moore stating – "I have an incentive to make this happen. I just need to cover my own ass and make sure I don't violate my responsibilities."

B. Stein failed to disclose that at all time relevant to this complaint, Stein was providing Moore and GVE with legal guidance and advice which were in direct conflict with RIL and Stein's role as a neutral and uninterested third-party escrow agent. For example, in one WhatsApp communication exchanged between Stein and Moore on or about April 27, 2021 – Stein was coaching Moore on what instructions to provide him (i.e., as the Escrow Agent) to assure that RIL's funds remain in Escrow, irrespective of GVE's

SECOND AMENDED COMPLAINT

failure to provide the AstraZeneca invoice as required.

C. Stein failed to disclose certain communications dated on or about April 21, 2021, with Moore, wherein Moore informed Stein that he was making $8,000,000.00 from the transaction and promised to make Stein a millionaire by stating – "Yes I will make you a millionaire."

D. Stein failed to disclose that he knowingly violated the express terms of the Escrow Agreement at the time of wiring funds to GVE. On or about April 28, 2021, Stein wrote Moore "Why is she asking for wire confirmations? [referring to RIL/Olivia Watson] BTW, I went back and looked at the paymaster agreement, it has really messed up drafting because it says that I am paying AstraZeneca directly, which is obviously not the case."

65.    Stein's communications providing Moore with legal advice have implicitly established an attorney-client relationship with Moore and his company GVE.

66.    The aforementioned release in favor of Stein states that the release shall be interpreted and enforced under the laws of the State of California. California has very stringent laws designed to protect the public and businesses from unfair, deceptive, or fraudulent business practices. California Civil Code § 1668, reads: All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law. *See* Cal. Civ. Code. § 1668. Stein's release is exactly what this statute contemplates; *to wit,* a party attempting to contract his way out of his own fraud and violations of law. Stein's attempt to obtain a release for his actions is improper under California law. This is coupled with the objective fact that Stein did not comply with the explicit terms of the release, violating its provisions and thereby rendering the release invalid.

67.     As of the date of the filing of this Complaint, RIL has been returned approximately $5.4 million of its initial deposit, leaving approximately $6.7 million in arrears. RIL has been unable to obtain the funds transferred out of the IOLTA account by Stein. To be more specific, RIL has not been returned funds distributed to Defendants Moore, GVE, and Prestige/Coley. In addition, RIL has not been returned funds in the amount of $485,000.00 which were disbursed to RDS, a foreign shipping company.

68.     With respect to RDS, Plaintiff was never advised of Defendants' intended use of RDS to deliver the vaccines to Barbados via air freight. Curiously, Defendants appeared to have hired a corporation based out of Dubai organized under the laws of Poland at a rate of nearly $500,000.00 - far above the market rate to transport a relatively small cargo from Europe to Barbados. Plaintiff at no time approved, or even had knowledge of, RDS' involvement until after Defendant Stein had disbursed to RDS nearly half a million dollars.

69.     Further, upon information and belief, since the time the wire transfers took place Defendant Coley appears to have purchased a Rolls Royce SUV, numerous diamond encrusted Rolex watches, various pieces of diamond encrusted jewelry, and various designer handbags and shoes, as evidenced by her Instagram account, which is available for public viewing. *See* screenshots of Coley's Instagram account attached as **Exhibit 15**. None of these expensive luxury items appear on Coley's Instagram page prior to June of 2021. Even further still, Defendant Moore represented to counsel for RIL, Olivia Watson, that he had taken large portions of the funds he received from Stein and given them to his family.  As such, RIL was forced to file this lawsuit in order to seek redress and protect its rights.

//

//

17

## FACTUAL ALLEGATIONS AS TO STEIN-MOORE RELATIONSHIP

70.     Up until the time of receipt of Stein's supplemental document production on July 8, 2022 (subsequent to  RIL's First Amended Complaint filed on or about September 29, 2021), RIL was unaware the specifics with respect to Stein and Moore's relationship.

71.     Stein and DS Law Group bear a fiduciary relationship to RIL. The duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary (RIL), of all facts which materially affect its rights and interests.

72.     Despite Stein's assurances to RIL, which Stein made as a member of the California Bar and officer of the court, that he is and will remain a neutral third party and able to fulfill his duties as the Escrow Agent, Stein concealed that he was providing Moore and GVE with legal advice and that he had a financial interest to benefit from the profits generated from the transaction (i.e., Moore's promise to payoff Stein's law school loans and/or to make Stein a millionaire.

73.     To that end, Stein and DS Law Group had a legal, financial, and professional relationship with Moore, GVE and in the subject matter of his representation and obligation as the Escrow Agent.

74.     During all relevant times, (including at the time of executing the Release), RIL was not effectively alerted to the existence and scope of the fraud and conspiracy with Moore and GVE and were not on notice of its potential claims until July 8, 2022.

75.     During all relevant times (including at the time of executing the Release) RIL was not effectively alerted that Stein and DS Law Group had a legal, financial, and professional relationship with Moore, GVE, and in the subject matter of his representation, which were adverse to RIL's interest and conflict with his obligations as the Escrow Agent.

18

SECOND AMENDED COMPLAINT

76.     RIL could not have acquired such knowledge through the exercise of reasonable diligence.

77.     Stein's self-concealing conspiracy and affirmative conduct to perpetuate his fraud (and fraud by DS Law Group) deprived RIL of actual or presumptive knowledge of facts sufficient to put them on notice as to its potential claims.

78.     Stein's relationship with Moore, and his expectation of receiving significant payment from Moore if the transaction had been completed, resulted in a non-waivable conflict of interest, which was not disclosed to RIL at the time RIL was fraudulently induced into executing the Release.

79.     The Release executed by RIL is void because it was induced by fraud, and because Stein and DS Law Group failed to disclose that it was intended to encompass a release for legal malpractice. Thus, it also violates California Rules of Professional Conduct 3-400. Defendants Stein and DS Law Group made no assertion that they informed RIL of a conflict of interest, nor any potential legal malpractice claim before inducing RIL to execute the Release on July 9, 2021.

80.     Under the terms of the Release, and as a condition precedent to Stein and DS Law Group's release, Stein and DS Law Group agreed to use its "best endeavors" to diligently pursue all persons, including Moore, GVE, Prestige, Coley and RDS and procure the funds wrongly misappropriated.

81.     Stein and DS Law Group have failed to use their "best endeavors" to diligently pursue all persons, including Moore, GVE, Prestige, Coley and RDS and procure the funds wrongly misappropriated.

82. Moreover, Stein and DS Law Group's promise to pursue all persons, including Moore, GVE, Prestige, Coley and RDS and procure the funds wrongly misappropriated, was in fact an untrue statement at the time it was made. At the time of executing the Release, Stein and DS Law Group knew that they were barred from

SECOND AMENDED COMPLAINT

pursuing claims against Moore and GVE because unknown to RIL, Moore and GVE had an attorney-client relationship conflicting Stein and DS Law Group from undertaking actions adverse to Moore and GVE.

83. The allegations in this factual section stem from documents which were produced to Plaintiffs on July 8, 2022, which Plaintiff had been requesting for some time. These documents detail communications between Moore and Stein via WhatsApp. RIL had been previously unaware of the substance of these communications prior to July 8, 2022 to the extent that Plaintiff was fraudulently induced to enter into a release with Stein based on Stein being required to assist to the best of his ability in obtaining a return of the funds from Moore. As will be detailed below, Stein would have been entirely unable to do so, because his relationship with Moore was that of a partner/client.

84. Per the terms of the Escrow & Paymaster Agreement between RIL, Moore, and Stein, RIL was to deposit $12.2 million to Stein's escrow account. Stein, per the Escrow Agreement, was authorized to disburse $10.2 million to AstraZeneca directly, or to a qualified intermediary to obtain the vaccines. No other authorization was given to Stein with respect to the disbursement of monies. The $2 million balance was to be transferred to GVE as a commission if the deal was completed. Stein was to act as a neutral, third-party escrow agent. Stein was to be paid .2% of the $12.2 million, or about $24,000 dollars for his services.

85. However, on April 20, 2022, prior to the initial wires being sent out by Stein, Stein and Moore discussed the transaction via WhatsApp. These communications were previously unknown to RIL until July 7, 2022.  Based on the Escrow Agreement, RIL was operating under the assumption that the vaccines would cost $10.2 million and GVE would make $2 million if the transaction went through. These items are crystal clear in the Escrow Agreement, and RIL was given no reason

whatsoever to think this was not the case.

86.    In their WhatsApp conversation Stein told Moore that "based on the (Escrow Agreement) funds don't get released until you provide a Bill of Lading". *See* Page 2 of Moore-Stein WhatsApp messages timestamped at 11:20am. *See* WhatsApp chat between Moore and Stein attached as **Exhibit 16.** Incredulously, Stein later acted directly against his own statement, releasing $4.2 million to Moore in direct violation of the terms of the transaction, as was discussed previously and will be discussed further below.

87.    Moore responded that "(RIL) doesn't know that the commission (the $2 million RIL was intending for GVE if the deal was completed) for the brokers is different than mine". *Id.*

88.    On April 21, 2021, Moore told Stein that his *actual* cost for the vaccines was $2 million, not the $10.2 million RIL had agreed on and that he was actually making $8 million on the transaction. Stein, as a neutral third-party escrow agent, and licensed California attorney no less, should have *immediately* told RIL that Moore was not adhering to the agreement, in which he was to receive only a $2 million commission upon the actual delivery of the vaccines.

89.    However, due to Stein being promised a "bonus" by Moore and the fact that Moore told Stein in these communications that he would "make him a millionaire", Stein decided to push aside his moral, ethical, professional, and legal obligations in an attempt to profit from the transaction himself. *See* Bonus E-mail attached as **Exhibit 17** and WhatsApp text message at page 6 timestamped at 3:23pm attached as **Exhibit 16.**

90.    Without RIL's knowledge, Stein wrote to more that "we (Stein and Moore) need to discuss the exact rules for distribution before any of it (the $12.2m deposit by RIL) is getting moved out of the account". *Id at p*age 5 timestamped at

3:01pm.

91.    Defendant Stein is a licensed attorney in the state of California who was supposed to be acting as a neutral third-party escrow agent. There was an Escrow Agreement in place. Yet Stein was speaking unilaterally with one of the parties about the "rules" for distributing the funds out of the account in a manner inconsistent with the Escrow Agreement, which, as stated above, could not be any clearer with regard to the distribution of funds and what Stein's exact responsibilities were. *Id* at page 5 timestamped at 3:01pm.

92.    With respect to the distribution of funds as requested by Moore, Moore unilaterally relayed to Stein the following breakdown of how the funds were to be wired out of the Escrow Account:

    a.  $40,000 to Charlie Stein (in violation of the agreement of .2% and without RIL's approval).

    b.  $2 million to be set aside for the "brokers".

    c.  $2 million for the vaccines themselves.

    d.  $8 million to GVE.

93.    In this very same message, Moore wrote to Stein, the supposed neutral third-party escrow agent who was supposed to only be making a small fee for holding and wiring out funds, that he would "make you (Stein) a millionaire". *Id.* at page 6, timestamped at 3:23pm.

94.    Stein, as a supposed neutral third party escrow agent, and attorney, should have *immediately* contacted RIL and alerted them to the fact that the funds were not going to be appropriated as RIL had directed. However, due to his greed, and the promise of receiving funds from Alex Moore, Stein's neutrality was entirely compromised, and he began to conspire with Moore to make the deal happen, despite the potential harms that could befall RIL.

SECOND AMENDED COMPLAINT

95.     In fact, later that same day, at 7:26pm, Stein wrote to Moore that "I have an incentive to make this happen. I just need to cover my own ass and make sure I don't violate my responsibilities" *Id.* at page 9, timestamped at 7:26pm.

96.     It cannot be overstated: Stein was an attorney who was supposed to be acting as a neutral third-party escrow agent. However, he was now "incentivized" to make this deal go through, due to Moore's financial promises.

97.     On April 22, 2022, Stein wrote to Moore that he really didn't need proof of funds of more than $2 million, because Stein now knew that the $2 million was all that was needed to procure the vaccines, with the remainder being Moore's profit. *Id.* at Page 10, timestamp 4:42pm. Despite this knowledge, Stein did not advise RIL of the true disbursement of its funds, despite his responsibility, both fiduciary, ethically, professionally, and moral, to do so.

98.     On April 23, Stein wrote that "I want to do this for you. Let's get that signed exhibit so I can make it happen. I hate holding money for... (WhatsApp message cutoff because Stein's document production was improper as they were produced in the form of screenshots and not in their native format with some messages not viewable in their entirety). *Id.* at Page 11. Stein was supposed to be a neutral third-party but was already pushing to make this deal happen so that he and Moore could make a tremendous profit, entirely unknown to RIL.

99.     With respect to the funds Stein was to receive for facilitating for the transaction, as stated above, and as agreed to in the Escrow Agreement with RIL, Stein was to be paid $24,400 for his services. However, without consulting RIL, Moore and Stein agreed unilaterally that Stein would be paid $40,000 for acting as an escrow agent. Stein discussed this with Moore on April 27 at 1:10pm. *Id. at* Page 18, 1:10pm. Stein asked Moore for the $40,000 they had agreed upon and told him that anything beyond that would be up to Moore's discretion. *Id.*

100.   In the messages provided to RIL by Stein, on May 7, 2021, Stein received an email from Mark Maloney, who was growing impatient as it had been ten days since his funds were wired out by Stein and there was no sign of progress with respect to procuring the vaccines. Maloney wanted to know, quite reasonably, what amount of RIL's funds had been disbursed out of the escrow account. Stein wrote to Moore that "The douchebag (Maloney) emailed me again today. He thinks he can make demands that he has no rights to ask." *Id.* at Page 28, timestamped 8:36pm.

101.   Stein had been entrusted with $12.2 million, but was, for reasons unbeknownst to RIL at the time, taking a highly defensive posture when simply asked where he had sent RIL's funds.

102.   On May 10th, with the deal seemingly beginning to fall apart, Stein began to try and cover his tracks. He wrote to Moore that, with respect to the Purchase Agreement for vaccines, that, *"That money (RIL's $12.2m) has to go into the AstraZeneca account, as in not your account…This deal has to come through or you will need to find a way to get every penny I paid out back. Id.* at Page 30, timestamped 6:25pm (emphasis added).

103.   This was a clear admission from Stein that he fully understood the intent of the Purchase & Sale Agreement and Escrow Agreement: that AstraZeneca ultimately needed to receive the funds for the vaccines, NOT Alex Moore or GVE. Stein knew that he had misappropriated the funds, which is further evidenced by him telling Moore that Moore would need to pay the money back. Stein knew he had breached his ethical, legal, fiduciary and professional obligations, and that he had no right to send Moore $4.2 million of RIL's funds.

104.   Perhaps the most damning message between Stein and Moore is a message Moore sent to Stein on May 10th or 11th at 5:20pm. Stein shared with Moore a long e-mail which spans several pages of the WhatsApp exhibit. The e-mail was

24

from Flora Brooke-Turner, who works within the Global Security Team for AstraZeneca. She was writing the e-mail with respect to a request given to her to confirm the purchase of AstraZeneca products for the island of Barbados. *Id.* At Page 32.

105.   Brooke-Turner stated that "AstraZeneca is receiving numerous reports of offers from private companies to sell its vaccines to legitimate pharmaceutical wholesalers, healthcare professionals, and national ministries of health…(but that) there is currently no private sector supply, sale, or distribution of the vaccine. AstraZeneca has not authorized any intermediaries or other private distributors to supply the vaccine. Any offer that claims to be sourcing vaccine directly from AstraZeneca or our Contracting Manufacturing Organizations is *likely to be fraudulent." Id.* at page 33.

106.   Brooker Turner's message went on to state that "Anyone (approached) by a private company offering to sell AstraZeneca Covid-19 vaccines    should consider it an attempt to defraud them and refuse or decline the offer. *Id.* at Page 34, timestamp 5:20pm.

107.   Stein, upon learning this information should have done everything in his power to advise RIL that it was likely being defrauded and that it needed to immediately reevaluate it's the transaction. However, Stein did nothing.

108.   On May 18th, Stein once again reached out to Moore to "check in", writing that "I just wanted to check in and see where things stand. I figure that one of us has to get back to the douchebag (Maloney) in the morning". *Id* at Page 36, timestamp 8:48pm. Stein, as the neutral third-party escrow agent, was clearly pushing to complete this transaction, hoping it would go through.

109.   With the transaction still not completed by May 20th, Stein, clearly very nervous, wrote to Moore that "I have to send that breakdown of payments to

Maloney's attorney. Do we have an ETA on the bill of lading? Because that would go a long way into calming nerves *given how much of these funds were sent to you*". *Id.* at Page 38 (emphasis added).

110.   Stein even began to send proposed e-mail messages to Moore, collaborating with him on what their strategy would be for dealing with Maloney's attorney. *See* Page 39 – 41 timestamped at 2:45pm. Stein and Moore were working as a team in order to continue stringing RIL along in the hopes the transaction would go through, so that they could reap unauthorized profits far in excess of what was contemplated by RIL.

111.   Stein began to advise Moore with respect to how and when to respond to certain e-mails and to provide a written record to show legitimacy. *See* Page 43 timestamped at 7:09pm. Stein, once again, was supposed to be a neutral third-party escrow agent. His conduct was wholly and entirely improper for a supposed neutral actor.

112.   Stein continued to advise Moore on what they needed to do to continue to string RIL along, and to cover their tracks by stating on May 23rd that "Maloney needs a response" and that "When I (Stein) said a response, I meant to his e-mail. The reason for that is that it shows communications to his attorney who can walk him back off a ledge. It also allows me to show that you are communicating with him. *This is how you use attorneys to cover your ass*. *Id.* at Page 44, timestamp 8:22pm (emphasis added).

113.   Stein undoubtedly was advising Moore and acting as his legal counsel. Stein advised Moore of the best strategy to take and repeatedly recommended to Moore of the best action to keep the transaction moving.  Stein *clearly* was acting as Moore's lawyer, and adviser, which would later compromise his ability to pursue Moore. Had their relationship been disclosed to RIL, it would have certainly

26

prevented RIL from executing a release in favor of Stein and his law firm. Stein did not and could not diligently pursue Moore, because he was his client/partner.

114.   On May 27, Stein continued to advise Moore that he "may want to hire counsel" to respond to Maloney, and that Moore should "send a legal letter to (Maloney)". *Id.* at page 46, timestamp 6:14am. While Stein was advising Moore to seek the advice of another attorney, Stein was still providing Moore with legal advice and advising him of how to navigate his way through the transaction.

115.   Later, on May 27, Moore sent Stein a message saying, "Charlie, *we* need to draft an e-mail". Moore was under the impression, clearly, that he and Stein were working together to try and pull off this transaction so that they could mutually profit. *Id.* at page 48, timestamp 10:08am. Moore and Stein then went back and forth, with Stein bragging about how he "hustles" to make money, but that Stein's legal mind was churning in messages he had sent. *Id.,* timestamp 10:58am, 11:12am.

116.   On June 1, Stein sent a message to Moore in which he was attempting to put together a gameplan for how to handle letting RIL know that Stein had improperly sent out funds. Stein wrote that "I need to send an e-mail with the list of wires made to Mark's counsel today. Therefore, we either have a delivery plan before I sent it, or I am notifying him that you are sitting on $4.2M, with Prestige another $2M, and the $400K+ to the carrier, and the partial amount to "me". *Id.* at Page 49, timestamp 9:02am.

117.   Stein did not want to let RIL know that he had sent the wires out in a manner inconsistent with what was authorized by RIL, because he *knew* that he had sent the wires improperly. Thus, prior to letting RIL know of his misappropriations, Stein was making one last attempt with Moore to try and conceal the wires he had sent.

SECOND AMENDED COMPLAINT

118.   Moore said the next day, on June 2, "Charlie, don't send them anything wait for John (Sutton, another attorney representing Moore) please" to which Stein replied "Obviously!". Stein and Moore were doing all they could to prevent RIL from knowing where the wires were actually sent.

119.   Over the next few weeks, Stein would check in with Moore because the deal was falling apart. It was abundantly clear that Moore was not going to deliver on his promise of sourcing vaccines for Barbados. However, on June 24th, Moore directed Stein to call Defendant Coley and ask her if she needed Stein's help editing a contract, presumably to try and procure the vaccines and save the deal. *Id.* at page 56, timestamp 6:13pm.

120.   It must be noted once again that RIL had absolutely no idea that any of these communications were taking place, had no idea that Stein was advising Moore and apparently Coley as well, nor did RIL know that Stein and Moore were in cahoots trying to push the deal through.

121.   On June 25th, Moore came to Stein with a potential new deal between a company called Serum Pharma and Defendant Prestige Pegasus, which would have a commission of $3.3 million. However, Stein did not appear to like that deal, as he commented to Moore, "Not sure where you or I are getting any money from this deal". *Id.* At page 57, timestamp 10:05am. Stein was clearly more concerned about making money for himself than acting in the capacity for which his role was intended to be: that of a neutral, third-party escrow agent.

122.   Moore asked Stein, with respect to this new transaction "What should I do?" To which Stein replied, "You basically need to fill in your info and then mirror that agreement between you and Maloney or the Barbados government" *Id.* at page 58, 10:32am. Rather than tell Moore that he is not his attorney, or that he cannot give Moore advice because he is a neutral third party, Stein did the exact opposite. Moore

asked if Stein could do this for him, to which Stein replied that he did not have the info to do so, and that Moore needed to fill it in himself. Stein directed Moore to change the names from Serum to GVE and change GVE to RIL. *Id.* timestamp 10:40am. Moore was giving Stein yet chance attempt to tell him no, and that he cannot advise him  because he is a neutral third party, but Stein refused to do so. Stein also did not advise RIL that he personally was trying to make a profit off this new deal.

123.   A few days later, on June 30th, with the pressure mounting from RIL, Stein advised Moore that Moore needed to respond to an e-mail chain which had RIL's attorney, Leonard Pertnoy copied. Stein advised that if Moore did not do so, Stein would have to return the funds. *Id.* at 59. Stein wrote that the response had to be "IN WRITING!! In response to the email chain! Not in a phone call or a text message or a WhatsApp message. You can get the attorney to do it. But they need to get the response too." *Id* at 60, 10:32am. Stein once again was advising Moore on how to navigate his way through this transaction.

124.   Throughout the entirety of the transaction, it is clear that Moore and Stein were  working together to try and profit off of the monies which RIL had entrusted with Stein to procure vaccines.

125.   Stein advised Moore throughout the entirety of the transaction.   Stein and Moore's relationship  was entirely unknown to RIL until July of 2022, and certainly was not known to RIL at the time the release of Stein was executed.

126.   The Release, which as stated above, required Stein to diligently pursue a return of funds from his co-Defendants, would require a diligent pursuit of GVE and Moore, in order for the conditions of the release to be fulfilled and for Stein and DS Law Group to be released. However, it is a complete impossibility that Stein could

SECOND AMENDED COMPLAINT

use his "best endeavors" to pursue Moore and GVE, as stated in the release, because of their relationship.

## FACTUAL ALLEGATIONS AS TO WARNER+NORCROSS+JUDD & JAMES L. SCOTT, ESQ.

127. In the context of the transaction between GVE and RIL, RIL requested that GVE provide legal opinion letters verifying information and support the narrative of having a track record of successful PPE transactions as represented by Moore during the course of his negotiations and communications with RIL and its representatives.

128. To that extent, RIL's endeavored to supplement its due diligence by requiring GVE to provide legal opinion letters, confirming that Moore and GVE were in fact legitimate participants with a record of having successfully negotiated supply and transactions within the PPE marketplace.

129. To that end, Defendant Scott, an attorney employed by WNJ was retained by GVE for the particular purpose of providing a written opinion confirming that GVE had provided the requisite documents supporting GVE's representation that it had negotiated contracts for the right to promote and sell COVID-19 vaccines.

130. This letter dated April 24, 2021 ("WNJ Opinion Letter"), which is written on WNJ Letterhead stated as follows and is attached as Exhibit 18:

> "To Whom it May Concern: I have been asked to represent Good Vibrations Entertainment LLC. In connection with that request, I can herby confirm, based on documents presented to me, that Good Vibrations Entertainment LLC ("GVE") has been involved in the medical supply and distribution business, and has negotiated contracts for the right to promote and sell COVID-19 vaccine products through its distribution channel for governments only. This letter is for the use of a transaction with GVE and

30

may not be used for any other transaction for purpose or proof of funds for any other transaction. Sincerely, James L. Scott, Esq.

131.   Upon information and belief, Defendant GVE by and through Moore, retained and instructed Scott to write the WNJ Opinion Letter.

132.   Moore provided Scott and WNJ with detailed information regarding GVE's transaction with RIL, including information with respect to the manufacturer and vaccine code description, supply quantities and authorizations provided to RIL by the Government of Barbados.

133.   Scott and WNJ were specifically aware that the WNJ Opinion Letter was to be used to supplement and confirm GVE's representations to RIL with respect to its previous and existing business dealings with respect to procuring, promoting and selling COVID-19 vaccines.

134.   RIL reasonably relied on contents of the WNJ Opinion Letter in furtherance of that purpose.

135.   Scott and WNJ were also specifically aware that RIL was the intended third-party beneficiary of the WNJ Opinion Letter.

136.   As a result of Scott and WNJ's negligent misrepresentation, RIL suffered damages.

137.   At Scott and WNJ's deposition taken on July 19, 2022, Scott admitted that Defendant Moore had provided him with documents to support the particulars with respect to drafting the WNJ Opinion Letter.

138.   Scott testified during his deposition to have relied solely on the following documents Scott ("Supporting Documents"):

a.   an opinion letter written by Stein, which is curiously similar to what Scott ultimately wrote on GVE's behalf;

b.   a strategic partnership agreement between Antibacteria International Co.

31

PTE LTD, a Singapore based entity, and Guoyu Holding Limited, a Hong Kong based entity;

c. a certificate from a company called Sinopharm Holding Changsha Hitech Medicine Co. LTD, a Chinese entity stating that Antibacterial International Co. Pte. Ltd. was authorized to promote and distribute Sinopharm's Covid Vaccine;

d. a letter of authorization authorizing a company called Protecti Global Holdings Ltd to promote and distribute Guoyu Holding Limited's Covid vaccine and associated products; and,

e. a letter of intent addressed to AstraZeneca authorizing RIL to procure vaccines on the governments behalf.

f. an unsigned letter without a letterhead titled "Authorised Distributor Letter" authorizing Good Vibrations Entertainment to promote and facilitate vaccine sales for United Product Distribution and Protecti Global Holdings.

139.    The contents of the Supporting Documents do not validate the findings of facts and conclusion contained in the WNJ Opinion Letter. Accordingly, WNJ's Opinion Letter is based on unsupported conclusions with respect to GVE's track record of negotiating and selling COVID-19 vaccines and hence fatally flawed.

## <u>COUNT I - PIERCING THE CORPORATE VEIL OF DEFENDANT GVE</u>

140.    Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

141.    To pierce the corporate veil in Florida, "a Plaintiff is required to prove that both the Corporation is a mere instrumentality or alter ego of the Defendant, and that the Defendant engaged in improper conduct. *Priskie v. Missry,* 958 So.2d 613,

32

614-15 (Fla. 4th DCA 2007) (citation and internal quotation marks omitted). "It matters not that the improper conduct occurred after the formation of the corporation." *Bellairs v. Mohrmann,* 716 So.2d 323 (Fla. 2nd DCA 1998)

142. In Florida, the corporate veil will be pierced only in exceptional circumstances, such as for fraud or where the corporation is formed for some illegal purpose. "Improper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1320 (11th Cir. 1998) (citation and internal quotation marks omitted); *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (Fla. 3d DCA 2000) (noting that "unless there is a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose - as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced.").

143. Under *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So. 2d 1114, 1118 (Fla. 1984), the Court held that the corporate veil could be pierced if the corporation was used for an "unjust purpose." *Dania Jai-Alai* requires only that the corporation be used improperly or in an unjust manner, which clearly occurred here.

144. Defendant Moore held himself out to be GVE' CEO and COO, and unilaterally controlled the formation, day-to-day operations, assets, liabilities and ability to enter into contractual obligations on behalf of GVE.

145. Further to Moore's own admission, communicated to RIL shortly after RIL demanded the return of the $4.2 million – that he could not return the $4.2 million because upon receipt of the $4.2 million he withdrew all the money from GVE business account and gave it all to his immediate family and friends.

146.   Defendant Moore used GVE as a shell, instrumentality or conduit for the sole purpose of receiving the $4.2 million, and immediately thereafter transferring and diverting the monies to "family and friends" to defraud RIL.

147.   Defendant Moore used GVE as a subterfuge for the fraudulent vaccine transaction with RIL, as more fully set forth herein.

148.   GVE was used by Defendant Moore to unlawfully defraud RIL.

149.   In actuality, Defendant GVE is the instrumentality and/or alter ego of Moore.

150.   With respect to this matter, the existence of GVE is a mere façade for Moore to conduct his illicit and fraudulent dealings.

151.   Moore has used GVE, as discussed in the factual allegations above, to misrepresent, defraud, and ultimately swindle Plaintiff out of nearly $6.7 million. Moore used GVE for a wrongful and/or inequitable purpose, namely the aforementioned fraud and inducement of Plaintiff to deposit $12.2 million into an escrow account. The only purpose of GVE with respect to this transaction was to perpetuate an illegal scheme and defraud Plaintiff in its hope to obtain life-saving vaccines for the nation of Barbados.

152.   Moore himself, via GVE, has been unjustly enriched to the tune of $4.2 million via his illicit and tortious conduct.

153.   Moore will attempt to use GVE to shield himself from liability for his wrongdoing. However, GVE is the instrumentality of Moore. Moore is a wrongdoer and has engaged in fraudulent and illegal behavior, he is not an innocent stakeholder.

154.   Moore has used GVE as a subterfuge in these illegal, illicit, and fraudulent transactions.

155.   Moore and GVE have reaped enormous financial gains from their fraudulent activities.

SECOND AMENDED COMPLAINT

156.   Plaintiff has suffered damages caused by Moore's use of GVE as a vehicle to swindle and defraud Plaintiff via Moore's fraudulent and wrongful conduct. Moore has diverted Plaintiff's assets which were intended to be used to procure vaccines for the nearly 300,000 citizens of Barbados to GVE, which serves as his instrumentality and/or alter ego.

157. GVE is dominated by Moore in such a way that GVE is the instrumentality and/or alter ego of Moore, and GVE has been used for a fraudulent and/or illegal purpose. As such, GVE should be disregarded as a distinct entity, and its alter ego, Moore, should be held liable. Moore should not be able to use GVE to escape liability for his fraudulent activities.

WHEREFORE, Plaintiff demands judgment against Moore and GVE, piercing the corporate veil of GVE, as set forth above, holding Moore liable on the obligations and liabilities of GVE, and for such other and further relief as deemed necessary and proper by this Court.

## COUNT II - PIERCING THE CORPORATE VEIL OF DEFENDANT PRESTIGE

158.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

159.   To pierce the corporate veil in Florida, "a Plaintiff is required to prove that both the Corporation is a mere instrumentality or alter ego of the Defendant, and that the Defendant engaged in improper conduct. *Priskie v. Missry,* 958 So.2d 613, 614-15 (Fla. 4th DCA 2007) (citation and internal quotation marks omitted). "It matters not that the improper conduct occurred after the formation of the corporation." *Bellairs v. Mohrmann,* 716 So.2d 323 (Fla. 2nd DCA 1998)

160. In Florida, the corporate veil will be pierced only in exceptional circumstances, such as for fraud or where the corporation is formed for some illegal

purpose. "Improper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1320 (11th Cir. 1998) (citation and internal quotation marks omitted); *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (Fla. 3d DCA 2000) (noting that "unless there is a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose - as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust, the corporate veil cannot be pierced.").

161.   Upon information and belief, Defendant Coley controlled the operation and management of Defendant Prestige.

162.   At all times material, Coley was and is the principal of Prestige.

163.   Upon information and belief, Prestige is not managed by directors or managers, but by Coley herself, directly.

164.   In actuality, Defendant Prestige is the instrumentality and/or alter ego of Coley.

165.   Prestige is operated exclusively in the interest of Coley.

166.   Coley used Prestige merely as a vehicle through which she exercised her will.

167.   With respect to this matter, the existence of Prestige is a mere façade for Coley to conduct her illicit and fraudulent dealings.

168.   Coley has used Prestige, as discussed in the factual allegations above, to misrepresent, defraud, and ultimately swindle Plaintiff out of nearly $6.7 million. Coley used Prestige for a wrongful and/or inequitable purpose, namely the aforementioned fraud and inducement of Plaintiff to deposit $12.2 million into an

36

escrow account. The only purpose of Prestige with respect to this transaction was to perpetuate an illegal scheme and defraud Plaintiff in its hope to obtain life-saving vaccines for the nation of Barbados.

169.   Coley herself, via Prestige, has been unjustly enriched to the tune of $2 million via her illicit behavior.

170.   Coley will attempt to use Prestige to shield herself from liability for his wrongdoing. However, Prestige is the instrumentality of Coley. Coley is a wrongdoer and has engaged in fraudulent and illegal behavior, she is not an innocent stakeholder.

171.   Coley has used Prestige as a subterfuge in these illegal, illicit, and fraudulent transactions.

172.   Coley and Prestige have reaped enormous financial gains from their fraudulent activities.

173.   Plaintiff has suffered damages caused by Coley's use of Prestige as a vehicle to swindle and defraud Plaintiff via Coley's fraudulent and wrongful conduct. Coley has diverted Plaintiff's assets which were intended to be used to procure vaccines for the nearly 300,000 citizens of Barbados to Prestige, which serves as his instrumentality and/or alter ego.

174.   Prestige is dominated by Coley in such a way that Prestige is the instrumentality and/or alter ego of Coley, and Prestige has been used for a fraudulent and/or illegal purpose. As such, Prestige should be disregarded as a distinct entity, and its alter ego, Coley, should be held liable. Coley should not be able to use Prestige to escape liability for her fraudulent activities.

WHEREFORE, Plaintiff demands judgment against Coley and Prestige, piercing the corporate veil of Prestige, as set forth above, holding Coley liable on the obligations and liabilities of Prestige, and for such other and further relief as deemed necessary and proper by this Court.

SECOND AMENDED COMPLAINT

1
2

### **COUNT III - CIVIL CONSPIRACY**
**(As to Stein, DS Law Group, Coley, Prestige, Good Vibration, and Moore)**

3       175.   Plaintiff incorporates by reference and realleges paragraphs 1 through
4   139 set forth above.

5       176.   Defendants conspired with one another, as well as other individuals and
6   entities to perpetrate an unlawful act upon Plaintiff, or to perpetrate a lawful act by
7   unlawful means, *to wit:* Defendants conspired with one another in order through
8   fraudulent means to induce Plaintiff to deposit a large sum of funds into an escrow
9   account in order to obtain life-saving vaccines for the nearly 300,000 citizens of
10  Barbados, despite Defendants having no intention or ability to procure or deliver
11  those vaccines. Defendants, at all times material, acted in concert to continue along
12  with the charade that they could in fact source and deliver vaccines to Barbados, in
13  order to induce Plaintiff to not seek a return of its funds, which unbeknownst to
14  Plaintiff, had been grossly misappropriated.
15

16      177.   Defendants put their own pecuniary interests ahead of the welfare and
17  economic safety of the victims of the conspiracy, namely Plaintiff, as well as putting
18  their own pecuniary interests ahead of the welfare and health of the nearly 300,000
19  citizens of Barbados. By acting in concert at all times material to defraud,
20  misrepresent, and falsely induce Plaintiff to continue with the transaction, so
21  Defendants could continue to possess and spend their ill-gotten gains at the literal
22  expense of Plaintiff.

23      178.   Defendants had actual and/or constructive knowledge of the ongoing
24  fraud being perpetuated, as well as of the misappropriation of funds deposited by
25  Plaintiff to obtain the vaccines.

26      179.   Defendants were aware that themselves and their agents played a vital
27  role in the success/maintenance of their fraud.

28

SECOND AMENDED COMPLAINT

180.   As a direct and proximate result of Defendants' participation in, and furtherance of the conspiracy, Plaintiff has suffered substantial economic damages. Further, the people of Barbados have been deprived of life-saving vaccines.

WHEREFORE, Plaintiff demands entry of a judgment against Defendants, for an amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees, and costs.

## COUNT IV - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") – BUSINESS AND PROFESSIONS CODE SECTION 17200
### (As to Defendant GVE)

181.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

182.   Business and Professions Code section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice, any unfair,  deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.

183.   The UCL imposes strict liability.  Plaintiff need not prove that GVE intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

184.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

185.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

SECOND AMENDED COMPLAINT

186.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

187.   The violation of any law constitutes an "unlawful" business practice under the UCL.

188.   Plaintiff has standing to bring this action pursuant to § 17204 Cal. Bus. & Prof. Code, because Plaintiff has suffered injury in fact and has lost money as a result of the unfair competition practices of Defendant GVE.

189.   Defendant GVE violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to the following: As described above, RIL repeatedly attempted to obtain delivery of vaccines with the assistance of GVE which were needed to better the health and well-being of the citizens of Barbados. GVE represented, expressly or by implication, through a variety of means, including through the internet via e-mail, through text message, and over the telephone, that they had they had the business connections and ability to procure 1 million doses of AstraZeneca vaccines. Through these fraudulent and deceptive means, GVE induced Plaintiff to pay $12.2 million dollars under the guise that GVE would be able to source and deliver the vaccines. Further, GVE represented that it would make only a $2 million commission from the transaction. In actuality, its anticipated profits were far in excess of that amount, to the tune of $8 million. Upon information and belief, GVE, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

190.   GVE specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

191.   Because of GVE' unfair, fraudulent, and unlawful activities, GVE has caused substantial damages to Plaintiff.

192.   In addition, GVE has been unjustly enriched because of their deceptive

acts and/or practices.

193.   By virtue of the foregoing, and Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order for GVE to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all of GVE's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## COUNT V - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") – BUSINESS AND PROFESSIONS CODE SECTION 17200
### (As to Defendant Alex Lee Jr, a/k/a Alex Moore a/k/a Flex Moore)

194.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

195.   Business and Professions Code section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.

196.   The UCL imposes strict liability.  Plaintiff need not prove that Moore intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

197.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

198.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

41

199.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

200.   The violation of any law constitutes an "unlawful" business practice under the UCL.

201.   Plaintiff has standing to bring this action pursuant to § 17204 Cal. Bus. & Prof. Code, because Plaintiff has suffered injury in fact and has lost money as a result of the unfair competition practices of Defendant Moore.

202.   Defendant Moore violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to the following: As described above, RIL repeatedly attempted to obtain delivery of vaccines with the assistance of Moore which were needed to better the health and well-being of the citizens of Barbados. Moore represented, expressly or by implication, through a variety of means, including through the internet via e-mail, through text message, and over the telephone, that they had they had the business connections and ability to procure 1 million doses of AstraZeneca vaccines. Through these fraudulent and deceptive means, Moore induced Plaintiff to pay $12.2 million dollars under the guise that Moore would be able to source and deliver the vaccines. Further, Moore represented that he, via GVE, his LLC of which he was the sole member, would make only a $2 million commission from the transaction. In actuality, Moore's anticipated profits were far in excess of that amount, to the tune of $8 million. Upon information and belief, Moore, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

203.   Moore specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

204.   Because of Moore' unfair, fraudulent, and unlawful activities, Moore has caused substantial damages to Plaintiff.

205.   In addition, Moore has been unjustly enriched because of their deceptive acts and/or practices.

206.   By virtue of the foregoing, and Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order for Moore to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all of Moore's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## COUNT VI - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") – BUSINESS AND PROFESSIONS CODE SECTION 17200
### (As to Defendant Prestige)

207.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

208.   Business and Professions Code section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice, any unfair,  deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.

209.   The UCL imposes strict liability.  Plaintiff need not prove that Prestige intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

210.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

211.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm

43

to the alleged victims.

212.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

213.   The violation of any law constitutes an "unlawful" business practice under the UCL.

214.   Plaintiff has standing to bring this action pursuant to § 17204 Cal. Bus. & Prof. Code, because Plaintiff has suffered injury in fact and has lost money as a result of the unfair competition practices of Defendant Prestige.

215.   Defendant Prestige violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to the following: As described above, and more specifically, Prestige misled Plaintiff into continuing with the transaction after it had deposited $12.2 million with Defendant Stein through false, misleading, and incomplete representations regarding Prestige's ability to procure and deliver vaccines to the island of Barbados. All the while, the principal of Prestige, Defendant Coley, continued to freely spend her ill-gotten gains. Upon information and belief, Prestige, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

216.   Prestige specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

217.   Because of Prestige's unfair, fraudulent, and unlawful activities, Prestige has caused substantial damages to Plaintiff.

218.   In addition, Prestige has been unjustly enriched because of their deceptive acts and/or practices.

219.   By virtue of the foregoing, and Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order for Prestige to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all of

Prestige's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

### COUNT VII - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL") – BUSINESS AND PROFESSIONS CODE SECTION 17200
### (As to Defendant Coley)

220.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

221.   Business and Professions Code section 17200 et seq. (the Unfair Competition Law or UCL) prohibits any unlawful, unfair or fraudulent business act or practice, any unfair, deceptive, untrue or misleading advertising, and any violation of Business and Professions Code section 17500 et seq.

222.   The UCL imposes strict liability.  Plaintiff need not prove that Coley intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

223.   The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  Cal. Bus. Prof. Code § 17200.

224.   A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

225.   A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

226.   The violation of any law constitutes an "unlawful" business practice under the UCL.

227.   Plaintiff has standing to bring this action pursuant to § 17204 Cal. Bus. & Prof. Code, because Plaintiff has suffered injury in fact and has lost money as a result of the unfair competition practices of Defendant Coley.

228.   Defendant Coley violated the UCL by engaging in unlawful, unfair, and fraudulent business acts or practices, including but not limited to the following: As described above, and more specifically, Coley misled Plaintiff into continuing with the transaction after it had deposited $12.2 million through false, misleading, and incomplete representations regarding Coley's ability to procure and deliver vaccines to the island of Barbados. All the while, Defendant Coley continued to freely spend her ill-gotten gains. Upon information and belief, Coley, at no time material hereto, possessed either the ability or the intent to procure, let alone deliver, these vaccines to RIL.

229.   Coley specifically sought to harm Plaintiff in the execution of their fraudulent scheme.

230.   Because of Coley' unfair, fraudulent, and unlawful activities, Coley has caused substantial damages to Plaintiff.

231.   In addition, Coley has been unjustly enriched because of their deceptive acts and/or practices.

232.   By virtue of the foregoing, and Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and order for Coley to cease this unfair competition, as well as disgorgement and restitution to Plaintiff of all of Coley's revenues associated with her unfair competition, or such portion of those revenues as the Court may find equitable.

//

//

46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VIII - CAUSE OF ACTION
## FRAUD
### (As to Defendant GVE)

233.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

234.   GVE knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of GVE.

235.   As described above, GVE, at all times material, materially misrepresented their ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that GVE offer proof that they could deliver, GVE continued to double and triple down on their ability to source and deliver the vaccines, despite no ability or intention to do so.

236.   Those representations, as GVE knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the sham propagated by GVE, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

237.   Each time Plaintiff demanded reassurance from GVE, GVE represented that they would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

238.   Those representations, as GVE knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by GVE, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

239.   GVE had a duty to disclose to Plaintiff that they would not be able to source and deliver the vaccines.

240.   GVE failed to disclose the aforementioned material information to

47

Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to GVE at all times material.

241.  In failing to disclose the aforementioned material information to Plaintiff, GVE acted in bad faith.

242.  GVE intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that GVE could obtain pecuniary gain.

243.  Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late and GVE had already received funds which had been misallocated.

244.  As a direct and proximate result of GVE misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

245.  By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting GVE from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT IX –FRAUD
### (As to Defendant Moore)

246.  Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

247.  Moore knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Moore.

248.  As described above, Moore, at all times material, materially

48

misrepresented his ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Moore offer proof that he could deliver, Moore continued to double and triple down on his ability to source and deliver the vaccines, despite no ability or intention to do so.

249.   Those representations, as Moore knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the sham propagated by Moore, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

250.   Each time Plaintiff demanded reassurance from Moore, Moore represented that he would be able to source and deliver the vaccines, or that his trusted intermediaries would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

251.   Those representations, as Moore knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Moore, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

252.   Moore had a duty to disclose to Plaintiff that he would not be able to source and deliver the vaccines.

253.   Moore failed to disclose the aforementioned material information to Plaintiff, despite knowing his failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Moore at all times material.

254.   In failing to disclose the aforementioned material information to Plaintiff, Moore acted in bad faith.

255.   Moore intended for Plaintiff to rely on the misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the

SECOND AMENDED COMPLAINT

escrow account, so that Moore could obtain pecuniary gain.

256.   Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late, and Moore had already received funds which had been misallocated.

257.   As a direct and proximate result of Moore misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

258.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Moore from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT X –FRAUD
### (As to Defendant Prestige)

259.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

260.   Prestige knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Prestige.

261.   As described above, Prestige, at all times material, materially misrepresented their ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Prestige offer proof that they could deliver, Prestige continued to double and triple down on their ability to source and deliver the vaccines, despite no ability or intention to do so.

262.   Those representations, as Prestige knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue

50

along with the sham propagated by Prestige, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

263.   Each time Plaintiff demanded reassurance from Prestige, Prestige represented that they would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

264.   Those representations, as Prestige knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Prestige, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

265.   Prestige had a duty to disclose to Plaintiff that they would not be able to source and deliver the vaccines. Further, Prestige had a duty to disclose that it was not a licensed or credentialed intermediary and did not have the status or ability to obtain vaccines from AstraZeneca.

266.   Prestige failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Prestige at all times material.

267.   In failing to disclose the aforementioned material information to Plaintiff, Prestige acted in bad faith.

268.   Prestige intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that Prestige could obtain pecuniary gain.

269.   Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late, and Prestige had already received funds which had been misallocated.

270.   As a direct and proximate result of Prestige's misrepresentations,

fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

271.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Prestige from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XI –FRAUD
### (As to Defendant Coley)

272.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

273.   Coley knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Coley.

274.   As described above, Coley, at all times material, materially misrepresented her ability to source and deliver vaccines to Plaintiff and the island of Barbados. Upon Plaintiff's insistence that the transaction be terminated, or that Coley offer proof that she could deliver, Coley continued to double and triple down on their ability to source and deliver the vaccines, despite no ability or intention to do so.

275.   Those representations, as Coley knew full well at the time they were made, were entirely false and made with the intent to induce Plaintiff to continue along with the sham propagated by Coley, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

276.   Each time Plaintiff demanded reassurance from Coley, Coley represented that she would be able to source and deliver the vaccines, despite a complete inability, or want to do so.

277.   Those representations, as Coley knew full well at the time they were

made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by Coley, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

278.   Coley had a duty to disclose to Plaintiff that they would not be able to source and deliver the vaccines. Further, Coley had a duty to disclose that she was not a licensed or credentialed intermediary and did not have the status or ability to obtain vaccines from AstraZeneca. Even further still, Coley failed to disclose that she had been the principal of a different company that had been subject to a lawsuit and subsequent judgment in excess of $335,000.00 for a similar PPE-related fraud just months prior to the events detailed in this complaint.

279.   Coley failed to disclose the aforementioned material information to Plaintiff, despite knowing her failure to disclose said information would induce Plaintiff to act contrary to how Plaintiff would have acted were it provided the material information known to Coley at all times material.

280.   In failing to disclose the aforementioned material information to Plaintiff, Coley acted in bad faith.

281.   Coley intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its deposit into the escrow account, so that Coley could obtain pecuniary gain.

282.   Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek reimbursement of their deposit amount until it was too late, and Coley had already received funds which had been misallocated. As is clear from the attached photos of Ms. Coley flaunting her newfound wealth on social media, she has freely spent those ill-gotten funds.

283.   As a direct and proximate result of Coley misrepresentations, fraudulent activity, and omissions, Plaintiff has been damaged in a substantial amount to be

determined at trial, exclusive of interest and costs.

284.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting Coley from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XII–FRAUD

### (As to Defendant Stein)

285.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

286.   Stein knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of Stein.

287.   As described above, Stein, at all times material, materially misrepresented that he had properly performed his obligations as the paymaster/escrow agent. Upon Plaintiff's insistence that confirmation of the wire transfers be provided, Stein insisted that the funds had been transferred in accordance with the paymaster agreement.

288.   Those representations, as Stein fully knew at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the transaction, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

289.   Each time Plaintiff demanded reassurance from Stein, he stated that these reassurances were not a part of his responsibility as escrow agent and that the funds had in fact been transferred in accordance with the paymaster agreement.

290.   Those representations, as Stein knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with

the charade perpetuated by Stein, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

291.    Stein had in actuality deviated entirely from the terms of the paymaster agreement, in express breach of his ethical and fiduciary duties, causing great harm to Plaintiff. Stein had a duty to disclose to Plaintiff that the funds had not been transferred in accordance with the paymaster agreement.

292.    Stein failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how it would act were it provided the material information.

293.    In failing to disclose the aforementioned material information to Plaintiff, Defendants acted in bad faith.

294.    Stein intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its funds, so that Stein could obtain pecuniary gain for himself and the other Defendants.

295.    Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek the return of its funds until a time at which Stein had already misappropriated the funds. Upon information and belief, these funds have already been largely spent by the Defendants.

296.    As a direct and proximate result of Stein's misrepresentations and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

297.    By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, together with interest and costs, an injunction prohibiting Stein from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

//

SECOND AMENDED COMPLAINT

## COUNT XIII – FRAUD

### (As to Defendant DS Law Group)

298.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

299.   DS Law Group knowingly made material misrepresentations and omissions to Plaintiff with the intent to induce Plaintiff to rely on those misrepresentations and omissions to the detriment of Plaintiff and for the pecuniary gain of DS Law Group.

300.   As described above, DS Law Group, at all times material, materially misrepresented that he had properly performed his obligations as the paymaster/escrow agent. Upon Plaintiff's insistence that confirmation of the wire transfers be provided, Stein insisted that the funds had been transferred in accordance with the paymaster agreement.

301.   Those representations, as DS Law Group fully knew at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the transaction, to the financial detriment of Plaintiff, as well as to the detriment of the citizens of Barbados.

302.   Each time Plaintiff demanded reassurance from DS Law Group via Stein, Plaintiff was told that those reassurances were not a part of his responsibility as escrow agent and that the funds had in fact been transferred in accordance with the paymaster agreement.

303.   Those representations, as DS Law Group knew full well at the time they were made, were false and made with the intent to induce Plaintiff to continue along with the charade perpetuated by DS Law Group, to the financial detriment of Plaintiff as well as to the detriment of the citizens of Barbados.

304.   Stein had in actuality deviated entirely from the terms of the paymaster

agreement, in express breach of his ethical and fiduciary duties, causing great harm to Plaintiff. Stein had a duty to disclose to Plaintiff that the funds had not been transferred in accordance with the paymaster agreement.

305.   Stein failed to disclose the aforementioned material information to Plaintiff, despite knowing their failure to disclose said information would induce Plaintiff to act contrary to how it would act were it provided the material information.

306.   In failing to disclose the aforementioned material information to Plaintiff, Defendants acted in bad faith.

307.   Stein intended for Plaintiff to rely on the aforementioned misrepresentations and omissions in order to induce Plaintiff to not seek a return of its funds, so that Stein could obtain pecuniary gain for himself and the other Defendants.

308.   Plaintiffs reasonably relied on the aforementioned misrepresentations and omissions and did not seek the return of its funds until a time at which Stein had already misappropriated the funds. Upon information and belief, these funds have already been largely spent by the Defendants.

309.   As a direct and proximate result of Stein's misrepresentations and omissions, Plaintiff has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

310.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, together with interest and costs, an injunction prohibiting Stein from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

//

SECOND AMENDED COMPLAINT

1
2

## COUNT XIV – NEGLIGENT MISRPRESENTATION
### (As to Defendant GVE)

3
4

311.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

5
6
7

312.   In accepting Plaintiff's $12.2 million deposit, GVE represented that they would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

8
9
10

313.   GVE had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to their ability to source and deliver the vaccines.

11
12
13
14

314.   From late March 2021 to late July 2021, as described above, GVE repeatedly misrepresented that they could source and deliver vaccines, to the detriment of Plaintiff. GVE failed to disclose material information related to their ability to actually perform their obligations under the Purchase Agreement.

15
16

315.   These misrepresentations and omissions made by GVE were materially misleading and false.

17
18
19
20

316.   GVE knew or should have known that their representations, including their representations conveyed as a result of omissions, were false, or made without knowledge of their truth or falsity.

21
22

317.   Plaintiff, acting in justifiable reliance on GVE misrepresentations and omissions, suffered significant damages.

23
24
25
26

318.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting GVE from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

27

//

28

58

## COUNT XV – NEGLIGENT MISRPRESENTATION
### (As to Defendant Moore)

319.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

320.   In accepting Plaintiff's $12.2 million deposit, Moore represented that he would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

321.   Moore had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to their ability to source and deliver the vaccines.

322.   From late March 2021 to late July 2021, as described above, Moore repeatedly misrepresented that he could source and deliver vaccines, to the detriment of Plaintiff. Moore failed to disclose material information related to his ability to actually perform their obligations under the Purchase Agreement.

323.   These misrepresentations and omissions made by Moore were materially misleading and false.

324.   Moore knew or should have known that his representations, including his representations conveyed as a result of his omissions, were false, or made without knowledge of their truth or falsity.

325.   Plaintiff, acting in justifiable reliance on Moore misrepresentations and omissions, suffered significant damages.

326.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Moore from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

//

SECOND AMENDED COMPLAINT

## COUNT XVI – NEGLIGENT MISRPRESENTATION
### (As to Defendant Prestige)

327.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

328.   In entering into the transaction as an "intermediary" Prestige represented that they would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

329.   Prestige had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to their ability to source and deliver the vaccines.

330.   As described above, Prestige repeatedly misrepresented that they could source and deliver vaccines, to the detriment of Plaintiff. Prestige failed to disclose material information related to their ability to actually perform their obligations under the purchase and sale agreement.

331.   These misrepresentations and omissions made by Prestige were materially misleading and false.

332.   Prestige knew or should have known that their representations, including their representations conveyed as a result of omissions, were false, or made without knowledge of their truth or falsity.

333.   Plaintiff, acting in justifiable reliance on Prestige misrepresentations and omissions, suffered significant damages.

334.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Prestige from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

//

SECOND AMENDED COMPLAINT

## COUNT XVII – NEGLIGENT MISRPRESENTATION
### (As to Defendant Coley)

335.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

336.   In entering into the transaction as an "intermediary", Coley represented that she would be able to obtain 1 million doses of AstraZeneca vaccines, to be delivered to Plaintiff for the purpose of vaccinating the citizens of Barbados, as described above.

337.   Coley had a duty not to mislead Plaintiffs and to disclose to Plaintiffs any material information that could be contrary to her ability to source and deliver the vaccines.

338.   As described above, Coley repeatedly misrepresented that she could source and deliver vaccines, to the detriment of Plaintiff. Coley failed to disclose material information related to her ability to actually perform her obligations under the Purchase Agreement.

339.   These misrepresentations and omissions made by Coley were materially misleading and false.

340.   Coley knew or should have known that her representations, including her representations conveyed as a result of omissions, were false, or made without knowledge of their truth or falsity.

341.   Plaintiff, acting in justifiable reliance on Coley misrepresentations and omissions, suffered significant damages.

342.   By virtue of the foregoing, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Coley from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

//

## COUNT XVIII – UNJUST ENRICHMENT
### (As to Defendant GVE)

343.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

344.   Plaintiff has conferred a benefit on GVE in the form of $4.2 million.

345.   GVE, undoubtedly, have knowledge of that benefit.

346.   GVE voluntarily accepted and retained the aforementioned funds from Plaintiff.

347.   Under the circumstances of this matter, it would be inequitable for GVE to retain those funds.

348.   The funds received by GVE belong in equity and good conscience to Plaintiff.

349.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by GVE, together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XIX – UNJUST ENRICHMENT
### (As to Defendant Moore)

350.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

351.   Plaintiff has conferred a benefit on Moore via GVE as its principal in the form of $4.2 million.

352.   Moore undoubtedly, has knowledge of that benefit.

353.   Moore voluntarily accepted and retained the aforementioned funds from Plaintiff.

354.   Under the circumstances of this matter, it would be inequitable for Moore to retain those funds.

355.   The funds received by Moore belong in equity and good conscience to Plaintiff.

356.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Moore, together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XX – UNJUST ENRICHMENT
### (As to Defendant Prestige)

357.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

358.   Plaintiff has conferred a benefit on Prestige in the form of $2 million.

359.   Prestige undoubtedly, has knowledge of that benefit.

360.   Prestige voluntarily accepted and retained the aforementioned funds from Plaintiff.

361.   Under the circumstances of this matter, it would be inequitable for Prestige to retain those funds.

362.   The funds received by Prestige belong in equity and good conscience to Plaintiff.

363.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Prestige, together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XXI – UNJUST ENRICHMENT
### (As to Defendant Coley)

364.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

365.   Plaintiff has conferred a benefit on Coley, via Prestige as its principal, in the form of nearly $2 million.

366.   Coley undoubtedly, has knowledge of that benefit.

367.   Coley voluntarily accepted and retained the aforementioned funds from

Plaintiff.

368.   Under the circumstances of this matter, it would be inequitable for Coley to retain those funds.

369.   The funds received by Coley belong in equity and good conscience to Plaintiff.

370.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Coley, together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XXII – CONVERSION
### (As to Defendant GVE)

371.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

372.   Plaintiff was rightfully in possession of approximately $4.2 million which has been wrongfully obtained and withheld by GVE in this matter through their illicit conduct.

373.   GVE have willfully and without lawful justification appropriated Plaintiff's property without the consent of Plaintiff.

374.   GVE unlawful misappropriation has damaged Plaintiff in an amount of nearly $4.2 million.

375.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by GVE, together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XXIII – CONVERSION
### (As to Defendant Moore)

376.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

377.   Plaintiff was rightfully in possession of $4.2 million which has been

wrongfully obtained and withheld by Moore as principal of GVE in this matter through their illicit conduct.

378.   Moore has willfully and without lawful justification appropriated Plaintiff's property without the consent of Plaintiff.

379.   Moore's unlawful misappropriation has damaged Plaintiff in an amount of nearly $4.2 million.

380.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Moore together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XXIV – CONVERSION
### (As to Defendant Prestige)

381.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

382.   Plaintiff was rightfully in possession of approximately $2 million which has been wrongfully obtained and withheld by Prestige in this matter through their illicit conduct.

383.   Prestige have willfully and without lawful justification appropriated Plaintiff's property without the consent of Plaintiff.

384.   Prestige's unlawful misappropriation has damaged Plaintiff in an amount of nearly $2 million.

385.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Prestige together with interest and costs, and any other relief the Court deems just and proper.

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT XXV – CONVERSION
### (As to Defendant Coley)

386.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

387.   Plaintiff was rightfully in possession of approximately $2 million which has been wrongfully obtained and withheld by Coley as principal of Prestige in this matter through their illicit conduct.

388.   Coley has willfully and without lawful justification appropriated Plaintiff's property without the consent of Plaintiff.

389.   Coley's unlawful misappropriation has damaged Plaintiff in an amount of $2 million.

390.   By virtue of the foregoing, Plaintiff is entitled to recover the amount of funds improperly retained by Coley together with interest and costs, and any other relief the Court deems just and proper.

## COUNT XXVI – BREACH OF CONTRACT
### (As to Defendant GVE)

391.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

392.   Plaintiff and GVE for valuable consideration, entered into a valid and enforceable Purchase Agreement on April 16, 2021, for the sourcing and delivery of 1 million doses of AstraZeneca vaccines by Defendants in exchange for money payments by Plaintiff.

393.   Plaintiff fulfilled its end of the bargain with respect to the contract by depositing $12.2 million into an escrow account.

394.   In breach of the express terms of the contract, GVE failed to source and deliver the vaccines to Plaintiff. GVE retained the benefit of the majority of the funds

placed into escrow by Plaintiffs.

395.   By virtue of this material breach of the agreement by GVE, Plaintiff has suffered substantial economic damages.   Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting GVE from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

**COUNT XXVII – BREACH OF CONTRACT**
**(As to Defendant Moore)**

396.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

397.   Plaintiff and Moore, for valuable consideration, entered into a valid and enforceable Purchase Agreement on April 16, 2021, for the sourcing and delivery of 1 million doses of AstraZeneca vaccines by Defendants in exchange for money payments by Plaintiff.

398.   Plaintiff fulfilled its end of the bargain with respect to the contract by depositing $12.2 million into an escrow account.

399.   In breach of the express terms of the contract, Moore failed to source and deliver the vaccines to Plaintiff. Moore retained the benefit of the majority of the funds placed into escrow by Plaintiffs.

400.   By virtue of this material breach of the agreement by Moore, Plaintiff has suffered substantial economic damages.   Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Moore from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

//

## COUNT XXVIII – NEGLIGECE

### (As to Defendant Stein)

401.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

402.   Defendant Stein is a licensed attorney in the state of California and is a partner at the DS Law Group.

403.   At all times material to this complaint, Stein was acting in the capacity as an escrow agent/paymaster with respect to the transaction detailed throughout this complaint to obtain vaccines to be used for the health and well-being of nearly 300,000 citizens of Barbados.

404.   Stein had a fiduciary and ethical duty to act reasonably and responsibly in his capacity as both an attorney and as the escrow agent/paymaster for the transaction described herein.

405.   Stein, while in the employ of DS Law Group, breached that duty, by misappropriating millions of dollars in funds to his co-Defendants, and directly and knowingly controverting the terms of the paymaster agreement.

406.   As a result of Stein's negligence, Plaintiff has suffered substantial economic damages. Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting Stein from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT XXIX – NEGLIGECE

### (As to Defendant DS Law Group)

407.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

408.   Defendant DS Law Group is an LLLP operating in the State of

California.

409.   At all times material to this complaint, DS Law Group, via its agent Stein, was acting in the capacity as an escrow agent/paymaster with respect to the transaction detailed throughout this complaint to obtain vaccines to be used for the health and well-being of nearly 300,000 citizens of Barbados.

410.   DS Law Group had a fiduciary and ethical duty to act reasonably and responsibly in its capacity as the escrow agent/paymaster for the transaction described herein.

411.   DS Law Group breached that duty, by misappropriating millions of dollars in funds, and directly and knowingly controverting the terms of the paymaster agreement.

412.   As a result of DS Law Group's negligence, Plaintiff has suffered substantial economic damages. Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting DS Law Group from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## <u>COUNT XXX - BREACH OF CONTRACT & RELEASE AGREEMENT</u>
### (as to Stein & DS Law Group)

413.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

414.   Plaintiff RIL and Stein, for valuable consideration, entered into the Release Agreement, which Stein insisted on in order to return the balance of Plaintiff's funds.

415.   Plaintiff RIL agreed to give Stein and DS Law Group a release  certain conditions precedent, which were:

   a. Stein shall wire the balance of the funds in the IOLTA Account relating to the Transaction, being $5,474,830 to RIL within one business day of

mutual execution of this Release;

b. Stein shall use his best endeavors to pursue the IOLTA recipients and all persons to whom funds were disbursed to out of the IOLTA Account in order to procure the return of all sums previously paid out in connection with the transaction;

c. Stein shall provide to RIL such assistance as may be requested by Radical to allow Radical to pursue the IOLTA recipients and all parties to whom sums were paid by Stein out of the IOLTA account in connection with the transaction;

d. Stein shall provide such correspondence, documentation or other communication related to requests for the disbursements out of the IOLTA Account or otherwise related to the Transaction together with evidence of all payments made, as Radical may request; and,

e. Stein shall forwith pay to RIL any sums which are returned to Stein/the IOLTA Account in respect of any repayment of sums previously disbursed by Stein out of the IOLTA Account to the IOLTA recipients or otherwise in respect of the Transaction. *Id.*

416. In breach of the express terms of the release, to date, Stein has done absolutely nothing in his power to meaningfully assist RIL with pursuing his co-Defendants, nor has he been forthcoming with providing correspondence and communications between him and his co-Defendants related to the disbursement of monies as described herein. Simply put, Stein has done next to nothing whatsoever to aid RIL in the recovery of the monies that Stein so grossly misappropriated, and has not fulfilled the conditions precedent to Stein and DS Law Group being released.

417. By virtue of this material breach of the agreement by Stein and DS Law Group, Plaintiff has suffered substantial economic damages and has been forced to

70

file this lawsuit. Stein has failed to fulfill the conditions precedent contained in the release, and thus he has fully and completely breached its terms, and both Stein and DS Law Group are not released.

418.   As such, Plaintiff is entitled to an award of compensatory damages, including consequential damages, together with interest and costs.

## Count XXXI FOR INJUNCTIVE RELIEF – FRAUD IN THE INDUCEMENT (As to Stein and DS Law Group)

419.   Plaintiff incorporates by reference and realleges paragraphs 1 through 139 set forth above.

420.   To establish a claim of fraudulent inducement, one must show that the Defendant did not intend to honor its contractual promises when they were made. *Agosta v. Astor*, (2004) 120 Cal.App.4th. 596, 603.

421.   Defendant Stein, at the time of execution of the release, failed to disclose a number of material facts regarding the transaction and his role to RIL.

422.   More specifically, Stein failed to disclose that he was, in effect, acting as an attorney for Defendant Moore and GVE, and that Stein was, despite conveying himself as a neutral, third-party escrow agent, intending to profit substantially from the transaction.

423.   Stein also was aware that his co-Defendants would profit  a sum substantially in excess of the agreed upon amount. Despite this knowledge, Stein failed to disclose any of these material facts to RIL.

424.   Per the terms of the Release of Stein and DS Law Group,  Stein was to diligently pursue the parties to which Stein had misappropriated RIL's funds, and was supposed to use his best endeavors to seek a return of the funds, as agreed upon per a plain reading of the release.

425.   To date, Stein has done nothing material to seek a return of the funds he

so grossly misappropriated for a simple reason: he cannot pursue Alex Moore or GVE, because GVE was, in effect, his client and business partner.

426.   Under California law, Fraud in the inducement occurs where a party's assent to a contract is obtained through conscious misrepresentation, concealment, or non-disclosure of a material fact which induces the innocent party to enter the contract. *Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 128.

427.   Stein, at no time, disclosed his attorney-client/business partner like relationship with Alex Moore that had run the course of, and actually pre-dated the entirety of the transaction. Had Stein disclosed his actual relationship with Moore, RIL would have been alerted to the fact that Stein was not a neutral third party, and that he could not fulfill the terms of the Release because he could not pursue his own client/business partner due to the conflict that had been created.

428.   Further, Stein also did not disclose that he was going to profit tremendously off of the transaction, or that he was working behind the scenes with Moore to try and consummate the deal.

429.   Simply put, Stein concealed his true role in the transaction, despite his professional, legal, ethical, fiduciary, and moral responsibilities. Had RIL been properly advised of Stein's true role in the transaction, RIL would never, under any circumstances, have signed the release because it would have known that Stein could not perform the conditions precedent, and even further, that Stein was in essence a co-conspirator to this massive fraud.

430.   As a result of Stein and DS Law Group's fraudulent misrepresentation of their true role in the transaction, RIL was fraudulently induced to sign the  release . As such, Plaintiff asks this Court for injunctive relief to invalidate the release between RIL and Stein/DS Law Group, because of the Stein Defendants misrepresentations and omissions surrounding the transaction, along with their failure to fulfill

72

conditions precedent to the release.

## Count XXXII FOR INJUNCTIVE RELIEF – TEMPORARY RESTRAINING ORDER, APPOINTMENT OF A RECEIVER, AND ASSET FREEZE

### (As to Moore, GVE, Coley and Prestige Pegasus)

431.      Plaintiff incorporated by reference and realleges paragraphs 1 through 139 as set forth above.

432.   Defendants, Moore and GVE, received $4.2 million in wire transfers from Defendant Stein on or about April 27, 2021 and May 3, 2021. Defendants Coley and Prestige Pegasus were the beneficiaries of $2 million via wire transfer on or about April 27, 2021.

433.   Defendants Moore & GVE, based on bank records received from Bank of America and hereby attached as **Exhibit 24**, have withdrawn substantial sums of cash, in the hundreds of thousands, from GVE's Florida based bank account.

434.   Moore has also spent large sums out of the GVE Florida Bank of America account on numerous lavish luxury items, including purchases which total in the hundreds of thousands on vehicles, designer items, jewelry, plastic surgery, and more.

435.   Moore has also made numerous transfers, which he openly discussed at his deposition, in the amount of several hundreds of thousands of dollars to his friends and family.

436.   Moore has, and upon information and belief, continues to recklessly spend funds to which he is not entitled, and which rightfully belong to RIL. Without an order from the Court preventing him from spending same, RIL will be permanently and irreparably harmed.

437.   With respect to Defendant Coley, as evidenced by the photos from her social media page attached hereto, Coley, via a Prestige Pegasus bank account, has

deliberately and recklessly spent millions of dollars on luxury items.

438.   As evidenced by her bank records, which are attached hereto as **Exhibit 25**, Defendant Coley has spent or transferred the entirety of the $2 million which was wrongfully misappropriated to her. Based upon information and belief, Defendant Coley is likely to continue to spend these funds until they are completely exhausted.

439.   Asset freezes are a proper equitable remedy to assure the availability of permanent relief.[3] A freeze of assets of the individuals and corporations involved in this matter is essential to prevent the dissipation of assets during the pendency of litigation.[4] In this case, the business practices of Defendants are permeated with unfair practices, deceptions, fraud, and deliberate misrepresentations. Given the behavior of Defendants throughout this transaction, there appears to be a strong likelihood that assets will be dissipated or concealed during legal proceedings, causing irreparable injury to Plaintiff's ability to obtain the relief sought herein. As shown by the cases cited above, the Southern District and 11th circuit has routinely held that assets may be frozen on the basis of pervasive or deceptive activities. Defendants' pervasive and ongoing fraudulent activities and deception demonstrates their willingness to engage in bad acts and wrongdoing.

440.   Given the likelihood of a substantial monetary judgment against Defendants Moore/GVE and Coley/Prestige, which would deprive Defendants of the benefit of their illegal labors, Defendants possess ample incentive to unload or conceal their recoverable assets. Freezing those assets is the only way to prevent this from occurring during the pendency of this litigation.

441.   As another measure to protect Plaintiff's ability to obtain redress, Plaintiff is seeking the appointment of a temporary receiver who will be able to assist

---

[3] *F.T.C. v. U.S. Oil & Gas Corp.* 748, F.2d 1433-34 (11th Cir. 1984); F.T.C. v. GEM Merch Corp. 87 F.3d 466 (11th Cir. 1996); *Levi Strauss & Co. v. Sunrise Int'l Trading,* 51 F.3d 982, 987 (11th Cir. 1995)
[4] FTC v. US Mort. Funding, Inc., No. 11-cv-80155, 2011 U.S. Dist. WL 2293377 (S.D. Fla. Mar. 1,2011)

SECOND AMENDED COMPLAINT

with locating and preserving the assets and records of the Defendants to obviate the threat of destruction, concealment or dissipation of any assets possessed by Defendants that are rightfully Plaintiff's. A temporary receiver is necessary because, as the Defendants in this case have shown by their conduct throughout this matter, they have no issue conducting their business with trickery and deceit.[5] Further, computer records and assets can be destroyed or concealed at the press of a button, unless a third-party has possession of those records. While the TRO is pending, the receiver will be in a better position to prevent further indiscretions by Defendants and ensure that Plaintiff's assets will not continue to be grossly misappropriated.

442.  A TRO would further grant the receiver and Plaintiff immediate access to the business and records of the Defendants for the purpose of gathering evidence relevant to this matter. Further, this would permit Plaintiff to conduct expedited discovery. This access and right to expedite discovery are necessary to prevent the destruction of relevant evidence by Defendants, as well as to ensure that this Court can ultimately determine: (1) the full scope of Defendants legal violations; (2) the amount of assets possessed by Defendants; and (3) the nature, extent, and location of those assets.

443.  As such, RIL is requesting this Court enter a Temporary Restraining Order with respect to Defendants Moore, GVE, Prestige Pegasus, and Coley.

444.  Defendants have shown a complete disregard for the law and for the assets rightfully belonging to RIL such that a TRO is necessary.

445.  Only through these means can the Court prevent the otherwise almost certain destruction of vital documents and records, as well as the concealment or

---

[5] *SEC v. R. J Allen & Assocs., Inc.*, 386 F. Supp. 866,877 (S.D. Fla. 1974) (in such circumstances, "the appointment of a receiver is necessary 'to prevent diversion or waste of assets to the detriment for those for whose benefit, in some measure, the injunction action is brought'…")

secretion of assets, both of which would jeopardize the possibility of effective relief for Plaintiff.

446.   For the reasons set forth above, Plaintiff respectfully requests that this Court issue the requested temporary restraining order and order to show cause why an injunction should not be granted.

## Count XXXIII – LEGAL  MALPRACTICE – NEGLIGENT MISREPRESENTATION
### (As to Scott & WNJ)

447.   Plaintiff incorporates by reference and re-alleges paragraphs 1-139 as set forth above. .

448.   Every lawyer must render legal advice with the skill, prudence, and diligence of a lawyer of ordinary skill and capacity. (Kirsch v. Duryea (1978) 21 Cal. 3d 303, 308; California Rules of Prof. Conduct 3-110.

449.   Upon information and belief, Defendant Moore asked Mr. Scott to write an opinion letter for him on GVE's behalf in order to induce RIL to proceed with the transaction which underlies this lawsuit. Scott had a legal duty to use the skill, prudence and diligence as a duly licensed attorney commonly possesses and exercises.

450.   Scott breached that duty by drafting an opinion letter, which RIL relied on to its extreme financial detriment, which contained opinions not grounded in any documents or facts.

451.   Scott, based on the materials provided to him by Moore, knew his opinion letter was intended to be used for the purpose of inducing RIL to enter into the transaction which underlies this lawsuit.

452.   Relying on Scott's opinion letter, RIL was induced to enter into the transaction. Unbeknownst to RIL, Scott's assertions contained in this letter were

entirely unsupported by fact.

453.   Scott's misrepresentations and omissions contained within his opinion letter were materially misleading and false.

454.   Scott knew or should have known that his representations, including his representations conveyed as a result of omissions, were false, or made without knowledge or their truth or falsity.

455.   Based upon Scott's opinion letter, RIL, acting in justifiable reliance on Scott's misrepresentations and omissions, entered the transaction, and ultimately suffered significant financial damages as a result.

WHEREFORE, Plaintiff prays for an award against Defendants as follows:

1. For monetary damages against all Defendants;

2. For Pre-judgment interest against all Defendants

3. For injunctive relief as to Defendants GVE/Moore and Prestige/Coley; and,

4. For other such and further relief as the Court deems just and proper.

Dated: October 10, 2022

Respectfully submitted,

VAZQUEZ & ASSOCIATES
*Attorneys for Plaintiff*
1111 Brickell Avenue Suite 1550
Miami, Florida 33131
Telephone (305) 371-8064
Facsimile (305) 371-4967

By:     */s/ Gerardo A. Vazquez*
GERARDO A. VAZQUEZ, ESQ.
Florida Bar No.: 06904
GV@GVazquez.com
RALPH R. LONGO IV, ESQ.
Florida Bar No.: 124169

SECOND AMENDED COMPLAINT

RL@GVazquez.com

78