Michael T. Stoller (SBN 120241)
**STOLLER LAW GROUP,PC.**
5747 Hoback Glen Road
Hidden Hills, California 91302
(310) 245-4028
(424) 702-3201 facsimile
michael.stoller@stollerlawgroup.com

John D. Schwalb
**JOHN D. SCHWALB, PLLC**
120 Third Avenue South
Franklin, Tennessee 37064-2511
(615) 794-7100
john@jdschwalb.com

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RADICAL INVESTMENTS LTD.,** a St. Lucia Company,  )<br><br>　　　**Plaintiff,**　)<br><br>**vs.**　)<br><br>**GOOD VIBRATIONS ENTERTAINMENT LLC, et al.**　)<br><br>　　　**Defendants.**　) | No. 2:22-cv-02752-SVW-AFM |

---

**RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW**

---

Comes now the Defendant's Good Vibrations Entertainment, LLC and Alex Lee Moore, Jr., and in response to the Local Rule 56.1 Statements of Fact submits their response to the alleged statements of fact and additional statements of material facts

---

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

1 of 23

precluding summary judgment and conclusions of law.

**A:**   **RESPONSE TO RADICAL'S INDIVIDUAL STATEMENTS OF UNDISPUTED MATERIAL FACT.[1]**

1. In or around early 2021, the Country of Barbados was seeking COVID-19 vaccines, but due to various reasons, was having difficulty obtaining them.  Declaration of Olivia Warson ["Watson Decl."] ¶ 3

**RESPONSE**: Undisputed.

2. RIL was authorized to procure AstraZeneca vaccines on behalf of the Government of Barbados, acting through the Ministry of Health and Wellness.  Watson Decl. ¶ 4; Declaration of Ralph R. Longo IV ["Longo Decl."] ¶ 4; Exh. 1

**RESPONSE**: Admitted in part and supplemented.  In addition, the letter falsely claimed that the one million doses were solely for the people of Barbados and would not be resold.  Such was false.  The Astra Zeneca Vaccines that were ordered were more than twice the numbered needed to fully vaccinate the population of Barbados that was eligible under the World Health Organization use authorization.   See, Docket Entry 153, Declaration of Moore at ¶ 30.

3. In or around late March/early April 2021, RIL was introduced to Moore.  Watson Decl. ¶ 7

**RESPONSE**: Undisputed.

4. Moore, by and through his company, GVE, represented that he had a solid

---

[1]     These and the following statements are responsive to both the plaintiffs statements of fact submitted as Docket Entry 205-3 and 206-3.  206-3 is essentially identical but contain 3 additional statements (#s 38, 39 and 40) which are not statements of fact but conclusions.

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

2 of 23

1   commercial track record with respect to sourcing and commercializing COVID-19 Personal

2   Protective Equipment, including being able to source vaccines (specifically AstraZeneca

3   vaccines). Watson Decl. ¶ 8.

4       **RESPONSE**: Admitted.

5       5. Moore provided RIL with a Sales and Purchase Agreement (the "Contract") for

6   the purchase of vaccines through GVE. Watson Decl.¶ 9; Exh. A, Longo Decl. ¶ 5; Exh.

7   2

8       **RESPONSE**: Denied as stated.  Moore provided an agreement to Watson, which

9   was marked up and returned in redline form.  The agreement revised is what was executed

10   by GVE and RIL.  See, Docket Entry 153, Declaration of Moore at ¶ 16 and Docket Entry

11   153-1, Exhibit I.

12       6. The Contract identified, Defendant Charles Z. Stein, Esq. ("Stein") as the escrow

13   agent/paymaster ("Escrow Agent").  Watson Decl. ¶ 10; Exh. B at p. 3, Art. 4

14   Longo Decl. ¶ 5; Exh. 2 at p. 3, Art. 4

15       **RESPONSE**: Admitted.

16       7. Stein is a partner at Defendant Davidovich Stein Law Group ("DS Law"), a

17   California law firm. Stein and DS Law were entrusted with safeguarding the RIL's funds.

18   RIL and Stein executed an Escrow and Paymaster Agreement, dated April 16, 2021.

19   Watson Decl. ¶ 10; Exh. B

20       **RESPONSE**: Neither admitted nor denied.  The Paymaster Agreement speaks for

21   itself.

22       8. As compensation, Stein/DS Law were to be paid a .2% fee, equal to $24,400.00.

23

24     *RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1*
*STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY*
*JUDGMENT AND CONCLUSIONS OF LAW*

25

26           3 of 23

1   Watson Decl. ¶ 11; Exh. B at p. 2, para 2(d)(i)

2       **RESPONSE**: Admitted.

3       9. The Contract was executed by RIL and GVE on or around April 16, 2021.

4   Watson Decl. ¶ 12; Exh. A; Longo Decl. ¶ 5; Exh. 2

5       **RESPONSE**: Admitted.

6       10. Per the terms of the Contract, RIL was to pay $10.2. million ("Purchase Price")

7   for one million AstraZeneca vaccines ("Vaccines"), and a $2 million commission to GVE

8   upon delivery of the Vaccines ("GVE Commission"). GVE was to deliver the Vaccines

9   within seven days of receipt of an invoice from AstraZeneca. Watson Decl. ¶ 13; Exh. A

10  at pp. 3-4, Art. 4, Longo Decl. ¶ 5; Exh. 2 at pp. 3-4, Art. 4

11      **RESPONSE**: The terms of the agreement speak for itself.

12      11. Delivery of the Vaccines was determined upon RIL's receipt of an original bill of

13  lading ("Original Bill of Lading"), evidencing delivery via air to Barbados. Watson Decl. ¶

14  13; Exh. A at p. 4, Art. 5; Longo Decl. ¶ 5; Exh. 2 at pp. 3-4, Art. 5.

15      **RESPONSE**:  The terms of the agreement speak for itself.

16      12. Upon execution of the Contract, RIL was to deposit the sum of $12.2 million

17  (collectively, the "Funds") into the Stein/DS Law escrow account ("Escrow Account"), to be

18  released in accordance with the terms set forth in the Escrow Agreement. RIL did, in fact,

19  deposit the Funds into the Escrow Account.  Watson Decl. ¶ 14; Exh. A at p. 4, Art. 5 ;

20  Longo Decl. ¶¶ 5, 8; Exh. 2 at pp. 3-4, Art. 5; Exh. 5

21      **RESPONSE**: Admitted.  The terms of the agreement speak for itself.

22      13. The Escrow Agreement provides: "WHEREAS the Buyer desires assurances

23

24  *RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1*
    *STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY*
    *JUDGMENT AND CONCLUSIONS OF LAW*

25

26

1  that the funds placed into the escrow account will be released to the Manufacturer of the

2  Products in accordance with the terms of the Purchase Agreement and that the

3  commission due to Seller will be released red upon delivery of the original bill of lading to

4  the Buyer in respect of the Products shipped by AstraZeneca to the Buyer within the

5  timeline stated in the Purchase Agreement."

6  Watson Decl. ¶ 16; Exh. B at p. 1.

7      **RESPONSE**:  The terms of the agreement speak for itself.

8      14. If the Vaccines were delivered, and full performance was rendered under the

9  Contract, RIL would instruct Defendant Stein, vis-à-vis written instructions, to release from

10  the Escrow Account the remaining sum of $2 million as payment for the GVE Commission.

11  Watson Decl. ¶ 18.

12      **RESPONSE**:  The terms of the agreement speak for itself.

13      15. Moore/GVE were to provide RIL with an invoice from AstraZeneca within 24

14  hours of the Funds being escrowed. On or about April 22, 2021, after numerous demands,

15  Moore/GVE provided RIL with a highly redacted copy of an invoice allegedly from

16  AstraZeneca. Watson Decl. ¶ 19; Exh. C; Longo Decl. ¶ 6; Exh. 3

17      **RESPONSE**: Admitted.  The invoice was provided to Moore by Prestige and in turn

18  provided to RIL.  See, Docket Entry 153, Declaration of Moore at ¶ 20-21 and Docket Entry

19  153-1, Exhibit M.

20      16. Subsequently, RIL demanded production of an unredacted version of the invoice

21  – containing the information required further to the terms of the Contract. Despite RIL's

22  repeated demands that Moore/GVE provide a conforming AstraZeneca Invoice - Moore

23

24  *RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1*
   *STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY*
   *JUDGMENT AND CONCLUSIONS OF LAW*

25

26

1  stated that he could not do so, due to confidentiality provisions with certain intermediaries.

2  Notwithstanding the issues with the invoice, Moore assured RIL that everything was fine

3  and that he would provide RIL with opinion letters from Stein/DS Law and the law firm of

4  Warner Norcross + Judd, LLP, confirming and assuring RIL in writing that GVE had

5  negotiated contracts with AstraZeneca and accordingly would be able to source and deliver

6  the vaccines as per the terms of the Contract.  Watson Decl. ¶¶ 20-24; Exh. D, Longo Decl.

7  ¶ 7; Exh. 4

8          **RESPONSE**: Admitted.

9          17. As early as April 20, 2021, prior to Escrow Agent's receipt of the Funds, Moore

10  communicated with Stein, unbeknownst to RIL, and told him that Moore/GVE stood to

11  make $8 million of the $12.2 million, and that Moore would make Stein a "millionaire."

12  Watson Decl. ¶¶ 25-26; Exh. E at pp. 5-6 (RIL00004-RIL00006) Longo Decl. ¶ 10; Exh. 7

13  at pp. 5-6 (RIL00004-RIL00006)

14          **RESPONSE**: Admitted.

15          18. After the Funds were transferred to the Escrow Agent, Moore disclosed that the

16  Funds could not be sent directly to AstraZeneca as provided for in the Contract and Escrow

17  Agreement – but instead needed to go through an authorized supplier with a specific

18  AstraZeneca supply contract and allocation.

19  Watson Decl. ¶ 28

20          **RESPONSE**: Admitted.

21          19. Moore identified co-Defendant Prestige Pegasus LLC ("Prestige") and its CEO,

22  co-Defendant Moniladai Coley ("Coley") as being an authorized supplier with a specific

23

24  *RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1*
    *STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY*
    *JUDGMENT AND CONCLUSIONS OF LAW*

25
26

1  AstraZeneca supply contract and allocation holder.

2  Watson Decl. ¶ 28

3      **RESPONSE**: Admitted.

4      20. Moore represented that GVE had a supply contract with Prestige to procure

5  RIL's Vaccines. Watson Decl. ¶ 28

6      **RESPONSE**: It is admitted that Moore represented on behalf of GVE that Prestige

7  was the company through which the vaccines were being sourced.

8      21. On or about April 27, 2021 and May 3, 2021, and as later confirmed by Stein to

9  RIL, Stein made the following wire transfers in direct violation of the Escrow Agreement:

10  (i) $4.2 million total to Moore via GVE in two separate wire transfers; (ii) $2 million to Coley

11  via Prestige; (iii) $485,000 to RDS Cargo Group, a foreign freight company, supposedly

12  based out of Dubai. Watson Decl. ¶¶ 31-32, Longo Decl. ¶ 10; Exh. 6.

13      **RESPONSE**: Denied.  See, Docket Entry 153, Declaration of Moore at ¶¶ 21-25.

14      22. RIL did not authorize any other disbursement of the Funds which were deposited

15  into the Escrow Account other than the following: $10.2 million to AstraZeneca or Prestige

16  as a "qualified intermediary." Watson Decl. ¶ 33.

17      **RESPONSE**: Denied.  See, Docket Entry 153, Declaration of Moore at ¶¶ 21-25.

18      23. Moore and Stein were working together against RIL's interest, and contrary to

19  RIL's understanding that Stein/DS Law were neutral and disinterested in the transaction.

20  Watson Decl. ¶ 34, See generally Exh. 7 to Longo Decl.

21      **RESPONSE**: Denied.  Moore, on behalf of GVE advised Stein of the price that

22  Prestige had agreed to pay and also gave Stein information which given to him regarding

23

24      *RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1*
*STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY*
*JUDGMENT AND CONCLUSIONS OF LAW*

25

26              7 of 23

1   the transportation costs of the vaccines to Barbados.  Moore had every reason and hope

2   that the matter would be concluded since he had a significant profit built into the

3   agreement.  See, Docket Entry 153, Declaration of Moore at ¶¶ 21-25.

4         24. Moore offered Stein a "Bonus" if the transaction was successful, compromising

5   his duty as a third-party escrow agent. Watson Decl. ¶ 34; Exh. F, Longo Decl. ¶ 20; Exh.

6   17.

7         **RESPONSE**: It is admitted that Moore offered a bonus.   The remainder is not a

8   factual statement.

9         25. Moore offered to make Stein a millionaire if the transaction closed.  Watson

10  Decl. ¶ 34; Exh. E at p. 6 (RIL00006), Longo Decl. ¶ 10; Exh. 7 at p. 6 (RIL00006)

11        **RESPONSE**: It is admitted that such language was used but it is clearly boasting.

12        26. Based on communications between Moore and Stein, the GVE Commission was

13  to   go   to   Moore's   "brokers."   Watson   Decl.   ¶   36;   Exh.   E   at   pp.   5-6

14  (RIL00004-RIL00006)Longo Decl. ¶ 10; Exh. 7 at pp. 5-6 (RIL00004-RIL00006)

15        **RESPONSE**: Admitted.

16        27. The Vaccines were never delivered to Barbados, despite Moore's repeated

17  assurances. Watson Decl. ¶ 38

18        **RESPONSE**: Admitted.

19        28. In or about June 2021, RIL sought to terminate the transaction as the Vaccines

20  were not delivered to Barbados per the terms of the Contract. RIL sought the return of its

21  Funds. Watson Decl. ¶ 38, Longo Decl. ¶ 11; Exh. 8

22        **RESPONSE**: Admitted.

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1
STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY
JUDGMENT AND CONCLUSIONS OF LAW*

29. RIL learned that Stein had misappropriated the Funds, and that GVE had actually received $4.2 million, which RIL did not authorize at any time.  Watson Decl. ¶ 32, 37, See generally Exh. 6 to Longo Decl.

**RESPONSE**: It is admitted that GVE received 4.2 million which was a portion of its profit from the transaction.

30. Moore was asked via e-mail by RIL, Stein, and by his own attorney, Jonathan Sutton, to return the Funds. The Funds were never returned. Longo Decl. ¶ 17; Exh. 14

**RESPONSE**: Denied.   The email in question, when you review the entire string refers to the funds held by Stein and the addendum (release) to the paymaster agreement that forms the basis of Stein's motion for summary judgment.

31. Moore/GVE spent or withdrew the majority (if not all) of the $4.2 million in RIL Funds wired by Stein. The monies were used at various nightclubs and gentlemen's clubs, to purchase, inter alia, luxury vehicles, plastic surgery, expensive trips, and to fund the lifestyles of multiple exotic dancers. Watson Decl. ¶ 42, Longo Decl. ¶ 19; Exh. 16. [Moore Deposition Transcript] at pp. 164-178.  See generally Exh. 15 to Longo Decl.

**RESPONSE**: Watson's declaration is neither a statement or fact nor otherwise admissible.  Rather, it is literally hearsay based upon what her counsel told her e.g. "based upon my understanding."  Nothwithstanding this, it is admitted that Moore spent a great deal of money although the cited portions of the deposition make no reference to "exotic dancers" or "gentlemans clubs."

32. Moore withdrew $10,000.00 in cash from the GVE bank account more than one-hundred times between May and August of 2021.  See generally Exh. 15 to Longo

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

9 of 23

1  Decl.

2  **RESPONSE**: Denied.  It is admitted that there were multiple withdrawals of cash

3  from the GVE Bank Account and multiple transfers and even multiple deposits.  Moore was

4  not the only person authorized to withdraw on the account.  Maria Hernandez was also

5  authorized to withdraw funds and in fact withdrew funds which she eventually replaced and

6  which resulted in her being removed from the account.  See, Id. Docket Entry 205-1 at

7  pages 303-04 (Deposition of Moore at 171-172).

8  33. Moore spent hundreds of thousands of dollars on exotic dancers in West Palm

9  Beach, Florida. Moore gave a woman named "Nyla Tito" whom he met at the Rhino

10  Gentleman's Club $300,000.00-$500,000.00. Moore gave up to $100,000.00 to another

11  exotic dancer named Roxie Romero, whom he also met at the Rhino Gentleman's club.

12  Longo Decl. ¶ 19; Exh. 16 [Moore Deposition Transcript] at pp. 165-168, See generally

13  Exh. 15 to Longo Decl.

14  **RESPONSE**: Is is admitted that he spent money on persons he met at a night club.

15  Nothing in the deposition identifies them as exotic dancer. Id.  Notwithstanding this, if the

16  company and ultimately Moore were entitled to the profit, it makes no difference what he

17  spent the money on or how much he spent.

18  34. Moore spent $100,000.00 on a BMW 850i.  Longo Decl. ¶ 19; Exh. 16, [Moore

19  Deposition Transcript] at p. 177, See generally Exh. 15 to Longo Decl.

20  **RESPONSE**: It is admitted that a check drawn off of a GVE account purchased a

21  BMW which was titled in the name of GVE.  Docket Entry 205-1 at pages 309-310

22  (Deposition of Moore at 177-178).

23

24  *RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1*
   *STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY*
   *JUDGMENT AND CONCLUSIONS OF LAW*

25

26

35. Moore gave his mother Joyce Moore $200,000.00 Longo Decl. ¶ 19; Exh. 16 [Moore Deposition Transcript] at p. 170, See generally Exh. 15 to Longo Decl.

**RESPONSE**: Admitted.

36. Because the Vaccines were never delivered per the terms of the Contract, Moore/GVE had no entitlement to the Funds or any portion thereof.

Watson Decl. ¶ 42; Exh. A, Longo Decl. ¶ 5; Exh. 2

**RESPONSE**: Denied.  See GVE and Moore's Statements below.

37. With respect to Moore/GVE, RIL has been damaged in the amount of $4.2 million. Watson Decl. ¶ 42.

**RESPONSE**: Denied.  See, GVE and Moore's Statements below.

38. In its Counter-Complaint, GVE does not specify any claim as to RIL. Longo Decl. ¶ 21; Exh. 18.

**RESPONSE**: Denied, See Longo Decl. ¶ 21; Exh. 18.

39. In its Counter-Complaint, GVE does not reference and/or provide any evidence in support its allegations.

Longo Decl. ¶ 21; Exh. 18

**RESPONSE**: Denied, See Longo Decl. ¶ 21; Exh. 18.

40. GVE has failed to provide any evidence, factual or otherwise, to support any claim as to RIL during the pendency of this litigation.

Longo Decl. ¶ 21; Exh. 18

**RESPONSE**: Denied, See Longo Decl. ¶ 21; Exh. 18.

---

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### B.   GVE'S AND MOORE'S STATEMENTS OF UNDISPUTED MATERIAL FACT.

41.     Good Vibrations Entertainment, LLC (GVE) is a sole member LLC.   Docket Entry 153, Declaration of Moore at ¶ 1

42.     In the summer of 2020, GVE began to get involved in the personal protective equipment supply chain as a result of the significant need for personal protective equipment (PPE) resulting from the Covid-19 global epidemic or pandemic. As a result of GVE's entry into this market Moore came in contact with Linda Salud Margon as a result of a company that she owned that had a large presents in the medical supply business. That company is known as United Product and Distribution (UPD) which is owned by LSM Trading.  Docket Entry 153, Declaration of Moore at ¶ 2-3

43.     Toward the end of 2020 as a number of companies, universities and governments were ultimately successful in testing their various formula for a COVID-19 vaccine and completion of some clinical trials, AstraZeneca received emergency marketing authorization (referred to in the United States as emergency use authorization) for the distribution and use of AstraZeneca vaccine which was known as AZD1222. Docket Entry 153, Declaration of Moore at ¶ 4-5

44.     The EMA granted by the World Heath Organization and the European Community (EU) extended the use or EUA to persons above the age of 18 years.  Docket Entry 153, Declaration of Moore at ¶ 6

45.     Given the demand for vaccines worldwide, it was safe to assume that not all of the AZD1222 vaccine was or could be produced at a single facility.

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

46.     The largest vaccine manufacturing facility in the world is located in India and is owned and operated by Serum Institute.  India as a whole, and Serum in particular, supply a significant portion of the vaccines used in the world.  In late UPD contractors were provided with some information and forms that were needed in order for UPD to provide AZD-1222 vaccines with a price set at $3.70 per dose or vial. Docket Entries 153, Declaration of Moore at ¶ 8-10 and 153-1 Exhibit A and B.

47.     GVE became aware that Radical or Barbados had approached UPD about obtaining the Astra Vaccine.  Docket Entries 153, Declaration of Moore at ¶ 11 and 153-1 Exhibits C and D.

48.     Radical was purportedly representing the Government of Barbados which was also trying to obtain the single dose Johnson & Johnson-Janssen vaccines through an individual named Cheryl Chambley.   Id.

49.     Radical and/or the Government of Barbados clearly understood that the vaccines would be manufactured under a license from AstraZeneca or at an AstraZeneca partner.  At the time, the world demand for Covid 19 vaccines was significanty greater than anything that could be supplied out of a single facility.  The April 6, 2021 letter from the Barbados Ministry of Health specifically refers to Embassy calls between Barbados and India, the location of Serum Institute which manufactured the bulk of the vaccine under the name Covishield.  Serum had been on board to manufacture the vaccine as far back as 2020.  Docket Entries 153, Declaration of Moore at ¶ 13 and 153-1 Exhibit E.

50.     As far as obtaining vaccines out of a Belgium manufacturing facility, every government trying to obtain the vaccine and their agents, knew or should have known that

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

13 of 23

the British Government and the EU which had funded the research by AstraZeneca was first in line with the order and in fact both were embroiled in a dispute over the failure of Astra Zeneca to timely delivery of the 400 million promised doses. Docket Entries 153, Declaration of Moore at ¶ 14.

51.  Ultimately, the dispute resulted in the EU taking legal action against AstraZeneca in April 2021. The dispute had been brewing for sometime and was heavily covered in the media. Docket Entries 153, Declaration of Moore at ¶ 15 and 153-1, Exhibits F, G and H.

52.  In April 2021, GVE and Radical reached an agreement regarding obtaining or facilitating the AZD1222 vaccine which was being manufactured by a number of companies for AstraZeneca. The initial agreements were marked up by counsel for Radical. Exhibit I. The final versions of the Purchase Agreement, Paymaster Agreement along with the addition of a non-disclosure agreement were executed by the parties. Docket Entries 153, Declaration of Moore at ¶ 16 and 153-1 Exhibits J, K and L, respectively.

53.  Regardless of the titles used in the Purchase Agreement, Radical was not the buyer nor was GVE the seller. The seller in all COVID vaccine transactions was the manufacturer and the buyer had to be a government. The material received from UPD clearly indicated that they were for government sales only and the delivery point was the Barbados Ministry of Health and the authorization letter by the Ministry of Health clearly indicated that the government, not Radical, was the buyer. Docket Entries 153, Declaration of Moore at ¶ 17, 153-1, Exhibits B and C,

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

54.     GVE  was introduced to Prestige Pegasus through a business acquaintance because Prestige was trying to buy masks in a partnership of somekind with Protecti Global Holdings. Protecti was a very large player in the PPE industry.  Prestige was the entity that had the contacts with Serum which Moore, and in turn GVE, believed from published reports to be one of the largest vaccine manufacturer in the world and which would be manufacturing the AZD1222 vaccine.  Docket Entry 153, Declaration of Moore at ¶ 17-18.

55.     Radical was well aware of the fact that the contact would be through Prestige and in turn, Serum.  In fact, Olivia Watson, counsel for Radical is the person who placed the banking information for Prestige on the Irrevocable Pay Order to authorize payment to Prestige Pegasus.  Docket Entry 153, Declaration of Moore at ¶ 19.

56.     Prior to the release of the $10,200,000.00, Radical demanded and Prestige provided an AstraZeneca invoice which was provided to Radical per its request. It was blacked out when GVE received the invoice which did not strike Moore as unusual since he believed that Prestige probably had profit built in to the transaction and the amount  was being paid was likely substantially less than the amount which Radical had agreed to pay on behalf of Barbados.  Docket Entries 153, Declaration of Moore at ¶ 20 and 153-1 Exhibit M.

57.     The invoice was confusing in one sense because the buyer was actually the Government of Barbados  and  the  ultimate  seller  was  either  Serum  (the  purported allocation holder or AstraZeneca.   Id.

58.     It was even more confusing because the irrevocable pay order issued to the paymaster was to pay $10,200,000.00 to Prestige despite the fact that GVE was named

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1
STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY
JUDGMENT AND CONCLUSIONS OF LAW*

15 of 23

on the invoice as the buyer and the agreement called for it to be paid to AstraZeneca.  Id.

59.    Prestige had agreed to provide the vaccines through Serum for $2,000,000.00.  This could yield a substantial profit to GVE of $8,000,000.00 less the transportation costs.  Docket Entries 153, Declaration of Moore at ¶ 22

60.    Moore told Stein that Prestige was not supposed to get the entire $10,200,000.00 but only $2,000,000.00, the price for which it had agreed to provide the vaccines to Barbados.   Moore, on behalf of GVE, advised Stein to pay the transportation company.  Had the entire amount been paid to Prestige someone would have had to pay for the transportation.  Docket Entry 153, Declaration of Moore at ¶ 23.

61.    The information for the transportation company was provided by Prestige and forwarded to Stein.  Docket Entry 153, Declaration of Moore at ¶ 24.

62.    Rather than withdraw the entire profit, Moore told Stein to hold the remaining funds of approximately 5.5 million dollars.  Moore had some concern that Prestige might have underbid the amount but I was aware that 3.7 million dollars would cover the last price quoted through UPD for one million doses at $3.70 per dose.  Docket Entry 153, Declaration of Moore at ¶ 25.

63.    Within about one week, Radical discovered what Prestige was being paid when they were sent an email outlining the amounts paid out of the escrow account.  Exhibit N.  Docket Entries 153, Declaration of Moore at ¶ 26 and 153-1, Exhibit N.

64.    Radical began to deal directly with Prestige and Serum which they were prohibited from doing under the confidentiality agreement.  As a result of dealing with Prestige, Coley started attempting to deal directly with the government of Barbados and

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

16 of 23

attempted to get the government to enter into a contract directly with Prestige for $23.00 a dose which was less than price Radical was charging the Docket Entries 153, Declaration of Moore at ¶ 27 and 153-1, Exhibit O.

65.     Rather than wait for the vaccines to actually be manufactured and delivered, once Radical discovered how much it was paying relative to the cost it got buyers remorse and cancelled the order in an attempt to increase its profit and in effect cut GVE and Prestige out of the equation.   Docket Entry 153, Declaration of Moore at ¶ 28.

66.     The effect of Radical's action is that Barbados has not vaccinated many of its people, (other than those dosages received prior to the transaction in question) despite the fact that the vaccines could have been supplied and there was a sufficient supply out of the India based manufacturer of the AZ1222 vaccine.   Docket Entry 153, Declaration of Moore at ¶ 29.

67.     According to multiple reports, Serum shutdown the production of the vaccine in December 2021 because its inventory of the AstraZeneca vaccine topped 200,000,000 doses and there was not sufficient demand.  Docket Entries 153, Declaration of Moore at ¶ 29 and 153-1, Exhibit P.

68.     The agreement modified by counsel for Radical and approved by her and entered into between Radical and GVE provided the following clause:

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

**Art. 12 Force Majeure**

The parties shall not be in breach of any of its obligation under this Agreement where **failure to perform or delay in performing any obligations is due wholly or in part, directly or indirectly, upon the occurrence of: Act of God, act of public enemy, act of governmental bodies or agencies foreign or domestic, sabotage, riot, fire, floods, typhoon, explosions or other catastrophes, epidemics or quarantine restrictions, labour unrest or labour sabotages, accident, freight embargoes, exhaustion of rawmaterials, delays occasioned by carriers or delays of a seller of the seller or because any other event beyond the control of the seller, for the period of time occasioned by any such occurrence.** A party is not liable under a force majeure event in so far as it proves (a) that the failure was due to an impediment beyond its control, (b) that it could not reasonably be expected to have taken the impediment and its effects upon its ability to perform into account at the time of the conclusion of the contract, and (c) that it could not reasonably have avoided or overcome the impediment or its effects.

Docket Entries 153, Declaration of Moore at ¶ 16 and 153-1, Exhibit J.

69.     At all time relevant to this action, there was a global pandemic, know as COVID-19.  Astra Zeneca was unable to keep up with demand to provide AZD-1222 on a timely basis to Great Britain, let alone to others who had impending orders for its vaccine. Docket Entries 153, Declaration of Moore at ¶¶ 14-15 and 153-1, Exhibits F-H.

70.     At the time Radical terminated the agreement, monies had already been disbursed to cover freight charges and to purchase the vaccine through Prestige.  Docket Entries 153, Declaration of Moore at ¶¶ 31-32.

71.     At the time Radical terminated the agreement, Astra Zeneca was behind on filling its pre-existing orders.  Docket Entries 153, Declaration of Moore at ¶ 29 and 153-1, Exhibit P.

---

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

18 of 23

72.    Overtime, and particularly toward the end of 2021 Serum Institute a manufacturer of the AZD-1222 vaccine under the name of Covidshield had more than sufficient supplies of the vaccine to have filled the order had it not been terminated.  Serum Institute amassed an inventory of nearly a quarter billion doses and couldn't even give it away.   Docket Entries 153, Declaration of Moore at ¶ 29 and 153-1, Exhibit P.

73.    In light of the force majeur provision in the agreement and the outstanding orders, had the contract was terminated before GVE was given the opportunity to perform even assuming Coley absconded with the money she received, there was sufficient monies remaining to covered the cost of the vaccines through Serum Institute, UPD or another AstraZeneca licensed manufacturer or supplier.  Docket Entries 153, Declaration of Moore at ¶ 40 and 153-1, Exhibits P.

## CONCLUSIONS OF LAW

1.    GVE entered into an agreement with Radical.  At the time of the agreement, regardless of the terms used, The buyer of the vaccine was the Government of Barbados.

2.    The agreement provided a force majeure clause which provided as follows:

**Art. 12 Force Majeure**

The parties shall not be in breach of any of its obligation under this Agreement where **failure to perform or delay in performing any obligations is due wholly or in part, directly or indirectly, upon the occurrence of: Act of God, act of public enemy, act of governmental bodies or agencies foreign or domestic, sabotage, riot, fire, floods, typhoon, explosions or other catastrophes, epidemics or quarantine restrictions, labour unrest or labour sabotages, accident, freight embargoes, exhaustion of rawmaterials, delays occasioned by carriers or delays of a seller of the seller or because any other event beyond the control of**

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

**the seller, for the period of time occasioned by any such occurrence.** A party is not liable under a force majeure event in so far as it proves (a) that the failure was due to an impediment beyond its control, (b) that it could not reasonably be expected to have taken the impediment and its effects upon its ability to perform into account at the time of the conclusion of the contract, and (c) that it could not reasonably have avoided or overcome the impediment or its effects.

At the time of the agreement the vaccines Radical was attempting to procure for the Barbados Government were being manufactured by Astra Zeneca and a number of its licensees.  However, Astra was behind on its delivery schedule to Great Britain and the EU and after the agreement between the parties Great Britain the the EU sued Astra  and became embroiled in litigation over its delivery schedule and back orders to others governments.  The world was in a pandemic and the ultimate supplier of the vaccines failure to meet its delivery schedule, not to mention the fact that there was a global pandemic were beyond the control of GVE and/or Moore.  As such strict compliance with the time frames set forth in the contract could not be enforced. See, ***Watson Lab'ys, Inc. v. Rhone-Poulenc Rorer, Inc***., 178 F. Supp. 2d 1099 (C.D. Cal. 2001), See also, ***InterPetrol Bermuda Ltd. v. Kaiser Aluminum Int'l Corp***., 719 F.2d 992 (9th Cir. 1983)

 3. Furthermore, it was the Plaintiff that specifically authorized the transfer to Prestige Pegasus.  The fact that Prestige Pegasus failed to perform, and appears to have defrauded all parties is not within the control of GVE.  GVE had already caused funds to be transferred to the freight company to secure transportation of the vaccines one they were available and Prestige was obviously not going to perform, GVE had available sources through United Products Distribution the allocation holder for vaccines from Astra

---

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

1   and it could have done so for a price within the profit it had originally built into transaction.

2   Based upon GVE's ability to source the products elsewhere, had the money not been

3   demanded back by and the contract terminated. Based upon the undisputed fact that GVE

4   could have supplied the vaccine through an alternative source, Radical wrongfully

5   terminated the agreement and GVE was entitled to the benefit of its bargain, that is it was

6   entitled to continue to source and provide the vaccines in light of the force majeure

7   provision.  As such, Radical's termination of the contract breached the contract in light of

8   the force majeure clause approved by its own counsel and GVE is entitled to all of its

9   expenses including lost profits resulting from Radical's breach which excused its own

10  performance when the funds were returned to Radical. ***Navarro v. Jeffries***, 181 Cal. App.

11  2d 454, 5 Cal. Rptr. 435 (Ct. App. 1960)

12                                  Respectfully submitted,

13

14                                  */s/ Michael T. Stoller*
                                    Michael T. Stoller (SBN 120241)
15                                  **STOLLER LAW GROUP,PC.**
                                    5747 Hoback Glen Road
16                                  Hidden Hills, California 91302
                                    (310) 245-4028
17                                  (424) 702-3201 facsimile
                                    michael.stoller@stollerlawgroup.com
18
                                    */s/ John D. Schwalb*
19                                  **JOHN D. SCHWALB, PLLC**
                                    120 Third Avenue South
20                                  Franklin, Tennessee 37064-2511
                                    (615) 794-7100
21                                  (615) 794-6333
                                    john@jdschwalb.com
22

23  ─────────────────────────────────────────────

24  ***RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1
    STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY
    JUDGMENT AND CONCLUSIONS OF LAW***
25
                                    21 of 23
26

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served via the electronic filing system of the Central District of California all counsel or record including the following:

Gerardo A. Vazquez
gv@gvazquez.com
Ralph R. Longo, IV
rl@gvazquez.com
Steven B. Herzberg
sh@gvazquez.com
**VAZQUEZ & ASSOCIATES, P.A.**
1111 Brickell Ave., Suite 1550
Miami, Florida 33131

Maurice D. Pessah
maurice@pessahgroup.com
Summer E. Benson
sbenson@pessahgroup.com
**PESSAH LAW GROUP, PC**
661 N. Harper Ave., Suite 208
Los Angeles, CA 90048

Rinat Klier-Erlich
rerlich@zelmserlich.com
Brian T. Smith
bsmith@zelmserlich.com
**ZELMS ERLICH & MACK**
20920 Warner Center Lane, Suite B
Woodland Hills, California 91367

Mark T. Drooks
mdrooks@birdmarella.com
Sharon Mayer
smayer@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561

---

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*

and was served upon the following entities or persons via first class mail:

Prestige Pegasus LLC
c/o Rance Bauman, Registered Agent
7182 Edgewood Drive
Highlands Ranch, CO, 80130

Moniladae Coley
6625 Reseda Blvd.
Reseda, CA 91335

this 7th day of November 2022

/s/ John D. Schwalb

---

*RESPONSE TO GOOD VIBRATIONS ENTERTAINMENT AND MOORE TO PLAINTIFF'S L.R. 56.1 STATEMENT OF FACTS, STATEMENT OF ADDITIONAL FACTS PRECLUDING SUMMARY JUDGMENT AND CONCLUSIONS OF LAW*